# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

VINCI BRANDS LLC,

               Plaintiffs,

               vs.

COACH SERVICES, INC., KATE SPADE,
LLC, TAPESTRY, INC., and CASE-MATE,
INC.,

               Defendants.

---

Civil Action No. 1:23-CV-05138

Complaint

**JURY TRIAL DEMANDED**

---

## THIRD AMENDED COMPLAINT

Plaintiff Vinci Brands LLC ("Plaintiff" or "Vinci"), by its attorneys, Benesch Friedlander Coplan & Aronoff LLP, and Cooley LLP, for its Third Amended Complaint against Defendants Coach Services, Inc. ("Coach Services"), Kate Spade, LLC ("Kate Spade), Tapestry, Inc. ("Tapestry"), and Case-Mate, Inc. ("Case-Mate"), (Coach Services, Kate Spade, Tapestry, and Case-Mate are collectively referred to as "Defendants"; Coach Services, Kate Spade, and Tapestry are collectively referred to as "Kate Spade Defendants"), alleges as follows:

## NATURE OF ACTION

1.     This is an action for damages and temporary, preliminary, and permanent injunctive relief against the Kate Spade Defendants for breach of their obligations under a License Agreement and for invalidly and improperly terminating the License Agreement, for breaching its duty of good faith and fair dealing, and for aiding and abetting Case-Mate's breach of fiduciary duty; against Defendant Case-Mate for violating its Non-Disclosure Agreements with Vinci, for violating the covenant of good faith and fair dealing in its role as Vinci's lender; for engaging in unfair competition with Vinci while acting as its lender and otherwise; for violating its fiduciary duty to Vinci when it briefly served as Vinci's lender; and for tortiously interfering with the License Agreement between Kate Spade and Vinci; and against all

1

Defendants for their tortious interference with Plaintiff's existing contracts and business relationships with its suppliers and customers and its prospective business advantage with those suppliers and customers, and for their fraudulent conduct toward Vinci.

2.    Vinci is in the business of, among other things, providing consumer technology protection, primarily for smartphones. Vinci also offers shells, sleeves, bags, and power management, and it sold under brands such as Kate Spade New York and Coach.

3.    For the past ten years, Vinci or its predecessors have manufactured Kate Spade-branded protective cases for cell phones and other technology accessories under the License Agreement.  Vinci and its predecessors paid approximately $70 million in royalties and fees to the Kate Spade Defendants and sold tech accessories, primarily mobile phone cases, in excess of $1 billion at retail over the life of the license.

4.    Prior to the events that preceded this lawsuit, Vinci at all times met its financial obligations under the License Agreement, and in fact had overpaid Kate Spade on several occasions due to Kate Spade's inability to accurately account for amounts paid by Vinci and amounts owed to Kate Spade and to send timely and accurate invoices to Vinci, as required under the License Agreement.

5.    In the fall of 2022, the Omicron variant of the COVID virus began causing widespread business disruption through China.  In October and November 2022, Foxconn's factory in Zhengzhou, China, the world's biggest iPhone factory, was hit with the Omicron outbreak, which significantly disrupted the production of the recently launched iPhone 14.

6.    The Omicron outbreak led to government lockdowns, strikes, and riots at the Apple Foxconn factory, which further disrupted iPhone production at Foxconn.  These events were widely reported and well-known in the industry.

7.    The disruption at Foxconn led to a shortage of new iPhone 14 devices just after the iPhone

14 had "launched" in the market.

8.      The launch of a new iPhone model, and the months immediately following, is typically the period that generates the most iPhone sales.

9.      Correspondingly, this is also the period with the most sales of iPhone cases, as most consumers typically will buy a new case only when they buy a new phone.  And for a phone case manufacturer like Vinci, the yearly launch of the new Apple iPhone model in the Fall is the single most important period for its business.

10.     The disruptions at Foxconn thus occurred at the worst possible time for Apple, as well as for makers of cases, including Vinci, for the iPhone models produced at Foxconn.  The shortage of iPhone devices naturally led to a drop in sales of iPhones in the months following the disruption and naturally had a corresponding impact on the iPhone accessory market. Simply put, the absence of iPhones in stores meant the sale of fewer iPhone cases.

11.     Once retailers realized they would not be receiving the expected number of iPhone devices, they pulled back on their re-orders of forecasted quantities of iPhone cases.

12.     The effects of the Foxconn disruptions on Vinci's sales and revenue were significant and lasted at least through July 2023.

13.     Because the iPhone device shortage lasted well into 2023, many consumers chose to wait until the launch of the next iPhone model in Fall 2023 to buy a new phone case.  This meant that sales that were lost in the last quarter of 2022 could not be "made up" for until late in 2023.

14.     Still, as late as December 2, 2022, Kate Spade's Director of International Financial Planning and Analysis, was telling Tapestry's CFO that she did not "believe there [was] a risk with the [Vinci] account as they have paid on time consistently."

15.     That same day the Accounting Senior Manager at Tapestry, told a colleague that Vinci

3

had not been late on any payments.

16.     As soon as Vinci (along with the rest of the industry) discovered the events in China that caused the iPhone shortage, it informed the Kate Spade Defendants in Zoom calls and emails.

17.     Specifically, in December 2023, Vinci notified Kate Spade that, due to the Foxconn disruptions and the resulting unanticipated drop in case sales, it would be unable to make certain installment payments that it had planned to make that month.

18.     On December 15, 2022, Jackee de Lagarde, Kate Spade's Vice President of Global Licensing, acknowledged in an email to Vinci that "we are aware of the significant impact" that the events in China had had on Vinci's business.

19.     Because both the Kate Spade Defendants and Vinci understood that the sale of phone cases is so dependent on the availability of phones in the market, the License Agreement contained several provisions that were designed to protect Vinci in the event of, *inter alia*, disruptions to the supply chain or to product launches and related downturns in sales caused by events outside Vinci's control.

20.     Yet, rather than work with Vinci in good faith to weather the storm, and rather than negotiate in good faith with Vinci over various terms in the License Agreement, including the amount of Guaranteed Minimum Royalties that Vinci would be required to pay in light of the events in China, as was required under the License Agreement, the Kate Spade Defendants began colluding with Vinci's competitor Case-Mate to have Case-Mate replace Vinci as the Kate Spade licensee for tech accessories. The Kate Spade Defendants and Case-Mate engaged in a pattern of fraudulent conduct and misleading practices to string Vinci along so that the "Case-Mate Takeover" could succeed in a way that was maximally beneficial to Kate Spade and Case-Mate and financially ruinous for Vinci.

21.     In order to effectuate the "Case-Mate Takeover," the Kate Spade Defendants first deceived Vinci into thinking it would maintain its role as the Kate Spade licensee by encouraging Vinci

to complete all of the design, tooling, and manufacturing work in preparation for the iPhone 15 launch scheduled for September 2023, and to seek and secure "awards" and "forecasts" from customers, even when the Kate Spade Defendants knew that they were planning to replace Vinci with Case-Mate as the licensee shortly prior to the launch. The Kate Spade Defendants did so because at that time, the production cycle for phone cases was already in full swing, and Case-Mate would not have been able to meet the all-important iPhone 15 launch date unless Vinci was willing to and did perform all of the necessary groundwork for the launch. The Kate Spade Defendants and Case-Mate would then take and utilize that groundwork for their own benefit.

22.    In other words, the Kate Spade Defendants and Case-Mate took advantage of their superior knowledge so that Vinci would continue to perform under the contract, unwitting as to what was going on in the background. Had Vinci known that it was being replaced, it would not have expended significant financial and operational resources producing iPhone cases for a launch it would never reap benefit from, let alone perform that work in order to hand it to a competitor. The Defendants knew this, of course, and conspired to deceive Vinci into believing otherwise.

23.    Kate Spade's and Case-Mate's efforts to deceive Vinci took numerous forms. For example, in addition to urging Vinci to expedite and complete production work, the Kate-Spade Defendants made repeated (and unusual) requests for Vinci's customer information, editable artwork, SKU lists, top selling items, inventory reports, and more, under the guise that it was collaborating with Vinci on the execution of the iPhone 15 launch. In reality, the Kate Spade Defendants did so in order to pass that information along on to Case-Mate to enable it to prepare for the launch.

24.    Meanwhile, Case-Mate obtained confidential information from Vinci during two periods when it was considering purchasing a portion or all of Vinci's business. Although this "due diligence" information was supposed to be used *only* to consider a potential purchase, in reality, Case-Mate, which did not purchase Vinci, used the information to get the inside track on Vinci's suppliers, including what

products they were manufacturing and where they were in the process, and on Vinci's customers, including what styles and quantities they had ordered for the upcoming launch. Indeed, Case-Mate and Vinci executed a confidentiality agreement governing the diligence process at a time when Case-Mate knew, but Vinci did not know that Case-Mate was negotiating a separate transaction with Kate Spade to take over as licensee whether or not it purchased Vinci. Vinci would never have agreed to share its confidential information with Case-Mate had it known about Case-Mate's and Kate Spade's side negotiations.

25.     The final step of the plan was to put Vinci out of business. First, at the direction of its CEO, Steve Marzio, Case-Mate became Vinci's principal lender on May 16, 2023 by purchasing Vinci's senior debt from Vinci's existing principal lender, giving it total control over Vinci's finances. Case-Mate used this control to immediately choke off funding to Vinci, preventing it from paying vendors and other creditors, including Kate Spade.

26.     Next, again at Marzio's direction, Case-Mate announced on May 23, just nine days after it become Vinci's senior lender, that it would hold a public auction of Vinci's collateral, including its inventory of Kate Spade-branded merchandise. Case-Mate organized the auction in a manner that ensured that no other party would be able to bid on the collateral, allowing Case-Mate to take possession of Vinci's inventory of Kate Spade-branded merchandise for pennies on the dollar and then sell that inventory when it became Kate Spade's licensee.

27.     After pushing Vinci to produce phone cases for the launch, procure orders from customers, and share confidential information that they could then pass to Case-Mate, the Kate Spade Defendants purported to terminate the License Agreement with Vinci.

28.     The scheme continued even after the purported termination. Not satisfied with simply replacing Vinci with Case-Mate as the Kate Spade licensee, Defendants worked together to prevent Vinci from exercising its post-termination rights under the License Agreement to complete production of and

sell Kate Spade-branded merchandise that had been ordered in writing by Vinci's customers as of the termination date. Defendants did this by providing false and misleading information to Vinci's customers and suppliers about Vinci's right to produce and sell Kate Spade-branded merchandise.

29.     The Kate Spade Defendants and Case-Mate did this so that Case-Mate could take control of Vinci's completed inventory and in-process goods and sell those goods itself to Vinci's customers

30.     Accordingly, Vinci brings this action to recover damages it has suffered as a direct and proximate result of Defendants' misconduct, including: Defendants' fraudulent conduct against Vinci and their tortious interference with Vinci's existing contracts and business relationships with its suppliers and customers and its prospective business advantage with those suppliers and customers; Kate Spade's breaches of the License Agreement and of the covenant of good faith and fair dealing; Case-Mate's breach of the Non-Disclosure Agreements with Vinci; and  Case-Mate's violations of the implied covenant of good faith and fair dealing, it unfair competition with Vinci, its violations of its fiduciary duty to Vinci, and its tortious interference with the License Agreement between Vinci and Kate Spade.

## PARTIES

31.      Vinci is a Limited Liability Company organized under the laws of the State of Delaware, and has two members, Steve Latkovic, an individual domiciled in Ohio, and Glenn Pollack, an individual domiciled in Florida.

32.     Coach Services is a corporation organized under the laws of the State of Delaware, with its principal place of business in New York, New York.  It is a wholly owned subsidiary of Tapestry.

33.     Kate Spade is a Limited Liability Company organized under the laws of the State of Delaware, with its principal place of business in New York, New York. Its sole member is Coach Services. Kate Spade is an indirectly wholly owned subsidiary of Tapestry.

34.     Tapestry is a corporation organized and existing under the laws of the State of Maryland, with its principal place of business in New York, New York.

35.     Case-Mate is a corporation organized and existing under the laws of the state of Georgia, with its principal place of business in Atlanta, Georgia.

## JURISDICTION AND VENUE

36.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 in that there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

37.     This Court has personal jurisdiction over Defendants under N.Y. CPLR 301 and 302 as, upon information and belief, they are residents of New York, regularly transact business in New York, breached the contracts at issue in New York, committed tortious acts within New York, committed tortious acts that caused an injury within New York, and/or committed fraudulent acts that caused an injury in New York. In addition, the Kate Spade Defendants are bound to Paragraph 21.3 of the License Agreement and, as such, submitted themselves to the personal jurisdiction of this Court. Lastly, all Defendants have appeared in this matter and have voluntarily submitted to the jurisdiction of this Court.

38.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

## FACTS

**The License Agreement and Amendments Thereto**

39.     On or about April 25, 2014, Incipio Technologies, Inc. ("Incipio") and Kate Spade entered into a License Agreement. See Plaintiff's Second Amended Complaint ("SAC"), ECF 198, **Exhibit A**.[1] Per its terms, the License Agreement was not exclusive; though certain territories were considered by the parties to be exclusive to the Licensee.

40.     Pursuant to the License Agreement, Kate Spade, the Licensor, granted to Incipio, the Licensee, and the Licensee accepted, a license to "use the Licensed Marks in the Territory as a

---

[1] Vinci reincorporates Exhibits A-H of its SAC, as these exhibits are part of and were used in connection with the SAC. They are incorporated by reference as if fully set forth herein.

trademark(s) in connection with the manufacture, advertising, merchandising, promotion, sale and distribution of Approved Licensed Merchandise to Approved Customers." License Agreement, § 2.1(a). "Approved Licensed Merchandise" refers to the phone cases and other mobile and tech accessories that the Licensee designed using Kate Spade branding, and that Kate Spade approved during the parties' design review process.

41.    The parties' obligations under the License Agreement commenced on the Effective Date of the License Agreement, April 15, 2014, and continued through the Initial Term of the Agreement, December 31, 2016. *Id.*, § 3.1(a) and Schedule 3.1 thereto.

42.    The License Agreement provided the Licensee the option to extend the Initial Term by additional renewal terms so long as all terms and conditions of renewal were satisfied. *Id.*, § 3.1(b) and Schedule 3.1 thereto.

43.    Pursuant to the License Agreement, the Licensee agreed to pay the Licensor a Sales Royalty and various fees for each Contract Year in accordance with the schedule set forth therein. *Id.*, § 9.1(a) and Schedule 9.

44.    Pursuant to the License Agreement, the Licensee agreed to pay the Licensor Guaranteed Minimum Royalties ("GMR") for each Contract Year (as that term is defined in the License Agreement and amendments thereto) in accordance with the schedule set forth therein. *Id.*, § 8.1 and Schedule 8.

45.    Pursuant to the License Agreement, the Licensor delivers to the Licensee the template for the Quarterly Sales Report ("QSR") and the Licensee is to fill out the QSR thirty (30) days after the end of each quarterly period in each Contract Year. *Id.*, § 11.1(b). The QSR contains detailed schedules with over 400 lines of data that Vinci is required to insert. Per the License Agreement, the QSR requires detailed entries regarding sales, deductions, and royalties, as well as the amount of Sales Royalty and GMR payable for each reporting period. *Id.*

46.    Section 3 of the License Agreement specifies events of default under the License

Agreement.  If an event of default occurs and is continuing, the non-defaulting party may, by written notice to the defaulting party, immediately terminate the License Agreement. *Id.*, § 3.5.

47.    The first instance of a monetary default is subject to a three-business-day cure period. *Id*, § 3.3(a).

48.    In the event of termination or expiration of the License Agreement, each party "agreed that any announcement to the public or trade of the termination or expiration of this Agreement will be made only at a time, and by a joint statement mutually agreed upon by the parties." *Id.*, § 3.2.

49.    Upon a valid and proper termination of the License Agreement, even as the result of a default, the Licensee is permitted to complete production of Approved Licensed Merchandise that is in process, or for which written orders have been received by customers, all as of the date of termination of the Agreement. *Id.*, § 12.3.  The Licensee is also permitted to sell to customers Licensed Merchandise that was subject to a written order from a customer as of the date of termination. *Id.*, §§12.2, 12.3.  Finished inventory and "in process" merchandise that are not subject to a written customer order may be purchased by Licensor pursuant to an "inventory purchase option."

50.    The License Agreement also contains a confidentiality clause, which provides that "[n]either party will at any time disclose or divulge to any Person, or use or suffer the use by any other Person…, directly or indirectly, for its own or the benefit of any Person, any Confidential Information of the other party" for any purpose "other than solely as required for the manufacturing, advertising, merchandising, promoting, selling and distributing of Approved Licensed Merchandise in accordance with the terms of this Agreement." *Id.*, §15.2.  Confidential Information is defined as, without limitation, "business plans, designs, sketches, materials, colors, costs, pricing, customers, production techniques, sources of supply and other documents, non-public information and trade secrets." *Id.*, § 15.1.  The parties to the License Agreement acknowledge that the disclosure or use of Confidential Information, other than for the sole purposes of manufacturing, advertising, merchandising, promoting, selling and

distributing Approved Licensed Merchandise in accordance with the terms of this Agreement, would be wrongful and would cause irreparable injury." *Id*.

51.    Each party to the License Agreement further acknowledged that the other party would suffer great and irreparable harm as a result of the breach of any covenant or agreement to be performed or observed under the License Agreement and thus acknowledged that the non-breaching party would be entitled to apply for and receive from any court of competent jurisdiction a temporary restraining order, preliminary injunction, or permanent injunction, enjoining the breaching party from further breach of the License Agreement, without the need to prove damages or to post a bond or other security. Id., § 16.1.

52.    The License Agreement contains a forum selection clause, through which the parties agreed "that the State and Federal courts sitting in the State, County, and City of New York have exclusive jurisdiction in any action arising out of or connected in any way with the [License Agreement]." *Id.*, § 21.3.  To that end, each party to the License Agreement consented to personal jurisdiction of and venue in the State and Federal courts sitting in the State, County, and City of New York. *Id.*  The parties to the License Agreement further agreed that the agreement would be construed and interpreted in accordance with the laws of the State of New York. *Id*.

53.    Over the course of several years, the parties to the License Agreement entered into several Amendments to the License Agreement.

54.    On or about January 13, 2016, the Licensee (Incipio) and Kate Spade executed a Consent to Assignment and Amendment of License Agreements ("Consent to Assignment"), through which (a) the Licensee (Incipio) assigned all of its rights and obligations under the License Agreement (and any Amendments thereto) to Incipio, LLC, and (b) Kate Spade consented to the assignment.  *See* **Exhibit B**.

55.    On or about November 13, 2019, Incipio, LLC and Defendant Coach Services entered into a Fourth Amendment to the License Agreement. *See* **Exhibit C.** As set forth in the Fourth Amendment, Coach Services, as of February 2019, claimed it held the exclusive right to use, exploit, and

sublicense all trademark rights owned by Kate Spade including, without limitation, the Licensed Marks subject to the License Agreement.

56.    On or about August 6, 2021, Vinci entered into a Sale Agreement with Incipio, LLC whereby Incipio, LLC transferred and assigned, and Vinci accepted and assumed, the License Agreements and all amendments thereto.

57.    In 2021, Vinci and Coach Services (for the benefit of the Kate Spade New York brand) entered into a Consent Agreement whereby Coach Services acknowledged and consented to the assignment and assumption of the License Agreement by Vinci (the "Consent Agreement"). *See* **Exhibit D**. As part of the Consent Agreement, the parties agreed to execute a Sixth Amendment to the License Agreement and Vinci paid a $1 million "signing bonus" to Coach Services. *Id.*, § 2.

58.    On or about January 1, 2022, Plaintiff and Coach Services (for the benefit of the Kate Spade New York brand) entered into the Sixth Amendment to the License Agreement (the "Sixth Amendment"). *See* **Exhibit E**. As with all prior Amendments to the License Agreement, the Sixth Amendment provided that, except as expressly modified therein, all terms and conditions of the License Agreement are incorporated by reference and remain in full force and effect. *Id.*, § 8.

59.    Cognizant of the disruptions the industry had experienced at the outset of the pandemic, the parties to the License Agreement also agreed to a Force Majeure provision, which provides that neither party shall be liable for loss or damage or be deemed to be in default under the License Agreement if such party is prevented or delayed from timely performing any obligation under the Agreement by a Force Majeure Event, *i.e.*, a cause or circumstance beyond a party's reasonable control such as a pandemic, quarantine, public health emergency, civil disturbance, etc. *Id.*, § 6. In addition, if a Force Majeure Event occurred during the term of the License Agreement, the parties agreed to meet and negotiate in good faith **any** terms of the Agreement that either of the parties wished to address in light of the Force Majeure Event. *Id.*

60.     Per the Sixth Amendment, the parties agreed to the following amended Schedules: Schedule 3.1 (Term, Renewal); Schedule 3.3(g) (Minimum Net Sales), Schedule 7.2 (Image Fund Payment), Schedule 7.8 (Creative/Design Fee), Schedule 8 (Guaranteed Minimum Royalties), and Schedule 9 (Sales Royalty). *Id.*, § 7.

61.     Per the Sixth Amendment, the Second Renewal Term was defined as follows:  Contract Year 9 (January 1, 2022 through June 30, 2023); Contract Year 10 (July 1, 2023 through June 30, 2024); and Contract Year 11 (July 1, 2024 through June 30, 2025). *Id.*, Schedule 3.1.  Notably, Contract Year 9 was 18 months long, rather than the usual 12 months.

62.     Per the Sixth Amendment, the parties agreed that the Licensee's Minimum Net Sales of Licensed Merchandise shall equal or exceed $60 million for Contract Year 9.  In addition, the parties agreed to renegotiate in good faith the Minimum Net Sales for a given Contract Year if "[t]here is an unexpected variance (favorable or negative) in launch years or product introduction, or there are material device shortages or recalls outside of Licensee's control." *Id.*, Schedule 3.3(g).

63.     Per the Sixth Amendment, the parties agreed to a $6 million GMR for Contract Year 9, payments of which were to be made on a quarterly basis on a schedule to be determined by the parties. In addition, the parties agreed to renegotiate in good faith the amount of the GMR for a given Contract Year if "[t]here is an unexpected variance (favorable or negative) in launch years or product introduction, or there are material device shortages or recalls outside of Licensee's control." *Id.*, Schedule 8.

**Contract Year 9 and Vinci's Royalty Payments**

64.     Over the course of the License Agreement, Vinci successfully delivered Kate Spade phone cases in excess of $1 billion of retail sales and paid the Kate Spade Defendants over $70 million in license fees.

65.     At no point in time prior to Contract Year 9 had Kate Spade deemed Vinci to be in default of any of the provisions in the License Agreement.

66.     In fact, for Contract Year 8, Kate Spade overstated the amounts that Vinci owed, continuously delayed the reconciliation of Vinci's payments, and failed to timely provide invoices as required under the License Agreement.

67.     Vinci's payment obligations under the License Agreement fall into three categories: (1) Image Fund Payment, which is 4% of actual Net Sales; (2) Creative/Design Fee, which is 1% of Net Sales; and (3) Sales Royalty, which is 10% of Net Sales. Ex. E, Schedule 7.2; 7.8; and 9.

68.     As noted above, the License Agreement also established for each Contract Year "Guaranteed Minimum Royalties" (GMR), which for Contract Year 9 was $6 million. Ex. A, Section 8.1; Ex. E, Schedule 8.

69.     Because the GMR was based on the parties' expectation of future Net Sales by Licensee rather than any certain amount of sales, the License Agreement provided that the parties "agree to renegotiate in good faith the GMR for a given Contract Year" if "[t]here is at least 10% loss of distribution in such given Contract Year that is beyond Licensee's control (e.g., an Approved Full Price Customer ceases carrying Licensed Merchandise)" or "[t]here is an unexpected variance (favorable or negative) in launch years or product introduction, or there are material device shortages outside of Licensee's control." Ex. E, Schedule 8.

70.     Section 11.1 of the License Agreement requires Kate Spade to provide a Quarterly Royalty Statement (QRS) that sets forth the various royalties and fees called for in the License Agreement. The QRS is a locked form that Vinci is to fill out in order to report its sales and determine the amounts due. The information that is to be contained in the QRS is outlined in section 11.1 of the License Agreement.

71.     Schedules 7.2, 7.8, and 8 of the Sixth Amendment required Kate Spade to invoice Vinci for Image Fund Payments, Creative Design Fees, and any excess GMR following receipt of Vinci's Quarterly Sales Report (QSR) at the end of each quarter but only after Vinci delivered the QSR thirty

14

(30) days after the end of each quarter.

72.     Pursuant to the License Agreement, Vinci was not required to make any payments of royalties and fees and the Kate Spade Defendants were not entitled to receive any payments from Vinci until (1) Vinci submitted a QSR within 30 days after the end of each quarter, and (2) Kate Spade then delivered invoices to Vinci for royalty and fee payments.

73.     Despite the requirement that the Kate Spade Defendants provide invoices to Vinci for sales reported in the QRS, they did not do so in a timely fashion.  Indeed, the Kate Spade Defendants did not even provide Vinci with the correct QRS form to report its sales in Contract Year 9 until on or about August 15, 2022, nearly 8 months after Contract Year 9 had started and nearly 9 months after they were required to provide the form.  Moreover, the Kate Spade Defendants finally provided the form only after repeated entreaties from Vinci.

74.     Despite not having the sales reports Vinci that it needed to calculate the amounts due as a result of its own failure to send Vinci the proper form, Kate Spade nevertheless issued improper, inflated and incorrect invoices to Vinci in order to collect monies they were not entitled to.

75.     Throughout 2022, Vinci specifically (and repeatedly) requested that the Kate Spade Defendants provide proper and accurate invoices required under the License Agreement and Sixth Amendment.  For instance, on January 25, 2022, Kate Spade issued invoices to Vinci seeking GMR, Image Fund, and Creative/Design payments in excess of $1 million for the first quarter, even though the first quarter of Contract Year 9 had just begun.  There was no possible way those monies could be due then since Vinci was not supposed to even report its sales for the first quarter (upon which Image Fund and Creative/Design fees were based) until April 2022.

76.     For months thereafter, Kate Spade continued issuing improper, inaccurate, and untimely invoices to Vinci seeking various payments on schedules not set forth in the License Agreement or Sixth Amendment.  It was not until late summer of 2022 that Vinci, after repeated pleas to the Kate Spade

Defendants, received the invoices for 2021. Those invoices showed, and Kate Spade finally admitted, on July 25, 2022, that Vinci had overpaid Kate Spade by $179,769.33 for Contract Year 8.

77.     The Kate Spade Defendants' chronic billing problems wreaked havoc on Vinci's ability to manage its cash flow, as it never knew when Kate Spade would finally get around to sending an invoice or whether the invoiced amounts were correct.

78.     Even though payments were not yet due, Vinci began to make weekly payments in order to manage its cash flow and preempt any problems that would be created if the Kate Spade Defendants were to bombard Vinci with late invoices and demanded payment all at once.

79.     Notably, by October 26th, 2022, the date that Kate Spade finally delivered the QRS form for Contract Year 9, Vinci had already made payments on account of approximately $3.7 million dollars.

**Covid Outbreak and Other Events in China Cause Significant Business Disruption**

80.     In the Fall of 2022, the Omicron variant of SARS-CoV-2, the virus that causes COVID-19, began causing widespread business disruption through China.

81.     In October and November 2022, Foxconn's factory in Zhengzhou, China, the world's biggest iPhone factory, was hit with the Omicron outbreak, which significantly disrupted the production of iPhones.

82.     The Chinese government's "zero-Covid" policy then led it to mandate a quarantine of the factory.

83.     In addition, in November 2022, thousands of employees walked away from the factory following complaints about unsafe working conditions. A violent protest ensued over these conditions, as well as unmet pay expectations.

84.     During this time, Apple announced that Foxconn's factory in Zhengzhou was operating at significantly reduced capacity, and that it now expected lower iPhone 14 Pro and iPhone 14 Pro Max shipments than it had previously.

16

85.    The resulting shortage of iPhones and disruption of the iPhone 14 launch caused a severe deleterious impact on sales of iPhone cases and other accessories, resulting in a significant decrease in revenues for Vinci, in both the short term and long term.

86.    By the time that retailers recognized that there would not be sufficient supply of iPhone 14s, it was too late to change their forecasts for cases and accessories. Retailers thus proceeded to cancel or reduce purchase orders for product that had already been produced based on previously formulated forecasts.

87.    Based on the reduced stock of the iPhone 14s, retailers sold substantially fewer cases, causing their own inventory of cases to pile up. This led to retailers delaying payment to iPhone case companies for product already received, as national retailers normally do not pay for products that have not sold through to the end user.

88.    Phone case vendors, such as Vinci, thus found themselves squeezed from a cash perspective—they were stuck with extra inventory, not getting paid for goods already shipped to customers, had to pay their suppliers for goods already produced, and were not able to sell their product on time or at the normal price.

89.    Apple's production delays due to the Omicron outbreak, lockdowns and quarantines, strikes, and civil unrest were an unforeseeable circumstance for any company that derives its revenue from the iPhone ecosystem.

90.    Between December 2022 and March 2023, there was constant dialogue between Vinci and Kate Spade—via phone calls, videoconferences, emails, and letters—regarding the events in China, the shortage of iPhone devices and disruption of the iPhone 14 launch, the decline in sales of iPhone cases, and the impact of all this on Vinci and its ability to pay fees and royalties to Kate Spade.

91.    On December 1, 2022, weeks prior to the end of the quarter ending on the last day of December, Kate Spade sent Vinci a letter, claiming that, as of that date, Vinci owed over $7 million in

17

royalties and fees. *See* **Exhibit F**.

92.     The outstanding amounts set forth in the December 1, 2022 letter appeared to reflect what the Kate Spade Defendants believed would be due at the **end** of Contract Year 9 if Vinci made $60 million in sales. These amounts therefore were necessarily based purely on estimates, since Contract Year 9 would not conclude until June 30, 2023. This meant that a significant portion of these amounts would not actually have been due until at least August 2023, nine months later.

93.     Specifically, the Kate Spade Defendants represented that the amount owed by Vinci as of December 1, 2022 included GMR in the amount of $4,497,436, total estimated Image Fund payments in the amount of $1,518,066, and total estimated Creative/Design Fee fees in the amount of $429,511. These amounts were calculated based on estimated revenue of $60 million for Contract Year 9 without regard to the amount of actual sales, and without any invoices, QRS, or any other documentation supporting the claimed amounts.  Based on the License Agreement and the applicable Schedules thereto, as well as the invoices issued by Kate Spade as of December 1, 2022 and received by Vinci, Kate Spade grossly overstated and improperly accelerated the amount due under the License Agreement.  The Kate Spade Defendants' December 1, 2022 letter, while overstating Vinci's outstanding debt by millions of dollars, also set forth a proposed payment plan for all of Vinci's Contract Year 9 payments based on the Kate Spade Defendants' *estimates* of what Vinci would owe.

94.     The letter was signed by Charlotte Warshaw, the North America Vice President of Wholesale, Travel Retail, and Global Licensing for Kate Spade and had a block for a countersignature from Vinci.  Vinci did not sign or agree to the payment plan, and later expressly told the Kate Spade Defendants that it could not agree to that plan in light of the effects of the events in China on its sales and revenue.

95.     The Kate Spade Defendants knew full well that Vinci did not and could not owe $7 million on December 1, 2022 because Contract Year 9 still had many months remaining and such an amount

would have accounted for unaccrued future royalties and fees.

96.    On or around December 13, 2022, Vinci notified the Kate Spade Defendants in a Zoom call and via a follow-up email, *see* **Exhibit G**, that the events in China, which were clearly outside Vinci's reasonable control, and their impact on the production of iPhones, would significantly and negatively affect Vinci's ability to make timely payments under the License Agreement. Vinci specifically notified the Kate Spade Defendants that these events would result in a significant decrease of iPhone sales and cause Vinci serious financial hardship, since such a decrease would necessarily also mean a decrease in sale of iPhone accessories, and that it expected the disruption to last for a significant period of time.

97.    It was clear that the Kate Spade Defendants were aware of the disruptions caused by Covid-19, the events in China, and the effect on Vinci and their other business partners.

98.    For instance, on December 15, 2022, the Kate Spade Defendants, in an email from Jackee de Lagarde, Kate Spade's Vice President of Global Licensing, acknowledged Vinci's notice from their December 13, 2022 email and Zoom call and expressly recognized that the aforementioned events would result in a decrease in the production and sale of iPhones and would cause Vinci financial hardship for a significant period of time. *See* **Exhibit H**.

99.    On December 20, 2022, Kate Spade's President Liz Fraser texted CFO Jim Capiola that Kate Spade itself "may see a sharp decline in delivery on time performances…with Covid sweeping China we'll get hurt through supply chain."

100.    On January 5, 2023, Vinci's Chief Financial Officer expressly communicated to the Kate Spade Defendants that Vinci could not commit to any payment schedule until it had clarity on when the iPhone shortage would abate.

101.    In its February 2023 10-Q filing, Tapestry similarly acknowledged the impact of Covid-19 stating: "The ongoing Covid-19 pandemic continues to impact a significant majority of the regions in which we operate resulting in significant global business disruptions. The widespread impact of Covid-19

19

resulted in temporary closures of directly operated stores globally as well as at our wholesale and licensing partners starting in fiscal 2020. Since then certain directly operated stores and the stores of our wholesale and licensing partners have experienced temporary re-closures or are operating under tighter restrictions in compliance with local government regulation."

**Vinci Enters into the Siena Loan**

102.    On August 6, 2021, Vinci entered into a loan agreement (the "Siena Loan Agreement") with Siena Lending Group ("Siena"), making Siena a secured creditor of Vinci. The Siena Loan Agreement was amended ten times, most recently on May 8, 2023.

103.    Pursuant to the Siena Loan Agreement, Vinci requested advances on the Siena loan based on a borrowing base which computed its availability under a line of credit. Advances would increase the loan balance. Vinci utilized advances under the Siena Loan Agreement for ordinary business expenses such as payroll and vendor payments.

104.    Each day when Vinci received funds from its customers, Siena would "sweep" the funds from Vinci's bank accounts, which would reduce the loan balance while creating more availability for advances. Each time Vinci needed more funds, Siena would then advance the funds it had "swept" back to Vinci, in accordance with the amounts reflected in the "borrowing base."

105.    The Kate Spade Defendants were made aware of the Siena Loan by entering a Consent Agreement on November 23, 2021, pursuant to which Kate Spade acknowledged and consented to Vinci's grant to Siena of a security interest in and collateral assignment of rights to manufactured and in-process Kate Spade-branded products. In other words, the priority lienholder under the Siena Loan, in the event of a termination of the license or a default on the loan, would be able to foreclose on, seize, distribute, or sell all of Vinci's Kate-Spade-related products without having to worry about violating Kate Spade's trademark rights. Specifically, the Consent Agreement states that, in the event of a default the Lender: (i) "may take possession of all or a portion of the [Merchandise]" (*Id.*, ¶ 4(a)(i)); (ii) "may

contact, send notices to, and communicate with, any Approved Customer or Approved Distributor for the purpose of selling the [Merchandise] to such Approved Customer or Approved Distributor…" (*Id.*, ¶ 4(a)(ii)); (iii) "may monetize the [Merchandise] in whole or in part…(*Id.*, ¶ 4(a)(iii)); and (iv) states that "all collections of accounts receivable generated from the [Merchandise] shall be free and clear of any rights, claims or interests of [Kate Spade] and [Kate Spade] shall have no rights, claims or interests in any proceeds of the [Merchandise]…" (*Id.*, ¶ 4(a)(iv)). Under the terms of the Consent Agreement, none of these actions would violate Kate Spade's trademark rights.

106.    On February 10, 2023, Siena issued a Notice of Default and Reservation of Rights to Vinci, notifying Vinci that Siena deemed Vinci to be in default because more than 75% of Vinci's accounts payable were more than sixty days past due.  Vinci's past-due accounts were a direct result of the Force Majeure Event's significant disruption to Vinci's business.  A true and correct copy of the Notice of Default is attached as **Exhibit I**.

107.    However, Siena did not accelerate the loan or exercise any default remedies against Vinci's assets under the Siena Loan Agreement.  Instead, the Notice stated—both in the title and in the body of the letter—that Siena was reserving its rights.

108.    At no time did Siena make a demand for payment of the loan.

109.    Notwithstanding Siena's declaration of an Event of Default under the Siena Loan Agreement, the Ninth Amendment to that agreement, dated as of April 4, 2023, and executed by Siena, stated at Section 3(e):  "No Default. No event has occurred and is continuing that constitutes a Default or an Event of Default."

110.    Accordingly, as of April 4, 2023, Vinci was not in default under the Siena Loan Agreement.

111.    However, on May 11, 2023, not seeing Vinci's sales recover from the effects of the device shortage, Siena issued a notice of a UCC Article 9 foreclosure sale of the underlying Collateral securing

the Siena Loan (the "Siena Article 9 Notice") and sent the Kate Spade Defendants a letter notifying them of Vinci's default and Siena's intent to sell substantially all right, title, and interest in and to Vinci's collateral.

112.    The Siena Loan Agreement gave Siena power of attorney to act on Vinci's behalf in providing notice.

113.    Despite receiving this notice, the Kate Spade Defendants did not issue a default letter to Vinci under the License Agreement based on Vinci's default on the Siena Loan.

114.    Weeks later, on May 26, 2023, the Kate Spade Defendants, in response to Siena's Article 9 Notice, issued a Reservation of Rights letter. But they still did not issue any default letter to Vinci based on Vinci's default on the Siena Loan.

115.    Siena sent Vinci a draft Notification of Public Sale of Collateral by Secured Creditor Pursuant to Uniform Commercial Code that would announce a public sale of Vinci's collateral.

116.     Notably, however, Siena did not actually publish the draft notice.

117.    The public sale never occurred because, as described below, the Siena Loan was bought by and assigned to Case-Mate in advance of the scheduled sale on May 18, 2023.

118.    At no time did Siena accelerate the loan or exercise any default remedies against Vinci's assets under the Siena Loan Agreement.

**Defendants Engage in a Scheme to Unlawfully Replace Vinci with Case-Mate as the KSNY Licensee**

A.    The Kate Spade Defendants Put Pressure on Vinci and Begin Implementing the Case-Mate Takeover Scheme

119.    In early January of 2023, Case-Mate's Vice President of Business Development Kristen Roney reached out to Charlotte Warshaw.  Case-Mate was purportedly interested in seeing if there was a strategic fit between the two companies in light of the struggles affecting the rest of the industry. Warshaw proposed a meeting.

120.    In or around February 2023, Kate Spade CFO, Jim Capiola, sent a message to Charlotte Warshaw stating, about Vinci, "I feel they may eventually ask for a reduction in GMR." Warshaw replied, "I wouldn't be open/inclined to doing that." Capiola then directed Warshaw to "have Casemate [*sic*] come in for a pitch."

121.    Although no meeting occurred right away, as the cash flow problems arising out of the Covid disruptions in China continued for Vinci, the Kate Spade Defendants began plotting to replace Vinci with Case-Mate as Kate Spade's licensee notwithstanding that Vinci was not in default on the License Agreement due to the Force Majeure Event and that the Agreement did not expire for two more years.  Specifically, on March 13, 2023, Warshaw texted Capiola that she was working on a meeting in New York City with Case-Mate.  Capiola responded that he would like to "put pressure on Vinci and see if they respond."

122.    The Kate Spade Defendants did in fact put pressure on Vinci and began hatching their plan to wrongfully terminate the License Agreement.  On March 17, 2023, the Kate Spade Defendants, knowing they were chronically delinquent in sending invoices to Vinci, hurriedly decided to process and send invoices to Vinci the following Monday, March 20, 2023 so that they could send a notice of non-payment the same day, despite knowing that payment of invoices was not due for at least 30 days after issuance and knowing that Vinci would not be able to make payment within the three-day period contemplated by the notice.

123.    The invoice and notice of non-payment did go out on March 20, 2023.  Despite the constant updates from Vinci and the Kate Spade Defendants' acknowledgement of the Force Majeure Event and device shortage, the Kate Spade Defendants, through a letter from Ms. de Lagarde, told Vinci that it had failed to make certain payments under Section 3.3(a) of the License Agreement and that they deemed Vinci's failure to pay to be an event of default. A true and correct copy of the March 20, 2023 de Lagarde letter is attached hereto as **Exhibit J**.  As noted above, the outstanding amounts set forth in

the March 20, 2023 letter were based on estimates of amounts that *would* be due on June 30, 2023, and further ignored Kate Spade's rights under the Force Majeure provision. Given that Contract Year 9 had yet to conclude, those amounts could not possibly be owed as of March 20. Based on the License Agreement and the applicable Schedules thereto, and the invoices issued by Kate Spade and received by Vinci, the March 20, 2023 letter, once again, grossly overstated the amount actually due at that time under the License Agreement.

124.    On March 22, Capiola sent a message to Warshaw stating, "after default letter is sent to Vinci, we should talk to them together. I will play bad cop."

125.    On or about March 22, 2023, in response to de Lagarde's March 20 notice of non-payment and demand for immediate payment, Vinci again informed Kate Spade, as it had since December 2022, that Apple had been unable to deliver iPhone 14 devices to market expectations, as Covid-19 restrictions and the other events recounted above had significantly affected production at Apple's primary assembly facility in China. A true and correct copy of Vinci's March 22, 2023 letter is attached hereto as **Exhibit K**.

126.    Vinci further noted that "[s]uch supply issues continued to have a materially negative impact and ripple effect on the mobile accessory market," bringing the mobile accessory industry "to a standstill, resulting in significant disruption to [Vinci's] business." Due to this Force Majeure Event, Vinci notified Kate Spade that it could not be deemed to be in default under the License Agreement.

127.    In addition, Vinci, as it was permitted to do under both the Force Majeure provision and Schedule 8 of the License Agreement, expressly requested that the parties meet and renegotiate in good faith the GMR (as a result of the significant business disruption caused by the Force Majeure Event in China and its effect on Vinci's sales, revenues, and ability to pay), as well as other terms of the Agreement, such as payment obligations, minimum net sales, royalty rates, extensions, defaults, notices and any other term potentially impacting the licensing relationship, that needed to be addressed in light

of the Force Majeure Event. *Id*. The License Agreement, Sixth Amendment, and Schedules 3.3(g) and 8 thereto required the parties to engage in good faith negotiations regarding the amount of GMR and regarding other provisions of the License Agreement in light of what had transpired.

128.    The next day, on March 23, 2023, Warshaw told Brian Stech, Vinci's then-CEO, that the notice of non-payment was "not a threat to terminate" the License Agreement.  This was a lie, as just five days later, Warshaw privately told Capiola that a notice of default would be sent to Vinci very soon.

129.    Despite Vinci's requests, the Kate Spade Defendants adamantly refused to meet and negotiate in good faith concerning the GMR or any other provisions of the License Agreement. In fact, on March 31, 2023, the Kate Spade Defendants rejected out of hand Vinci's March 22, 2023 request to meet and negotiate in good faith, calling it a "non-starter."  Indeed, the letter emphasized explicitly that "[n]othing in this letter shall be taken as a concession or agreement that any term of the License Agreement, including Schedule 8 or Schedule 3.3(g), warrants renegotiation or is being renegotiated." Instead, the Kate Spade Defendants insisted that Vinci "acknowledge[]…its payment obligations and mak[e] the outstanding payments" as a condition of the Kate Spade Defendants' willingness even "to consider any continuing partnership." A true and correct copy of the March 31, 2023 letter is attached hereto as **Exhibit L**.  In that letter, the Kate Spade Defendants expressly recognized that Vinci disputed that it owed the amounts claimed in the March 20, 2023 Notice of Default.

130.    Also on March 31, 2023, the Kate Spade Defendants sent a "Notice of Default" letter to Vinci, demanding that Vinci pay $3,753,122.00, a true and correct copy of which is attached hereto as **Exhibit M**. Internal Kate Spade emails show that this amount was grossly and knowingly inflated, as it included a month of payments that was not technically in arrears and compounded interest, which was not permitted under the License Agreement.

131.    Kate Spade thus breached its obligations under the License Agreement and the amendments thereto by failing to meet in good faith and negotiate the GMR.

132.    Kate Spade also breached its obligations under the License Agreement and the amendments thereto by failing to meet and renegotiate any other term impacting the licensing relationship between Vinci and Kate Spade.

133.    Kate Spade further breached its obligations under the License Agreement by declaring a default, when any default based on non-payment was barred by the Force Majeure provision of the License Agreement, since Vinci's inability to perform its payment obligations was caused by the Force Majeure Event.

134.    In addition, Kate Spade breached its obligations under the License Agreement by knowingly basing its declaration of default on an inaccurate accounting of the amount due from Vinci.

135.    Even after sending the March 31, 2023 letters and in spite of the continuing pressure on Vinci to make payments that Kate Spade knew Vinci could not make and that were not in fact due under the License Agreement, it did not terminate the License Agreement, and, as noted above, took care to comfort Vinci that it was not threatening termination.  Instead, the Kate Spade Defendants urged Vinci to complete preparations for the Fall 2023 iPhone launch, all while engaging in detailed and extended discussions with Vinci's competitor Case-Mate and its CEO, Steve Marzio, about replacing Vinci as Kate Spade's licensee.

B.    Defendants Plot the Takeover

136.    On or around March 16, 2023, the Kate Spade Defendants and Case-Mate entered into a non-disclosure agreement.  That agreement begins by stating, "Whereas the parties are discussing a potential license…."

137.    By early April 2023, the Kate Spade Defendants began more formal discussions and meetings with Case-Mate about replacing Vinci as Kate Spade's licensee.  Vinci had no reason to suspect that Defendants were colluding behind its back, given that two years remained on the term of the License Agreement, Kate Spade and Vinci were fully collaborating on the designs and tools for the upcoming

iPhone 15 launch scheduled for September 2023, the Kate Spade Defendants were pressuring Vinci to complete production for that launch, the Kate Spade Defendants advised Vinci that they were not threatening to terminate the License Agreement, and the Kate Spade Defendants had no right to do so in light of Vinci's invocation of the Force Majeure clause.

138.    Defendants needed Vinci to keep investing efforts in producing cases and procuring customer orders for the forthcoming September 2023 iPhone 15 launch.  Any disruption in the tight design and production schedule would mean that no Kate Spade-branded phone cases would be ready for that launch, and Kate Spade would lose significant revenue.  From Defendants' perspective, it was thus essential for Vinci to continue spending time and resources toward the launch and to fully expect to participate in that launch. At the same time, it was critical that Vinci *never suspect* that Kate Spade had begun planning to replace Vinci as the licensee.  Vinci would not have expended time and resources or secured orders from its customers for Kate Spade-branded merchandise if it had known that Kate Spade was intending to replace Vinci before it could ever benefit from its hard work and significant expenditures.  Thus, while Kate Spade continued to pressure Vinci for payments did not owe, it simultaneously needed Vinci to falsely think that the parties' operating relationship was business as usual.

139.    By mid-April, and unbeknownst to Vinci, the Kate Spade Defendants had effectively decided that they would pursue an agreement with Case-Mate to replace Vinci as licensee. Indeed, on April 12, 2023, Warshaw and Capiola agreed to "move on to another [licensing] partner."  Warshaw explained that Kate Spade needed to time this move effectively, "while also getting our money."

140.    Warshaw and Capiola were the Kate Spade officers principally responsible for deciding to move forward with the plan to have Case-Mate replace Vinci as the licensee.

141.    Despite the Kate Spade Defendants' covert decision to move on from Vinci, Kate Spade continued to push Vinci to be prepared for the iPhone 15 launch.  For example, on April 13—the day

after Warshaw and Capiola had decided to replace Vinci with Case-Mate—the Kate Spade Defendants sent Vinci a May 10, 2023 meeting invite for a "Final Prototype Review (fall 2023 launch)" with Kate Spade. The meeting was intended for the Kate Spade Defendants to provide final comments in real time on the Kate Spade-branded case samples provided by Vinci for the Fall 2023 iPhone 15 launch. On information and belief, that meeting occurred as planned. The very same day, de Lagarde sent Case-Mate an email with the key information Case-Mate needed to start preparing to take over for Vinci.

142.    Lacking the Kate Spade Defendants' superior knowledge that Kate Spade was going to replace Vinci with Case-Mate for the iPhone 15 launch, Vinci continued to oblige the Kate Spade Defendants' requests to perform under the License Agreement. Further, Vinci tried to make royalty payments to Kate Spade. In May 2023, despite its severe, ongoing cash crunch due to the Force Majeure Event, Vinci paid $400,000 on account in a good faith gesture, even after the Kate Spade Defendants refused to negotiate in good faith with Vinci as required under the License Agreement and amendments thereto.

143.    On May 2, de Lagarde sent Case-Mate a term sheet to fill out.

144.    Warshaw and de Lagarde, along with Tapestry's Assistant Secretary, Director, and Senior Counsel Jonathan Malki, were principally responsible for negotiating the new license agreement with Case-Mate on behalf of Kate Spade.

145.    Case-Mate's CFO, Tuan Pham; along with Roney and Marzio were principally responsible for negotiating the license agreement on behalf of Case-Mate.

146.    Around the same time, the Kate Spade Defendants were still relying on and encouraging Vinci's efforts to have phone cases manufactured and prepared for the launch that they knew Vinci would not participate in. For example, notes from a May 4, 2023 internal meeting between de Lagarde and one of her reports indicate that de Lagarde's colleague had recently asked Vinci to send Kate Spade two "samples." Subsequent emails between the Vinci and Kate Spade design teams on May 18, May 30, June

2, and June 5 confirm that the Kate Spade Defendants continued to encourage Vinci to send "sample" designs and mockups for Kate Spade's review, and to begin arranging for the approved designs to be manufactured.

147.    During her deposition, de Lagarde acknowledged that in early May 2023, the Kate Spade Defendants were still communicating with Vinci and acting as though it was "business as usual."

148.    On May 16, Marzio met with Warshaw and Capiola regarding, among other things, Case-Mate's impending License Agreement, and plans for the upcoming iPhone 15 launch in fall 2023.

149.    On May 19, 2023, Warshaw texted Capiola that Kate Spade and Case-Mate had agreed on terms for Case-Mate to take over the Kate Spade license.  That same day, Warshaw sent an email to Case-Mate with a revised term sheet, writing "if the Case Mate side is aligned with the above, we are looking forward to moving forward!"

150.    Three days later, on May 22, 2023, Warshaw confirmed in a message to Capiola that Kate Spade would move on from Vinci in favor of Case-Mate, stating: "Case-Mate agreed to our terms and we're moving forward."

151.    As of June 5, 2023, nearly two months after the Kate Spade Defendants had decided that they would replace Vinci and that Vinci would reap no benefit from the iPhone 15 launch, and weeks after terms with Case-Mate had been formally agreed upon, the Kate Spade Defendants were *still* instructing Vinci to proceed with preparations for the iPhone 15 launch.

152.     Indeed, three days earlier, Warshaw had a telephone call with Charles Tebele of ACS Group Acquisitions, LLC ("ACS"), which at that point had become Vinci's primary lender and had paid off the Siena/Case-Mate loan.  Warshaw's notes from the call reveal that Tebele placed an emphasis on working together to meet the iPhone 15 launch.  Warshaw did nothing to dissuade Tebele of the notion that Vinci would remain the Kate Spade licensee.

153.    Warshaw then spoke with Marzio about her call with Tebele.

154.    Kate Spade and Case-Mate ultimately executed their new license agreement on June 14, 2023, the same day Kate Spade purported to terminate the License agreement with Vinci.

C.    Defendants Extract Information from Vinci under False Pretenses

155.    Case-Mate's impending, but secret, replacement of Vinci as Kate Spade's licensee presented a problem for meeting the iPhone 15 launch, because it would be much too late for Case-Mate to start preparing for launch from scratch upon signing its license agreement with Kate Spade in mid-June, just three months before the iPhone 15 release date.

156.    Preparing for a new iPhone launch is an iterative process between the licensee, licensor, customers, and suppliers as they discuss and share different versions of design ideas until they reach consensus on final designs.  The licensee must then make samples and obtain necessary approvals from the licensor.  It then must work with manufacturers to design and fabricate the tooling to make the phone cases, and reach agreement with manufacturers on production contracts.  And it must work with customers to obtain "forecasts" and "awards," which constitute, in writing, the number of each design each customer will buy over the coming months.  This process takes many months, usually starting over a year in advance of a new iPhone launch.

157.    Vinci's customers are among the largest retailers in the world.  They work collaboratively with Vinci in selecting products, and typically reach the *end* of their process and make their final decisions by the May before a fall launch.

158.    There was thus no way that Kate Spade could bring in a new licensee in June and still expect to produce and deliver cases in time to make the iPhone launch in September.

159.    To solve this problem—and cognizant of the fact that they could not tell Vinci it was a lame duck and was about to be terminated—Defendants endeavored to obtain information critical to Case-Mate's preparations for launch from Vinci under false pretenses.

160.    Case-Mate was able to do so by virtue of the fact that it had considered, but ultimately did

not follow through on, purchasing part or all of Vinci, and thereby obtained critical due diligence information.  Specifically, in a January 23, 2023 email to Steve Latkovic of Candlewood Partners, Marzio, expressed an interest in purchasing Vinci's Incase brand.

161.    Accordingly, on or about January 26, 2023, Vinci and Case-Mate entered into a Confidentiality Agreement (the "First Confidentiality Agreement"), a true and correct copy of which is attached hereto as **Exhibit N**.  Marzio authorized Case-Mate's CFO to sign the agreement on his behalf.

162.    Pursuant to the First Confidentiality Agreement, Case-Mate acknowledged that certain confidential information, defined as Evaluation Material, would be disclosed to it during the course of negotiations and affirmatively agreed not to disclose any Evaluation Material to any person and not to use any Evaluation Material in any way "detrimental to [Vinci] or for any business or competitive purpose other than its evaluation or negotiation of the contemplated purchase."  *Id.*, ¶ 2.

163.    Case-Mate further agreed not to reproduce or copy any Evaluation Material without Vinci's prior written permission, to return all Evaluation Material if Case-Mate ceased being interested in the contemplated purchase, and to destroy all notes or memos relating to the Evaluation Material."  *Id.*, ¶ 4.

164.    Case-Mate further agreed that money damages would not be an adequate remedy for any breach of the First Confidentiality Agreement, that Vinci would be entitled to injunctive relief for any threatened or actual breach of the agreement, and that Case-Mate would waive any requirement for the securing or posting of any bond in connection with such a remedy.  *Id.*, ¶ 6.

165.    The parties to the First Confidentiality Agreement further agreed that the prevailing party in any litigation relating to the First Confidentiality Agreement shall be entitled to recover from the non-prevailing party all such costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) incurred by the prevailing party in connection with such litigation.  *Id.*, ¶ 13.

166.    Following the execution of the First Confidentiality Agreement and as part of Case-

31

Mate's contemplated purchase of Vinci's Incase brand, Vinci disclosed its confidential and sensitive business and financial information to Case-Mate, including its revenue, product costs, customer lists, and inventory on hand for the Incase brand.

167.    Within a week of executing the First Confidentiality Agreement and after receiving Vinci's confidential and sensitive business and financial information, Marzio suddenly told Vinci that Case-Mate was no longer interested in pursuing the contemplated purchase.

168.    However, in April 2023, Case-Mate, through Marzio, once again expressed an interest in purchasing Vinci's business and brands, rather than just Vinci's Incase brand.  Notably, this was *after* Defendants had begun discussing Case-Mate's replacement of Vinci as Kate Spade's licensee. Accordingly, on or about April 18, 2023, Vinci and Case-Mate entered into second a Confidentiality Agreement (the "Second Confidentiality Agreement"), a true and correct copy of which is attached hereto as **Exhibit O**.  Prior to executing the Second Confidentiality Agreement, Case-Mate did *not* tell Vinci that it was simultaneously negotiating with Kate Spade to replace Vinci as licensee—information that would have caused Vinci not to disclose its confidential business information to Case-Mate.

169.    Marzio acted as Case-Mate's "point person" with regard to Case-Mate's purported interest in purchasing all or some of Vinci and its review of Vinci's confidential information.

170.    The Second Confidentiality Agreement, like the First Confidentiality Agreement, prohibited Case-Mate from disclosing Vinci's confidential and sensitive business and financial information or using it in any way detrimental to Vinci or for any business or competitive purpose other than Case-Mate's evaluation of the contemplated transaction.

171.    Following the execution of the Second Confidentiality Agreement, Vinci again disclosed large amounts of confidential and sensitive business and financial information to Case-Mate, including information in connection with the Siena Loan, information about Vinci's suppliers for the fall 2023 iPhone launch, the terms of Vinci's License Agreement with Kate Spade, and its on-hand Kate Spade

and Coach inventory.

172.    At the same time, of course, Case-Mate was engaged in discussions with the Kate Spade Defendants to take over the Vinci License Agreement regardless of whether Case-Mate purchased Vinci. Case-Mate officers and employees openly admitted in internal correspondence that Case-Mate was using the information obtained from the Vinci due diligence to prepare for the launch on the assumption that Case-Mate would replace Vinci as Kate Spade's licensee one way or the other.

173.    For example, on May 12, 2023, Marzio sent Vinci a "very urgent" due diligence request for Vinci's License Agreement with Kate Spade and all the amendments thereto. But this was not a due diligence request. Marzio received the Agreement and amendments the same day and immediately forwarded them to Kristen Roney, the Case-Mate employee who was actively negotiating the Kate Spade license on behalf of Case-Mate. Marzio asked Roney to review Vinci's License Agreement and identify any points of interest. Later that day, Marzio received from Roney a summary of the key provisions, including Vinci's royalty rate. Less than an hour later, Roney sent comments back to Kate Spade with Case-Mate's latest counteroffer, reflecting that she had used the Vinci License Agreement received in the supposed due diligence process to inform Case-Mate's negotiations to replace Vinci as Kate Spade's licensee, including, among other things, on the royalty rate Case-Mate would pay Kate Spade.

174.    On May 15, 2023, Marzio received a message on Google Chat from Roney confirming that Case-Mate had made a counter-offer to Kate Spade that would "guarantee existing business," *i.e.*, that it would give Case Mate the same license rights (*e.g.*, territories, product types) that Vinci had.

175.    Marzio continued to wrongfully funnel his team due diligence information Vinci had provided to Case-Mate based on Case-Mate's representations that it was legitimately interested in purchasing Vinci. On May 16, Marzio and his team discussed the SKU counts (*i.e.*, the quantity of each type of case) for Kate Spade and Coach that Verizon had ordered for the Fall 2023 launch, based on a spreadsheet Vinci had provided to Marzio in Case-Mate's ostensible due diligence just days before.

Marzio also directed a Case-Mate financial analyst to model the predicted revenue from the Kate Spade and Coach licenses through the end of 2023 using Vinci's Q1 sales data. This was clearly not done to further Case-Mate's evaluation of a Vinci acquisition, as Case-Mate used that data in talking points for a call with Kate Spade pushing back on Kate Spade's estimated revenue for the iPhone 15 launch.

176.    Then, on May 17, 2023, Case-Mate's Chief Operating Officer, Keshav Mehta asked Vinci for several notable pieces of information, including Vinci's contract with one of its main distributors, Superior, the top 50 launch SKUs with factory costs and names, a list of inventory at Superior, and a list of SKUs at a warehouse. Twenty minutes later, Mehta sent an email internally to the leadership group at Case-Mate—including Marzio and Founder/Chairman Shashi Reddy—explaining that they were going to use the Superior contract with Vinci for their launch prep plans.

177.    On May 24, 2023, nearly a week after Case-Mate and Kate Spade had agreed on the terms by which Case-Mate would take over the license (unbeknownst to Vinci), Roney instructed the Case-Mate financial analyst to use the inventory data Vinci had provided Case-Mate in due diligence to analyze what inventory Case-Mate might be able to take from Vinci. The analyst asked whether he was "supposed to be using that data." The analyst understood that Case-Mate was deceptively using data provided by Vinci in due diligence to figure out what SKUs were selling to prepare for its takeover of the Kate Spade license. Importantly, this was after Case-Mate's purported negotiations to purchase Vinci (described in more detail below) had broken down.

178.    Case-Mate went beyond misappropriating the data provided in due diligence by Vinci. In a June 18, 2023 text exchange, Marzio went as far as encouraging Roney to tell a key account executive Case-Mate hired away from Vinci to bring all the confidential information she acquired while at Vinci with her to Case-Mate. Roney agreed.

179.    For their part, the Kate Spade Defendants solicited Vinci for detailed information related to Vinci's launch prep under the guise that Vinci would be maintaining the Kate Spade license, when, in

reality, they intended to, and did, forward that information to Case-Mate so *it* could use the information to prepare for the September launch.

180.    For example, on May 24, 2023, Case-Mate sent de Lagarde and Warshaw a list of "things that will help us execute launch."  Those "things" included confidential information of Vinci, such as designs and packaging files.  The "designs" constituted the actual phone cases with Kate Spade prints that Vinci had spent months perfecting.  The "packaging files" were Vinci's proprietary and confidential designs for the packaging of the phone cases, at least as long as the License Agreement was in effect.  For 2023, Vinci spent months developing plastic-free packaging for its iPhone 15 cases.  De Lagarde texted Warshaw individually, explaining that Kate Spade and Case-Mate would "need to partner as best as possible in order to hit launch."  So, on May 25, 2023, de Lagarde sent Case-Mate Vinci's packaging files, along with the iPhone 15 spring design catalog for Kate Spade, and Vinci's forecasts from Verizon.

181.    The next day, de Lagarde emailed back and forth with Case-Mate, sharing the launch styles for Vinci's top three customers, Verizon, Target, and Best Buy.  These were the design selections that Vinci had secured awards for.  This was Vinci's highly confidential information that Kate Spade was sharing with Case-Mate, which was not yet a licensee, in order to help Case-Mate meet the iPhone 15 launch once it replaced Vinci as the licensee and took over Vinci's designs, production process, and customer orders.

182.    Separately, the packaging files that de Lagarde had also sent to Case-Mate turned out to be unusable because they were in the wrong format.  Case-Mate needed the ".ai" files that Vinci's design team created in order to edit the files and create production-ready images.  So Case-Mate asked de Lagarde to try and get those .ai files from Vinci.  De Lagarde proceeded to lie to Vinci in order to get those files on May 25, asking a Vinci employee to provide all iterations of its packaging artwork for Kate Spade for the iPhone 15 launch.  Sensing that this request was out of the ordinary, the employee asked de Lagarde to clarify the request and did not send the files.

183.    After her first unsuccessful attempt, de Lagarde on May 26 emailed a lower-level Vinci designer to request the .ai files, this time without copying the more senior Vinci employee who had previously questioned the request.  De Lagarde represented that Kate Spade needed the files for "two new home licensees."  This was a lie, as de Lagarde solicited the files to fulfill Case-Mate's request for the information.  De Lagarde followed up on her lie by making another request to Vinci on May 30, but never provided Vinci with further explanation as to why Kate Spade needed this information.  Vinci did not send the files.

184.    The request was escalated to more senior Vinci employees and on June 5, de Lagarde again lied to Vinci, claiming that she wanted the vectorized artwork to share with other licensees in the home, watches, stationery and gifts spaces.  Of course, de Lagarde made no mention of Case Mate.  Privately, de Lagarde lamented to Warshaw that Vinci was "holding our artwork hostage."  But under the terms of the License Agreement, these vectorized artwork files were Vinci's confidential information, belonging to the licensee only to be turned over to the Licensor after the termination of the license.  But the Kate Spade Defendants were not prepared to tell Vinci that it was soon to be terminated and replaced, because they needed Vinci to continue to prepare for the launch.

185.    On June 14, 2023, the day Kate Spade terminated the License Agreement with Vinci, Warshaw sent Case-Mate Vinci's current inventory list, proving that Kate Spade was using Vinci's launch prep to help Case-Mate take over as the Kate Spade licensee.  On June 21, Case-Mate sent the inventory list back to Warshaw and de Lagarde, indicating what merchandise on the list Case-Mate wanted to keep.  Case-Mate offered that "in a perfect world, you would seize the inventory, and/or require them to provide all of it for relief of past-due payments."

D.    Case-Mate Took Deliberate Steps to Force Vinci Out of the Mobile Device Accessories Market

186.    Case-Mate's goal was always to obtain the Kate Spade license.  They had two alternative plans for achieving that goal. Plan A was to purchase Vinci's assets at a steep discount and have Vinci

assign the license to Case-Mate (with Kate Spade's consent).  If that plan failed, Plan B was to have Case-Mate sign its own license agreement with Kate Spade and put Vinci out of business.  Case-Mate pursued both plans simultaneously, until it became clear that Plan A would not work because Vinci's owners would not agree to the steeply discounted price Case-Mate offered for the company.  At that point, Case-Mate, with the Kate Spade Defendants' knowledge and assistance, pursued Plan B exclusively.

187.    Case-Mate understood Vinci's financial predicament resulting from the Force Majeure Event due to the information they had obtained in the due diligence process. It therefore sought to force Vinci to sell its assets at the lowest possible price by drastically reducing its original offer once Vinci had no other options.

188.    As early as April 20, 2023, for example, in a Case-Mate leadership group text, Mehta texted Marzio and the rest of the group:  "So LOI [Letter of Intent] at $13 [million] and drop to $8 or $9 day of closing?"  And on May 9, Pham noted that Case-Mate could "sign 30 days exclusivity for $8 million, and then ask for more time to drag the numbers through the mud and offer $6-$8m.  At that point they probably have no choice but to dump the asset."  Case-Mate's Chairman, Reddy, responded in agreement.  Mehta followed, claiming his "goal [was] to get [Vinci] pregnant in 30 days and make one time cash offer of $10m and finish it."  Marzio thought "that would be freaking awesome."

189.    Around this time, Siena was growing impatient with Vinci's financial predicament as a result of the Force Majeure Event.  On or around May 11, 2023, Siena sent a notice stating that it intended to foreclose on Vinci's assets and proceed to an Article 9 sale.

190.    Shortly thereafter, Case-Mate's Reddy determined that Case-Mate should acquire the Siena Loan, which it had learned about in diligence.

191.    Case-Mate presented this plan to Vinci as a necessary step to prevent Siena from foreclosing on Vinci's assets, thereby "saving" Vinci.

192.    But in reality, purchasing the Siena Loan gave Case-Mate control of Vinci's finances. This enabled Case-Mate to put pressure on Vinci to force it to accept a lowball offer for Vinci's assets.

193.    If Vinci rejected such an offer, Case-Mate could foreclose on Vinci's assets and put it out of business.

194.    In either scenario, Case-Mate would acquire the Kate Spade and Coach inventory that Case-Mate intended to sell once it became Kate Spade's (and Coach's) licensee.

195.    Accordingly, on or about May 16, 2023, Case-Mate entered into an agreement with Siena whereby Siena assigned to Case-Mate the Loan, the Siena Loan Agreement, and all related duties, rights, and obligations.

196.    By purchasing the Siena Loan, Case-Mate became Vinci's senior lender, with all the rights and responsibilities of a lender.  However, Case-Mate did not act in good faith as a lender or deal with Vinci fairly.  Rather, it abused its position as lender to try to force Vinci to sell its business to Case-Mate at a discount or to destroy Vinci as an ongoing business and foreclose on its assets.  Either way, Case-Mate would remove Vinci as a competitor and step into Vinci's shoes as Kate Spade's licensee for mobile phone accessories and related merchandise.

197.    Thus, after purchasing the Siena Loan, Case-Mate reneged on its prior offer and reduced the price it had agreed to pay Vinci's owners by millions of dollars.

198.     When Vinci rejected that offer, Case-Mate ceased negotiating with Vinci.  It knew it had the Kate Spade license in hand and no longer needed to buy Vinci to get its most valuable asset—the license.  Case-Mate then proceeded to intentionally handicap Vinci's business by, among other things, not advancing funds after collecting sweeps and cutting off Vinci's funds for operational expenses and for payments to Kate Spade.  Case-Mate would not even advance Vinci funds to cover payroll.  On May 26, 2023, Vinci's counsel emailed Case-Mate's counsel asking "if [Case-Mate] will permit Vinci to use cash to at least fund its employee payroll, that must be funded today.  The Company's going concern

viability will otherwise be put in jeopardy." That same day, Vinci pleaded with Case-Mate's CFO to fund Vinci's payroll, imploring him to "consider the lives of the individuals this affects." Missing payroll is a violation of federal and state labor laws. Case-Mate eventually relented and agreed to make a payment to Vinci's payroll. But they refused to make, or advance funds to Vinci so it could make, payments to Kate Spade or other creditors.

199.    Just days after Case-Mate's acquisition of the Siena Loan, on or about May 23, 2023, Case-Mate's attorney stated Case-Mate's intention to foreclose on the Collateral securing the Loan, and to notice a UCC Article 9 sale on or about June 5, 2023 of all, or substantially all, of Vinci's assets on which Case-Mate held a lien. Such a foreclosure would effectively end Vinci as a going concern. Case-Mate notified the Kate Spade Defendants of the scheduled sale.

200.    Despite receiving this notice, the Kate Spade Defendants did not declare Vinci to be in default under the License Agreement on the basis of its default on the Siena/Case-Mate loan.

201.    The timing of this notice proved that Case-Mate did not buy the Siena loan to "save" Vinci. Rather, it did so in order to acquire leverage to purchase Vinci on the cheap or to destroy Vinci's business and acquire its assets on the cheap. This was all part of its plan, hatched with Kate Spade, to replace Vinci as Kate Spade's licensee and remove Vinci as a competitor.

202.    As Marzio texted to the Case-Mate leadership group after negotiations with Vinci broke down: "Good news is we have struck a deal with KS and right now it looks like we will have that business." In other words, Case-Mate knew it was getting the Kate Spade license one way or the other.

203.    In order to avert the threatened foreclosure, and still completely in the dark that Case-Mate was about to take over the Kate Spade licensee and reap the benefits of Vinci's preparation for the launch, Vinci began to actively pursue third-party funding sufficient to pay off the Siena Loan and save its business, or to buy the business at a reasonable price.

204.    Eventually, Sam "Sonny" Haddad and Charles Tebele learned of Vinci's predicament

and engaged in discussions with Vinci's owners to try to save Vinci's business. In late May 2023, Haddad and Tebele formed ACS Group Acquisitions LLC ("ACS"), and indicated ACS's intent to acquire the Case-Mate loan.

205.    On or around June 1, 2023, ACS and Vinci's owners had agreed on a framework whereby ACS would take out Case-Mate's loan position while also providing Vinci the working capital it badly needed.

206.    Thus, on June 1, 2023 at 7:22 PM, Latkovic emailed Warshaw and indicated that ACS would buy out Case-Mate's loan and provide capital to Vinci. Latkovic also informed Warshaw that Tebele, ACS's principal, was interested in speaking with her about Vinci's license and to "provide a path forward," and "discuss the current situation and possible solutions."

207.    That same day, ACS began discussions with Case-Mate about buying the Siena/Case-Mate loan on behalf of Vinci.

208.    On June 1, 2023 at 8:29 PM, Case-Mate agreed to sell the loan to ACS. At or around 11:30 AM on June 2, Warshaw reached out to schedule a call with Tebele for 1:30 PM that same day.

209.    But at 12:47 PM, Case-Mate's counsel advised ACS's counsel via email that despite Case-Mate's agreement to sell the loan just the night before, Case-Mate would not go forward with the sale: "I just got a call from Casemate that upon further consideration they have now decided not to proceed with the sale of the note." Case-Mate's counsel added that "there [was] still time to participate in the foreclosure sale on Monday."

210.    This invitation to the auction was an empty gesture, as a text thread between Case-Mate executives confirmed: 12:47 PM on June 2 was too close to the deadline for any new bidder to get pre-qualified to participate.

211.    In his 1:30 PM call with Warshaw, Tebele told her that ACS would be providing funding to Vinci and that he wanted to work with Kate Spade to ensure Vinci made the launch. He also told her

that while he could not speak for Vinci, once things were on track with the launch, ACS would make sure that Vinci had the resources to pay whatever it actually owed the Kate Spade Defendants.

212.    Warshaw told Tebele that she would consider his proposal.  But this was not true.

213.    Unbeknownst to Tebele, the Kate Spade Defendants had already secretly agreed on the terms of a license with Case-Mate and had decided to terminate Vinci's license as soon as the agreement with Case-Mate could be signed.  Warshaw did not tell this to Tebele.

214.    After her call with Tebele, Warshaw spoke with Marzio about the call.

215.    At or around 2:22 PM on June 2, just after Tebele's call with Warshaw and less than two hours after Case-Mate reneged on its agreement to sell the loan to ACS, the Kate Spade Defendants sent a reservation of rights letter to Case-Mate, demonstrating that the Kate Spade Defendants knew in advance that Case-Mate was not going to sell the loan after all.

216.    There were very important reasons for Kate Spade and Case-Mate to join forces to quash the sale of the loan to ACS. First, they could not execute their scheme if Vinci were allowed to stay in business. As discovery has shown, Kate Spade and Case-Mate were in constant communication during this time, moving the chess pieces so that they could call "check-mate" on Vinci. They realized that if ACS purchased the loan, it could and would seek to help Vinci stay in business, as Latkovic relayed to Warshaw on June 1 and Tebele confirmed on June 2.  Once the loan was sold, Kate Spade and Case-Mate would no longer have immediate access to Vinci's completed inventory and in-process goods. Without this merchandise, Case-Mate would not have goods to sell by the launch, even after Kate Spade terminated Vinci's license.

217.    Second, even if Vinci were not able to survive, ACS's purchase of the loan would give it the right to foreclose on and sell Vinci's inventory without the need to obtain Kate Spade's approval, per the terms of the Consent Agreement.

218.    Either of these eventualities would throw a huge wrench into Kate Spade's and Case-

Mate's scheme to have Case-Mate immediately replace Vinci as Kate Spade's licensee and use Vinci's completed inventory and in-process orders to enable Case-Mate to make the launch, now just three months away. Without these goods, Case-Mate could not conceivably make the launch.

219. Notably, it would take a new licensee such as Case-Mate months to begin receiving the necessary inventory to support normal day-to-day sales of Kate Spade merchandise, let alone to receive enough inventory to satisfy retail customers' demands for the launch of a new iPhone, when consumer interest in phone cases is at its highest.

220. Accordingly, Case-Mate reneged on its agreement to sell the loan to ACS as soon as it and Kate Spade realized the potential repercussions. Otherwise, it would not have been commercially reasonable for Case-Mate to turn down ACS's offer to buy the loan. No lender, faced with the prospect of selling its collateral at auction for pennies on the dollar, would turn down an offer of 100 cents on the dollar for the loan—in this case, nearly $10 million—unless it had an ulterior motive. Case-Mate rejected ACS's offer because the prospect of even greater rewards lay in putting Vinci out of business, taking possession of its inventory and in-process goods, making launch, and cementing its relationship with Kate Spade.

221. Left with no other option to save Vinci, and still unaware of Kate Spade's and Case-Mate's scheme, ACS proceeded to pay off the Siena/Case-Mate Loan (as opposed to acquiring it). A pay-off was something Defendants could not prevent. Thus, on June 5, 2023, Case-Mate's interest in the Loan was paid off in full and the Loan was retired.

222. As of June 5, 2023, Vinci owed no debt to Siena or to Case-Mate; thus, there was no default or event of default under any loan agreement.

223. Moreover, since Case-Mate never acted to accelerate the loan or exercise any default remedies against Vinci's assets, Case-Mate waived any default by Vinci.

224. In addition, since the loan was paid in full, any default by Vinci was completely cured.

42

225.    Case-Mate's conduct throughout this time, and its continuing conduct, have demonstrated that its true motive was to obtain Vinci's confidential and sensitive business and financial information, including information relating to the Siena Loan Agreement and Vinci's License Agreement, and use that information to negotiate its own license agreement with the Kate Spade Defendants; improperly, unfairly, and unlawfully drive Vinci out of business; and take over for itself Vinci's production and sale of Kate Spade-branded tech accessories.

E.    The Kate Spade Defendants Purport to Terminate the License Agreement

226.    Prior to any purported termination of the License Agreement, the Kate Spade Defendants, including de Lagarde and Warshaw, announced to the public and/or trade—including Case-Mate, a member of the phone accessory trade—that they were going to terminate the License Agreement. Then they announced to the public and/or trade—including Case-Mate—that they had terminated the License Agreement. All this occurred before Vinci filed this lawsuit.

227.    On or around June 14, Warshaw specifically acknowledged and confirmed to Tebele that the Kate Spade Defendants had announced to Case-Mate that they were going to terminate the License Agreement with Vinci prior to any purported termination of the License Agreement.

228.    At no time prior to announcing to the public and/or trade—including Case-Mate—that they were going to terminate, or had terminated, the License Agreement did the Kate Spade Defendants notify Vinci that they would be making any such announcement.

229.    At no time prior to announcing to the public and/or trade—including Case-Mate—that they were going to terminate, or had terminated, the License Agreement did the Kate Spade Defendants seek the consent of Vinci as to the timing of any such announcement.

230.    At no time prior to announcing to the public and/or trade—including Case-Mate—that they were going to terminate, or had terminated, the License Agreement did the Kate Spade Defendants seek the consent of Vinci as to a joint statement regarding the termination of the License Agreement.

231.    On June 14, 2023, the Kate Spade Defendants sent Vinci a letter stating that they were terminating the License Agreement "pursuant to Section 3.5(a) of the License Agreement," effective immediately.  A true and correct copy of the Kate Spade Defendants' June 14, 2023 purported Notice of Termination is attached hereto as **Exhibit P**.  Section 3.5(a) of the License Agreement does not exist.

232.    The June 14, 2023 Notice of Termination grossly overstated the amounts due under the License Agreement and amendments thereto.

233.    Despite being significantly affected and hampered by the Force Majeure Event, Vinci, between July 27, 2022 and May 2023, paid the Kate Spade Defendants a total of $4,118,420.

234.    The June 14, 2023 Notice did not validly or properly terminate the License Agreement.

F.    Defendants Engaged in a Campaign to Force Vinci's Suppliers and Customers to Cease Their Business with Vinci and Move It to Case-Mate

235.    As described above, Case-Mate and Kate Spade's plan had been for Case-Mate to fully and completely step into Vinci's shoes to handle the fall 2023 iPhone launch.  In other words, although Vinci had done the majority of the work under the License Agreement to prepare for the launch, Vinci would reap none of the benefits.

236.    In order for their plan to succeed, however, Defendants had to solve one additional problem.  Under the terms of the License Agreement, even upon termination by reason of default, Vinci was entitled to complete the production of Kate Spade-branded merchandise that was "in-process" or had been ordered by a customer in writing as of the date of termination, and to sell any such merchandise that had been ordered by a customer in writing as of that date.  License Agreement, §§ 12.2, 12.3**.**  By the time the Kate Spade Defendants purported to terminate the License Agreement in June 2023, Vinci had already received written orders for Kate Spade-branded merchandise from most of its largest customers and had begun the work to fulfill their iPhone 15 case orders.  For example, Verizon, Best Buy, Best Buy Canada, Target, Telus, Bell, Voicecomm, and Softbank had each submitted to Vinci, in writing, their orders and awards and accompanying ship dates, which specified the designs and estimated quantities

that they wanted to have delivered in installments over the following months. Vinci also had written orders for cases designed for older model iPhones. Moreover, Vinci had sent this information to its manufacturers, and the production of cases was in process as of the date of the purported termination.

237.    Thus, the final piece of Case-Mate and Kate Spade's plan, hatched by Marzio, Warshaw, and de Lagarde in a series of emails and meetings from May 22 to May 25, was to lie to Vinci's customers and suppliers about Vinci's ability to produce and sell Kate Spade-branded merchandise so that (i) Vinci would not be able to exercise its post-termination rights to complete production of merchandise that was in process or had been ordered in writing from customers as of the purported termination date, and to sell merchandise to customers that had placed written orders as of that date; (ii) Vinci's suppliers instead would utilize the design, tooling, and manufacturing work they completed with Vinci to now produce merchandise for Case-Mate; and (iii) Vinci's customers would move their orders to Case-Mate.  This meant that Case-Mate would reap all the rewards from the work that Vinci had been doing, and the money it had spent, to prepare for launch.

238.    Indeed, as early as June 6, before Kate Spade *had even purported to terminate* the License Agreement, Case-Mate, at Marzio's instruction, started contacting Vinci's customers, notifying them that they were going to take over the Kate Spade License.

239.    On June 13, 2023, before the Vinci License Agreement was purportedly terminated, Roney sent Marzio a spreadsheet identifying Kate Spade and Coach awards from Vinci's customers for the iPhone 15.

240.    On June 15, just one day after the purported termination of the License Agreement and one day before Vinci instituted this action, Case-Mate called at least two of Vinci's principal suppliers and told them that Case-Mate was now the "rightful" and "exclusive" licensee authorized to design, manufacture, and sell Kate Spade-branded phone cases and other mobile accessories.  This was false because, as described above, Vinci, at minimum, had post-termination rights to complete production

and/or sell Kate Spade-branded merchandise that was in-process or subject to written orders from customers as of the date of termination.  This was also false because Case-Mate's License Agreement had an effective date of July 1, 2023.  Before that date, then, Case-Mate was not only not the "exclusive" licensee, but it was also not yet a licensee at all.

241.     That same day, Case-Mate, at Marzio's direction, followed up the calls with emails to the suppliers reiterating that Case-Mate was now the "exclusive" licensee for Kate Spade-branded phone accessories. Again, this was false.

242.     The emails from Case-Mate further instructed Vinci's suppliers to provide Case-Mate with information concerning the suppliers' production of Kate Spade-branded merchandise for Vinci and their artwork and tooling to produce that merchandise. A true and correct copy of Case-Mate's June 15, 2023 email is attached hereto as **Exhibit Q**.

243.     Attached to the Case-Mate emails was an existing product SKU list and referenced artwork and tooling designs to be used for the production of the described Kate Spade-branded merchandise. This information was confidential and sensitive business information of Vinci that Case-Mate had obtained during diligence from Vinci under false pretenses.  Indeed, the Kate Spade Defendants have acknowledged that these SKUS are Vinci's own internal control numbers.  The emails even attached Vinci's own production timeline, which contained Vinci's sensitive and confidential information that Vinci had shared only with Kate Spade and Case-Mate, and which those parties were prohibited from using for Case-Mate's own benefit by their respective confidentiality agreements with Vinci.

244.     In addition to these calls and emails to Vinci's suppliers, at least by June 16, 2023, Case-Mate also transmitted to Vinci's suppliers and customers a "Letter of Authorization" from Kate Spade, whereby Kate Spade "confirms" that Case-Mate is Kate Spade's "Authorized Licensee" and is authorized by Kate Spade to "develop, produce, manufacture, promote, advertise, distribute, & sell" "authentic protective technology cases and mobile accessories, and related packaging materials," a true and correct

copy of which is attached hereto as **Exhibit R**.  This Letter was the product of discussions among Marzio, Warshaw, and de Lagarde, among others.  The Letter of Authorization further provides that "[t]here shall be no disposition of KSNY Brand inventory other than that expressly authorized in writing by Kate Spade LLC in a separate writing." *Id*.

245.    The Letter of Authorization was false.  It was, again, a blatant misrepresentation of Vinci's rights under the License Agreement, at the very least because Vinci retained the ability to produce and sell certain Kate Spade-branded merchandise even after the purported termination.  It was also false because Case-Mate was not yet Kate Spade's licensee.  And it was false because Kate Spade's purported termination of Vinci's license on June 14 was invalid, as this Court would preliminarily hold in September 2023.

246.    The Letter of Authorization was drafted at the request of Case-Mate.  In fact, when Case-Mate emailed Warshaw requesting such a letter, Warshaw responded, "Not sure exactly what you need so please feel free to draft on our behalf and we can put on our letterhead, and I am also happy to sign if helpful."  This gave Case-Mate an opportunity to craft its own message to Vinci's suppliers and customers.

247.    By designating Case-Mate as a licensee authorized to "develop, produce, manufacture, promote, advertise, distribute and sell phone accessories and related packaging," while at the same time stating that "there shall be no disposition of KSNY brand inventory unless that disposition was expressly authorized in writing by Kate Spade," the letter was intentionally designed to mislead suppliers and customers into believing that they were precluded from continuing their business with Vinci, which lacked such a written letter of authorization, and to direct them to move their in-process work and their orders from Vinci to Case-Mate.

248.    Case-Mate took additional steps to trick Vinci's suppliers and customers into sending them Vinci's business.  On June 14, 2023, Pham texted a customer that Case-Mate had signed a licensing

agreement with Kate Spade and Coach.  On June 17, 2023, Marzio himself emailed the Vice President, Business Development at Drexel, a Canadian distributor, and announced that Case-Mate was now officially the global license owners for Kate Spade and Coach.  A true and accurate copy of this email is attached as **Exhibit S**.

249.    Additionally, Marzio and Pham, along with other Case-Mate employees, participated in meetings and phone calls  to convince Vinci's suppliers and customers to terminate their business, including existing orders, with Vinci and make the jump to Case-Mate.

250.    Communications by Case-Mate to Vinci's suppliers and customers became increasingly threatening.  These communications, including from Marzio, were part of an explicit effort to pressure Vinci's suppliers and customers to break their contracts and/or existing relationships with Vinci and move them to Case-Mate.

251.    For instance, Case-Mate, including through Marzio, contacted several of Vinci's suppliers and asked them whether they had been notified yet by the Kate Spade Defendants to stop all production with Vinci and to accept orders from Case-Mate instead.  Case-Mate also directed Vinci's suppliers to shift their production business to Case-Mate and suggested that their continued engagement with Vinci was improper, unauthorized, and even illegal.  Marzio knew that this misrepresented Vinci's rights under the License Agreement.

252.    Case-Mate exerted similar pressure on Vinci's buying agent and directed the agent to discontinue its business relationship with Vinci.

253.    Marzio also falsely told Vinci's distributors that "Case-Mate is the new owner of the global license for Kate Spade phone cases & mobile accessories," and stated that the distributors "may want to immediately ensure that you are sourcing/selling product from the legal vendor," thereby falsely suggesting that Vinci was an "illegal" vendor.  A true and correct copy of Case-Mate's June 20, 2023 communication is attached hereto as **Exhibit T**.

48

254.    Upon information and belief, Case-Mate followed up this communication by calling at least one of Vinci's distributors and explicitly threatening that if the distributor did not shift its business from Vinci to Case-Mate, Case-Mate would call all of the distributor's customers and tell them that they are purchasing "illegal" merchandise.

255.    In addition, Case-Mate contacted customers of Vinci that had placed written orders for Kate Spade-branded protective technology cases and mobile accessories slated for delivery in advance of the upcoming Fall launch of the iPhone 15. In those communications, Case-Mate falsely told Vinci's customers that Case-Mate had stepped into the shoes of Vinci, and that Vinci was not authorized to produce or sell Kate Spade-branded merchandise.

256.    In fact, one major customer that received such a communication, Verizon, affirmatively cancelled its orders with Vinci and said it would not reinstate the orders until Vinci could show that Vinci was authorized to complete the production of the orders and distribute Kate Spade-branded merchandise.

257.    Vinci sought to give its suppliers and customers assurances, both orally and in writing, that it was still authorized to produce and sell Kate Spade-branded merchandise under the terms of the License Agreement. But these assurances proved to be insufficient in the face of the relentless pressure campaign by Defendants. On June 22, 2023, Verizon cancelled a meeting with Vinci scheduled for the next morning and informed Vinci that it would not meet with anyone from the company unless they brought a letter from Kate Spade confirming that Vinci was authorized to sell Kate Spade-branded merchandise.  Instead of meeting with Vinci that day, Verizon met with Marzio, Roney, and Warshaw.

258.    Verizon's refusal to move forward with the orders it had already placed with Vinci  was precisely what Case-Mate and Kate Spade had intentionally and fraudulently plotted to achieve all along: to mislead Vinci into laying all of the groundwork to prepare, produce, and market the relevant iPhone cases to customers for the launch, only to swoop in and replace Vinci with Case-Mate at the last minute. And as described above, in order to complete the plan, Kate Spade and Case-Mate intentionally misled

49

customers and suppliers, including Verizon, into believing that Vinci was not authorized or legally permitted to complete the very sales that Vinci had originated.

259.    The Defendants continued to escalate their improper and unlawful pressure campaign on Vinci's suppliers and customers to move their business from Vinci to Case-Mate. For example, on June 22, 2023, on Marzio's insistence that the Kate Spade Defendants take even stronger action to prevent customers and suppliers from continuing to work with Vinci, Warshaw sent a letter to Vinci customers falsely stating that "this letter confirms that as of today and going forward Case-Mate, Inc., is Kate Spade's only and exclusive licensee, and is the sole partner authorized to use the KSNY Trademarks and other intellectual property owned by Kate Spade to produce, manufacture, promote, advertise, distribute, and sell technology cases and mobile accessories, and related packaging. We are working closely with and supporting Case-Mate in the manufacture, distribution and sale of Kate Spade products, and we look forward to Case-Mate receiving your orders with respect to Kate Spade's technology cases and mobile accessories, including with respect to the expected Apple devices launching in September 2023 and all prior and future Apple and non-Apple tech accessories and programs." A true and correct copy of the Kate Spade Defendants' Letter is attached hereto as **Exhibit U**.  De Lagarde was separately emailing with customers and falsely telling them that Vinci was not authorized to finish its in-process orders and that Case-Mate would take over those orders for the fall 2023 launch.

260.    The letter from Warshaw attached a new version of the "Letter of Authorization" like the ones disseminated by Case-Mate earlier, only now the Letter of Authorization (signed by Warshaw) repeatedly and falsely referred to Case-Mate as Kate Spade's "Exclusive Authorized Licensee."

261.    The letter from Warshaw also falsely accused Vinci of creating "confusion" with customers with respect to the status of its relationship with Kate Spade. In fact, Vinci's assurances to its customers and suppliers about its ability to complete production and fulfill existing orders were entirely true. It was Defendants' repeated assertions that Case-Mate was now Kate Spade's "exclusive" licensee

and that Vinci had no right to use Kate Spade's trademarks or produce or sell Kate Spade-branded merchandise that were false, and which caused confusion in the market.

262.    Moreover, even if Vinci's termination had been valid, any confusion could have been avoided had Kate Spade complied with its obligation under the License Agreement to coordinate with Vinci on the timing and content of its announcement, and made clear to the market and the trade that Vinci retained the ability to produce and sell certain licensed merchandise pursuant to its post-termination rights.

263.    Indeed, this is precisely what the Court ended up ordering Kate Spade to do in October 2023 when it issued a preliminary injunction directing Kate Spade to provide Vinci with a limited letter of authorization that described Vinci's post-termination rights to produce and sell Kate Spade-branded goods.

264.    Warshaw and de Lagarde worked closely with Case-Mate during this time to ensure their false message that Case-Mate was the "exclusive licensee" was widely disseminated to Vinci's suppliers and customers and others in the industry.

265.    In response to a message from Case-Mate about Vinci's communications with its *own* customers, Warshaw offered to "connect with all customers with Steve [Marzio] to clarify." Such meetings did, in fact, take place.

266.    As recently as January 24, 2024, Warshaw sent communications to Vinci's customers such as TJ Maxx and Ross Stores notifying them of the pending litigation and reiterating that Case-Mate was now Kate Spade's licensee for the sale and distribution of Kate Spade New York phone cases and tech accessories. A true and correct copy of an example of this email is attached hereto as **Exhibit V**.

267.    Defendants' blatant and improper pressure campaign caused grave concern and instability among Vinci's suppliers and customers, leaving them uncertain whether they could continue doing business with Vinci and at least complete the production and delivery of merchandise that was in process

or subject to written orders from Vinci's customers.

268.    Defendants succeeded in pressuring Vinci's suppliers to stop their production and its customers to cancel their orders. This had a disastrous effect on Vinci's business. It not only deprived Vinci of the profits it would have made from the orders it had received from customers, but it also meant that the significant expenditures that Vinci had made to design, tool, and manufacture cases to fulfill those orders had been wasted. Defendants' fraudulent pressure campaign also significantly harmed Vinci's reputation and credibility and has caused irreparable harm not only to Vinci's existing relationships and contracts with its suppliers and customers, but also its prospective business relationships and business advantage with them.

269.    For instance, on May 12, 2023, one of Vinci's customers, Koan Company Limited, in Thailand, had sent Vinci a written forecast specifying the number of specific categories of Kate Spade merchandise it would order from Vinci over the next few months. On August 22, 2023, however, due to Defendant's fraudulent pressure campaign, Koan wrote to Vinci requesting to "cancel our pending order for Kate Spade," indicating that it remained concerned about "the license thing." This cancellation, like many others, was caused by Defendants' spreading false information and interfering with Vinci's contracts with its customers and suppliers and its existing business relationships.

270.    Similarly, Cesium Telecom, Inc., in Canada, transmitted its written forecast to Vinci and followed up with a written purchase order for Kate Spade-branded merchandise on May 30, 2023. Vinci accepted this purchase order. However, on September 5, 2023, Cesium's Managing Director cancelled the order, writing:

> I wanted to be upfront with you with regard to the current Kate Spade situation. We have moved forward with placing our new iPhone Kate Spade order with Case-Mate. Obviously, Vinci was always our first choice but it didn't work out that way. If anything changes on your end please let us know and we are always happy to continue purchasing Kate Spade from Vinci.

271.     In May, Atlantia Holdings, in Canada, sent its forecast to Vinci. It followed up with a purchase order for Kate Spade-branded merchandise on June 30, 2023. Vinci accepted the offer. However, as a result of the interfering actions by Defendants, Atlantia later told Vinci it was canceling its order.

272.     Verizon Services Ireland had a Master Services Agreement with Vinci and its distributor, Superior Communications. On May 31, 2023 Verizon communicated to Vinci and Superior that they had "been awarded the products listed to be carried by Verizon," including specified Kate Spade-branded merchandise," "[a]s pursuant to the Master Agreement." However, on June 23, 2023, Superior received a letter from Tapestry, Inc. (signed by Charlotte Warshaw) falsely stating that "as of today and going forward Case-Mate, Inc., is Kate Spade's only and exclusive licensee, and is the sole partner authorized to use the KSNY Trademarks and other intellectual property owned by Kate Spade to produce, manufacture, promote, advertise, distribute, and sell technology cases and mobile accessories, and related packaging." The letter further stated that Vinci's license had been terminated, and expressed appreciation for Superior's anticipated "quick partnership with Case-Mate given the accelerated timeline needed to meet Case-Mate and Kate Spade's orders for the expected Apple devices launching in September 2023." Superior forwarded that letter to Vinci the same day, and informed Vinci that it had received communication from Verizon indicating that it had "removed all KYSN [sic] iPhone 15 line from our account"—i.e., that it had cancelled the order.

273.     In May 2023, Appcessory PTE LTD, in Singapore, transmitted its forecast to Vinci. On July 5, 2023, it followed up with a purchase order for Kate Spade-branded merchandise. Vinci accepted the order. However, as a result of Kate Spade's and Case-Mate's wrongful interference and communications to Appcessory, it, too, later cancelled its orders.

274.     These are only a few examples. Many other customers of Vinci transmitted written forecasts and/or purchase orders to Vinci, which Vinci agreed to fulfill. However, as a result of the

wrongful actions by Kate Spade and Case-Mate, and the false statements that Vinci was not authorized to produce or sell Kate Spade-branded merchandise at all, those customers cancelled their orders.

275. Many customers indicated to Vinci that they would be willing to renew their orders if Vinci could supply a Letter of Authorization, similar to the one Kate Spade provided to Case-Mate, indicating that Vinci was authorized to sell them Kate Spade-branded merchandise. However, by the time Kate Spade was forced, by Court order, to provide Vinci with such Letters of Authorization, it was too late. The customers that had sent Vinci forecasts and/or purchase orders indicated that they would not renew their orders, either because they had already filled their needs from Case-Mate or another producer, or because the Letters of Authorization did not assuage their fears of retaliation or legal repercussions after Defendants' relentless pressure campaign, or for some other reason.

276. In addition, Defendants' pressure campaign and false statements to customers and suppliers prevented Vinci's existing and prospective customers from placing additional orders with Vinci.

277. This improper and unlawful pressure campaign by the Kate Spade Defendants and Case-Mate was based on three fundamental falsehoods: first, that Vinci's License Agreement had been validly terminated; second, that Case-Mate was now Kate Spade's exclusive licensee; and third, that, regardless of whether Vinci's license had been validly terminated, Vinci was not permitted to complete production of Licensed Merchandise which was in process, or for which written orders had been received from customers, and was not permitted to sell Licensed Merchandise to customers that had placed written orders with Vinci as of the date of the purported termination.

278. Each of these claims was false, and Defendants knew they were false.

279. Vinci's License Agreement had not been validly terminated because the Force Majeure provision prohibited Kate Spade from declaring Vinci in default when its delay in paying Kate Spade was caused by Force Majeure Event.

280.    In addition, Kate Spade could not terminate the Agreement because it was itself in material breach of the Agreement and had not performed its material obligations thereunder: among other things, it breached its obligations under the Force Majeure Provision and Schedules 3.3(g) and 8 by refusing to renegotiate the Minimum Net Sales and Guaranteed Minimum Royalties despite the Force Majeure Event and the resulting device shortage and disruption of the iPhone launch, which were obviously events outside Vinci's control; the Notice of Termination was premised on a Notice of Non-Payment and Notice of Default that were based on a false accounting of amounts Vinci owed under the License Agreement; it violated the confidentiality provisions of the Agreement by providing Vinci's confidential information to Case-Mate as part of the fraudulent plan to have Case-Mate replace Vinci as Case-Mate's licensee; and it breached its obligation to consult and reach agreement with Vinci on the timing and content of its announcement to the public and/or trade of the termination of the License Agreement, before announcing to the public and/or trade, including Case-Mate, that Vinci's License was being terminated.

281.    Vinci had Approved Licensed Merchandise "in process" as of the dates of the purported Notice of Termination (June 14, 2023) and the Supplemental Notice of Termination (June 18, 2023).

282.    As of those dates, Vinci also had written orders from retailers and distributors for both the current line of Kate Spade-branded phone accessories and those to be sold as part of the Fall 2023 new iPhone launch, including from Target, Best Buy, Verizon, Cesium Telecom, and Voice Comm, as well as for other Kate Spade branded accessories.

283.    The Kate Spade Defendants' and Case-Mate's communications to Vinci's suppliers and customers thus wrongfully, intentionally, and falsely stated, suggested, and indicated that Vinci was no longer authorized or able to complete the production of Licensed Merchandise which was in process, or for which written orders had been received from customers, or to sell Licensed Merchandise for which written orders had been received from customers.

284.    Moreover, Vinci has provided all necessary information to the Kate Spade Defendants under Section 12.3 of the License Agreement.

**Vinci Issues Cease and Desist Letter and Files this Action**

285.    In an effort to mitigate the harm Defendants were causing, on June 19, 2023, Vinci issued a Cease and Desist letter to the Kate Spade Defendants, demanding that they "cease and desist from any further instructions, directives, or communications with Vinci's suppliers, customers, the trade, or the public indicating or suggesting that Licensee was no longer able to manufacture Licensed Merchandise, and from making any announcements to the trade or the public concerning the purported termination." A true and correct copy of Vinci's Cease and Desist Letter is attached hereto as **Exhibit W**.

286.    Vinci also demanded that the Kate Spade Defendants direct Case-Mate, in writing, to cease making the same or similar communications to Vinci's suppliers, customers, the trade, or the public, and to cease holding itself out as holding an exclusive licensing agreement with Kate Spade to design, manufacture and sell phone cases and other mobile accessories globally.

287.    Vinci further demanded that the Kate Spade Defendants send a letter to any supplier or customer of Vinci to which a "LETTER OF AUTHORIZATION" regarding Case-Mate had been disseminated, or to any other person or entity to which any other communication (verbal or written) had been made that stated or suggested that Vinci was no longer able to produce Licensed Merchandise, notifying them that Vinci in fact remained able to produce, manufacture, and deliver Kate Spade-branded protective technology cases and mobile accessories and related packaging materials until June 30, 2025 (the end of the Renewal Term specified in the Sixth Amendment). Ex. M.

288.    The Kate Spade Defendants failed to comply with Vinci's demands, cavalierly not even responding to Vinci, its license partner for ten years.

289.    Vinci was left with no choice but to file this action against the Kate Spade Defendants on June 16, 2023, seeking damages and injunctive relief.

290.    On June 23, 2023, Vinci filed an amended complaint, adding Case-Mate as a defendant.

291.    That same day, Vinci moved for a temporary restraining order (TRO) and preliminary injunction.

292.    On June 27, 2023, the Honorable Lorna G. Schofield held a hearing on Vinci's application for a TRO. During the course of that hearing, counsel for the Kate Spade Defendants repeatedly stated that the only basis for the Kate Spade Defendants' termination of the License Agreement was Vinci's supposed late payments of fees and royalties.

293.    During that same hearing, however, the Court made clear that it agreed with Vinci that the Force Majeure provision of the License Agreement applied to the Licensee's failure to make timely payments.

294.    This caused the Kate Spade Defendants to search for a new rationale for terminating the License Agreement.

**The Kate Spade Defendants Send a Supplemental Notice of Termination**

295.    On July 18, 2023, the Kate Spade Defendants, realizing that their June 14 Notice of Termination was improper and invalid, sent Vinci a Supplemental Notice of Termination of the License Agreement. A true and correct copy of the July 18, 2023 Supplemental Notice of Termination is attached as Exhibit X.

296.    The purported basis for the Supplemental Termination was Vinci's default on its loan obligations to third-party creditor Siena in February 2023, purportedly triggering an automatic termination under Section 3.3(d) of the License Agreement as of the date of default, and Vinci's purported failure to notify Kate Spade of the default to a third party pursuant to Section 3.6(a) and 11.10 of the License Agreement.

297.    The Force Majeure provision, however, holds that Vinci could not "be deemed to be in default" if it was "prevented or delayed from timely performing *any* obligation under th[e License]

Agreement" by a Force Majeure Event.

298.    Moreover, the notice requirement of Section 11.10 is triggered only if the lender (i) delivers written notice of default to Licensee and (ii) as a result of such default, has accelerated such indebtedness or has exercised any other default remedies against Licensee assets.

299.    At no time did Siena ever accelerate Vinci's indebtedness or exercise default remedies against Vinci's assets.

300.    Siena provided notice of its intent to exercise a default remedy via its notice of public sale (and Kate Spade was notified of that intent). However, Case-Mate purchased the Siena Loan before Siena could exercise the default remedy of selling Vinci's assets. As a result, Siena never exercised any default remedy against Vinci's assets before it sold the loan and was paid in full. It also never accelerated Vinci's indebtedness.

301.    Moreover, both Siena and Case-Mate notified Kate Spade of Vinci's default under the loan. Under the Siena Loan Agreement, the lender was authorized to exercise power of attorney for the borrower including in providing such notice.

302.    On June 5, 2023, over a month before the Kate Spade Defendants sent their Supplemental Notice, the loan was paid in full, thereby retiring the loan.

303.    When the loan was paid off, neither Siena nor Case-Mate had ever accelerated Vinci's indebtedness or exercised default remedies against Vinci's assets. The assets were never foreclosed on. The assets were never sold.

304.    Moreover, both Siena's and Case-Mate's failure to exercise any default remedies constituted a waiver of any default by Vinci.

305.    Additionally, Kate Spade had known about Siena's default notice since no later than May 11, 2023. Yet, it waited until June 14 to terminate Vinci's license because it still needed Vinci to continue producing licensed merchandise for the launch and securing customer orders, while Kate Spade and Case-

58

Mate finalized the details of Case-Mate's license.

306.    And even when Kate Spade did issue its purported Notice of Termination on June 14, it made no mention of Vinci's default on the Siena/Case-Mate loan and did not do so until July 18, 2023 when it was forced to look for alternative ground to terminate the License Agreement after the Court suggested that the Force Majeure provision barred terminating Vinci's license on the basis of non-payment.

307.    Kate Spade therefore waived any right to deem Vinci in default under the License Agreement based on any default on the Siena/Case-Mate loan or its supposed failure to notify Kate Spade of such a default.

308.    Accordingly, there are no valid grounds to support the Supplemental Notice of Termination.

**Kate Spade Defendants' Search for Additional Grounds for Terminating the License Agreement**

309.    Recognizing that the Supplemental Notice of Termination was also invalid and ineffective, the Kate Spade Defendants have searched desperately for additional grounds for terminating Vinci's License Agreement.

310.    On June 18, 2024, a year after they had countersued Vinci, alleging trademark infringement and related causes of action, the Kate Spade Defendants moved for leave to file a Third Amended Complain (TAC) against Vinci.

311.    The Kate Spade Defendants' TAC alleges additional spurious grounds for termination of the License Agreement, including that Vinci had been "unable to pay its debts generally as they became due" for much of 2022 and throughout 2023, that Vinci had "discontinued a substantial portion of its business operations" merely by signing a Manufacturing and Distribution Agreement with Superior Communications, Inc. on March 3, 2023, and that Vinci had "transferred all of its assets and ceased its business operations" merely by entering into a Sales and Services Agency Agreement with Onward

Brands LLC, which allegedly also resulted in a "change of control" of Vinci.

312.     The Kate Spade Defendants allege, conveniently, that all of these actions resulted in an "automatic termination" of the License Agreement at the time the actions were taken.

313.     The Kate Spade Defendants' new allegations depend on false and inaccurate descriptions of the Manufacturing and Distribution Agreement with Superior and the Sales and Services Agency Agreement with Onward.

314.     The Kate Spade Defendants' TAC also fails to acknowledge that the Kate Spade Defendants were well aware of Vinci's financial condition and inability to make timely payments of amounts due starting no later than December 2022, and had chosen not to terminate the License Agreement.

315.     The proposed TAC also fails to acknowledge that the Kate Spade Defendants were informed of, and approved, Vinci's Manufacturing and Distribution Agreement with Superior, and certainly did not treat it as a basis for termination at any time between March 3, 2023 and the filing of the motion for leave to file the proposed TAC on June 18, 2024.

316.     Moreover, none of the Kate Spade Defendants' purported grounds for termination cures a fundamental defect in their claims: the Kate Spade Defendants failed to perform their own obligations under the License Agreement, as set forth above, and therefore cannot make claims or take action against Vinci based on Vinci's purported breaches of the License Agreement.

**Defendants Have Caused, and Will Continue to Cause, Massive and Irreparable Harm to Plaintiff**

317.     The Kate Spade Defendants' failures to comply with Sections 3.2, 12.2, and 12.3 of the License Agreement and all Defendants' tortious conduct have resulted in unauthorized, untruthful, and actionable communications to Vinci's suppliers and customers.

318.     Due to the Kate Spade Defendants' premature and unilateral announcement of the purported termination of the License Agreement and their numerous breaches of the License Agreement,

and due to all Defendants' false and malicious communications with Vinci's suppliers and customers, Vinci was unable to complete production of merchandise that was in process and/or had been ordered in writing by customers as of the date the Kate Spade Defendants purported to terminate the License.

319.    As a result of Defendants' conduct, Vinci has suffered massive reputational harm within the industry and trade, including but not limited to, damage to its customer, distributor and channel partner relationships.

320.    As a result of the Defendants' actions, Vinci was unable to deliver merchandise to distributors and customers that had placed written orders for it as of the date of the purported termination and were expecting and relying on Vinci to deliver on those orders.

321.    Vinci faces additional imminent and irreparable harm to its reputation and to its supplier, distributor, and customer relationships in the absence of injunctive relief, resulting in the irreplaceable loss of future business and revenue.

322.    Once Vinci loses placement on a customer's shelves, it is incredibly difficult, and sometimes impossible, to get that placement back because the relationship and trust on which such placements depend have been destroyed.

323.    The majority of sales of phone accessories occur when the new model of a mobile phone is launched. The major retailers that Vinci provides accessories to—such as Best Buy, Target, and Verizon—carefully work all year to select which vendors and styles they will assort. Once Vinci has been selected as a vendor for phone accessories, these retailers (and Vinci's distributors) are relying on Vinci to deliver on its commitments by the time that the new phone launches.

324.    Phone accessories like those produced by Vinci account for the vast majority of the profits retailers make from phone-related sales, as they do not make much profit from sale of the phones themselves. And the launch of a new phone model is the biggest sales opportunity in the phone category each year.

325.    Vinci's production in advance of the iPhone 15 launch scheduled for September 2023 was effectively shut down due to the Defendants' interference with its suppliers, customers, and distributor channels, which has resulted in the loss of business and revenue.

326.    Because Vinci was unable to keep its commitment to deliver the goods retailers and distributors were expecting, the retailers' and distributors' trust in Vinci has been irrevocably broken, and Vinci's ability to win future orders has been irreparably damaged.

327.    Although Vinci was finally able to provide its customers, suppliers, and distributors with their requested Letter of Authorization pursuant to a Court order issued in October 2023, the damage had already been done—Vinci missed the launch of the iPhone 15 and lost the trust and business of its customers, suppliers, and manufacturers due to the actions of the Kate Spade Defendants and Case-Mate.

328.    iPhone cases represent the vast majority of Vinci's business, and Vinci sells these and other accessories to the major retailers. A large percentage of iPhone accessories are sold during the launch of a new iPhone. So, if Vinci is unable to participate in iPhone launches, it also loses the business of those retailers, and there are no other equipment makers or retail companies that have anything close to the same share of the market, or enough market share to allow Vinci to survive in business.

329.    Indeed, in a May 14, 2023 email to Vinci member Steve Latkovic concerning potential financing for Vinci from Case-Mate,  Steve Marzio himself acknowledged the irreparable harm that failing to deliver accessories in time for an iPhone launch would cause: "Missing (i.e. late) an iPhone launch is catastrophic in this business and it is nearly impossible to get back into the major accounts if there is severe supply disruption….especially in today's cut throat mobile accessory market."  A true and accurate copy of this email is attached as **Exhibit Y**.

330.    In addition, in the License Agreement, the Kate Spade Defendants acknowledge that the Licensee "will suffer great and irreparable harm as a result of the breach of any covenant or agreement to be performed or observed under this Agreement other than the covenants to make monetary payments,

and, whether such breach occurs before or after the termination of this Agreement,….that the non-breaching party will be entitled to apply for and receive from any court of competent jurisdiction a temporary restraining order, preliminary injunction and permanent injunction, without any necessity of proving damages or any requirement for the posting of a bond or other security, enjoining the breaching party from further breach of this Agreement." Ex. A, § 16.1.

331.    To make matters even worse, Vinci lost the out-of-pocket expenditures it made in preparation for the launch, as  Defendants concealed their scheme from Vinci, and the Kate Spade Defendants pressed Vinci to continue with its preparations for the launch even when it had already reached terms on a license with Case-Mate and it knew it was about to send Vinci a notice of termination.

332.    Moreover, because Defendants' actions prevented Vinci from delivering on customers' written orders, Vinci now has millions of dollars of inventory sitting in warehouses. That inventory is now worth pennies on the dollar. On top of that, Vinci is incurring hundreds of thousands of dollars in storage fees to store that inventory.

<u>**FIRST CLAIM FOR RELIEF**</u>
**Kate Spade Defendants' Breach of Contract**
**Breach of Section 3.2 of the License Agreement**

333.    Vinci incorporates the preceding paragraphs as though fully set forth herein.

334.    The License Agreement, including all amendments thereto, is a valid and enforceable contract.

335.    Pursuant to the Consent Agreement, Vinci assumed the rights and obligations of the Licensee under the License Agreement, and the Kate Spade Defendants acknowledged and consented thereto.

336.    Vinci has performed all of its material obligations under the License Agreement or is otherwise excused from being deemed in default of the License Agreement due to a Force Majeure Event.

337.    The Kate Spade Defendants have breached their obligations under Section 3.2 of the

License Agreement by announcing to the public and/or trade, including Case-Mate, that they were terminating the License Agreement without seeking the consent of Vinci as to timing of such an announcement or to a joint statement making the announcement.

338.    As a result of the Kate Spade Defendants' aforementioned breaches, Vinci has sustained, and will continue to sustain, damages in an amount to be determined at trial but not less than $75,000.00.

339.    As a result of the Kate Spade Defendants' aforementioned breaches, Vinci has suffered, and will continue to suffer, massive irreparable harm within the industry and trade and is thus entitled to obtain temporary, preliminary and permanent injunctive relief enjoining the Kate Spade Defendants from continuing to breach Section 3.2 of the License Agreement.

**SECOND CLAIM FOR RELIEF**
**Kate Spade Defendants' Breach of Contract Breach**
**of Sections 12.2 and 12.3 of the License Agreement**

340.    Vinci incorporates the preceding paragraphs as though fully set forth herein.

341.    The License Agreement, including all amendments thereto, is a valid and enforceable contract.

342.    Pursuant to the Consent Agreement, Vinci assumed the rights and obligations of the Licensee under the License Agreement, and the Kate Spade Defendants acknowledged and consented thereto.

343.    Vinci has performed all of its material obligations under the License Agreement or is otherwise excused from being deemed in default of the License Agreement due to a Force Majeure Event.

344.    The Kate Spade Defendants breached their obligations under Sections 12.2 and 12.3 of the License Agreement by disseminating untruthful communications to Vinci's suppliers and customers stating, which suggested and indicated that Vinci was no longer able to complete the production of Licensed Merchandise that was in process, or for which written orders had been received from customers, and no longer able to sell Licensed Merchandise to customers that had sent written orders to Vinci as of

64

the date of the Notice of Termination or Supplemental Notice of Termination.

345.    These communications prevented Vinci from being able to timely complete production of Licensed Merchandise that was in process, or for which written orders had been received from customers, and to sell Licensed Merchandise to customers that had placed written orders, as Vinci is permitted to do under Section 12.3 of the License Agreement.

346.    As a result of the Kate Spade Defendants' aforementioned breaches, Vinci has sustained, and will continue to sustain, damages in an amount to be determined at trial but not less than $75,000.00.

347.    As a result of the Kate Spade Defendants' aforementioned breaches, Vinci has suffered, and will continue to suffer, massive irreparable harm within the industry and trade and is thus entitled to obtain temporary, preliminary and permanent injunctive relief enjoining the Kate Spade Defendants from continuing to breach Section 12.3 of the License Agreement.

### THIRD CLAIM FOR RELIEF
**Kate Spade Defendants' Breach of Contract**
**Breach of Section 15.2 of the License Agreement**

348.    Vinci incorporates the preceding paragraphs as though fully set forth herein.

349.    The License Agreement, including all amendments thereto, is a valid and enforceable contract.

350.    Pursuant to the Consent Agreement, Vinci assumed the rights and obligations of the Licensee under the License Agreement, and the Kate Spade Defendants acknowledged and consented thereto.

351.    Vinci has performed all of its material obligations under the License Agreement or is otherwise excused from being deemed in default of the License Agreement due to a Force Majeure Event.

352.    The Kate Spade Defendants breached their obligations under Section 15.2 of the License Agreement by disclosing or divulging Vinci's Confidential Information, including Vinci's production schedule and processes, internal control numbers, and financial information.

353.     Section 15.1 of the License Agreement states that Confidential Information includes "all information of a business, financial, and/or technical nature imparted to the other party during the course of this Agreement with respect to the business of the disclosing party and its affiliates, including without limitation the terms of this Agreement, business plans, designs, sketches, materials, colors, costs, pricing, customers, production techniques, sources of supply and other documents…." At a minimum, the Kate Spade Defendants disclosed to Case-Mate Vinci's product awards and styles from Vinci's top 3 customers, Vinci's inventory report, Vinci's production schedule and processes, Vinci's internal control numbers, and Vinci's financial information.

354.     The full scope of the Kate Spade Defendants' breach of Section 15.2 of the License Agreement has yet to be determined because Vinci does not yet have full knowledge of all the confidential information inappropriately disclosed by the Kate Spade Defendants.

355.     As a result of the Kate Spade Defendants' aforementioned breaches, Vinci has sustained, and will continue to sustain, damages in an amount to be determined at trial but not less than $75,000.00.

356.     As a result of the Kate Spade Defendants' aforementioned breaches, Vinci has suffered, and will continue to suffer, massive irreparable harm within the industry and trade and is thus entitled to obtain temporary, preliminary and permanent injunctive relief enjoining the Kate Spade Defendants from continuing to breach Section 15.2 of the License Agreement.

**FOURTH CLAIM FOR RELIEF**
**Declaratory Judgment**
**Invalid and Improper Notices and Allegations of Termination**

357.     Vinci incorporates the preceding paragraphs as though fully set forth herein.

358.     The License Agreement, including all amendments thereto, is a valid and enforceable contract.

359.     Pursuant to the Consent Agreement, Vinci assumed the rights and obligations of the Licensee under the License Agreement, and the Kate Spade Defendants acknowledged and consented

thereto.

360.    On June 14, 2023, Coach Services, Inc. issued the Notice of Termination which purported to terminate the License Agreement pursuant to Section 3.5(a) thereto for failure to make certain payments.

361.    Section 3.5(a) does not exist. Reliance on this provision as the basis for termination renders the termination invalid and ineffective.

362.    Pursuant to the Force Majeure Clause of the License Agreement and Sixth Amendment, no party will be deemed in default of the License Agreement if that party is prevented or delayed from timely performing any obligation under the Agreement by a Force Majeure Event, i.e., a cause or circumstance beyond a party's reasonable control.

363.    As a result of a Force Majeure Event, Vinci was prevented and/or delayed from timely performing its obligations under the License Agreement and Vinci promptly provided notification of that Force Majeure Event.

364.    To the extent that Vinci has failed to make certain payments under the Licensing Agreement, such failure cannot constitute an event of default under the License Agreement.

365.    Moreover, the Kate Spade Defendants refused to negotiate in good faith with Vinci over the effect of the Force Majeure Event on Vinci's ability to make timely payments and over terms and conditions in the License Agreement, as required by the Force Majeure provision.

366.    The Kate Spade Defendants also refused to negotiate in good faith the amount of GMR, despite the requirement that they do so whenever there is a disruption in a launch year, a device shortage, or other circumstances relevant here, as set forth in Schedule 8.

367.    The Supplemental Notice of Termination issued on July 18, 2023 also is invalid because Siena and Case-Mate never accelerated Vinci's indebtedness or exercised default remedies against Vinci's assets, and because Kate Spade was, by its own admission, notified of any purported default

under the Siena Loan Agreement.

368.    Moreover, any default by Vinci under the Siena Loan Agreement was waived or cured.

369.    In addition, Vinci's License did not "automatically terminate" due to Vinci's inability to pay its debts generally as they became due in 2022 or 2023 because any such inability was caused by the Force Majeure Event.

370.    Vinci's Manufacturing and Distribution Agreement with Superior Communications, Inc. did not result in an automatic termination of the License Agreement because the agreement with Superior did not assign, transfer, or otherwise hypothecate or dispose of the License Agreement, cause Vinci to cease doing business, or result in a "change in control" of Vinci.

371.    Moreover, Vinci informed the Kate Spade Defendants of the agreement with Superior, and the Kate Spade Defendants gave their consent to and approval of that agreement.

372.    Vinci's Sales and Services Agency Agreement with Onward also did not result in an automatic termination of the License Agreement because the agreement with Onward did not assign, transfer, or otherwise hypothecate or dispose of the License Agreement, cause Vinci to cease doing business, result in a "change in control" of Vinci, or effect the transfer of all or substantially all of Vinci's assets.

373.    For all these reasons, the License Agreement has not been validly terminated, and Vinci is entitled to a declaratory judgment declaring that the License Agreement remains in effect.

374.    An actual and justiciable controversy thus exists regarding the validity of the June 14, 2023 Notice of Termination and the Supplemental Notice of Termination.

## FIFTH CLAIM FOR RELIEF
### Case-Mate's Tortious Interference with License Agreement

375.    Vinci incorporates the preceding paragraphs as though fully set forth herein.

376.    The License Agreement, including all amendments thereto, is a valid and enforceable contract.

377.    Pursuant to the Consent Agreement, Vinci assumed the rights and obligations of the Licensee under the License Agreement, and the Kate Spade Defendants acknowledged and consented thereto.

378.    At all relevant times hereto, Case-Mate had knowledge of the parties' rights and obligations under the License Agreement.

379.    Case-Mate maliciously and in bad faith, without any legitimate justification and for the sole purpose of destroying Vinci's business and doing away with a prime competitor, induced the Kate Spade Defendants to disseminate unauthorized, untruthful, and improper communications to Vinci's suppliers and/or customers regarding Vinci's rights and obligations under the License Agreement in breach of the Kate Spade Defendants' obligations under the License Agreement, and thereby preventing Vinci from being able to exercise its rights under that Agreement, including its rights under Sections 12.2 and 12.3 to complete production of merchandise that was in process or subject to written orders from customers and to sell merchandise to customers who had placed written orders.

380.    Case-Mate maliciously and in bad faith, without any legitimate justification and for the sole purpose of destroying Vinci's business and doing away with a prime competitor, induced the Kate Spade Defendants to disclose or divulge Vinci's Confidential Information to Case-Mate in breach of the Kate Spade Defendants' obligations under Section 15.2 of the License Agreement.

381.    Case-Mate maliciously and in bad faith, without any legitimate justification and for the sole purpose of destroying Vinci's business and doing away with a prime competitor, induced the Kate Spade Defendants to announce to the public and/or trade, including Case-Mate itself, that they were terminating or had terminated the License Agreement, without the Kate Spade Defendants' seeking the consent of Vinci as to the timing of such an announcement or to a joint statement, making the announcement in breach of the Kate Spade Defendants' obligations under Section 3.2 of the License Agreement.

382.    Case-Mate maliciously and in bad faith, without any legitimate justification and for the sole purpose of destroying Vinci's business and doing away with a prime competitor, interfered with Vinci's ability to make further payments to the Kate Spade Defendants when Case-Mate was Vinci's lender.

383.    Case-Mate maliciously and in bad faith, without any legitimate justification and for the sole purpose of destroying Vinci's business and doing away with a prime competitor, induced the Kate Spade Defendants to terminate, or attempt or purport to terminate, the License Agreement with Vinci.

384.    As a result of Case-Mate's tortious interference, Vinci has sustained, and will continue to sustain, damages in an amount to be determined at trial but not less than $75,000.00.

385.    As a result of Case-Mate's tortious interference, Vinci has suffered, and will continue to suffer, massive irreparable harm within the industry and trade.

**SIXTH CLAIM FOR RELIEF**
**Case-Mate's Breach of Duty of Good Faith and Fair Dealing**

386.    Vinci incorporates the preceding paragraphs as though fully set forth herein.

387.    The Loan Agreement between Vinci and Case-Mate is a valid and enforceable contract.

388.    Case-Mate had a duty as Vinci's lender to perform in conformity with the terms of the Loan Agreement and in conformity with the implied covenant of good faith and fair dealing.

389.    Case-Mate was required under its duty of good faith and fair dealing not to take any action that would violate the reasonable expectations of the parties from the time they entered into the agreement, and not to take any action that had the effect of destroying or injuring the right of Vinci to receive the fruits of the loan agreement.

390.    In violation of this implied duty of good faith and fair dealing, Case-Mate intentionally and maliciously, for the sole purpose of destroying Vinci as an ongoing business and prime competitor to Case-Mate, handicapped Vinci and its business by, among other things, not advancing funds after collecting sweeps, cutting off its funds for operational expenses and for payments to the Kate Spade

Defendants, and providing false information to Vinci about its true intentions with regard to Vinci.

391.    Vinci either dutifully performed its obligations under the Loan Agreement or was prevented from performing those obligations by the wrongful and intentional misconduct of Case-Mate.

392.    Vinci has been damaged by Case-Mate's breach of the covenant of good faith and fair dealing in an amount to be determined at trial but not less than $75,000.00.

**SEVENTH CLAIM FOR RELIEF**
**Case-Mate's Unfair Competition**

393.    Vinci incorporates the preceding paragraphs as though fully set forth herein.

394.    Case-Mate engaged in unfair competition with Vinci by misappropriating Vinci's trade secrets and confidential information and wrongfully taking advantage of and exploiting Vinci's skill, expenditures, and labor for Case-Mate's commercial benefit.

395.    Rather than competing fairly with Vinci in the marketplace, Case-Mate used duplicity and coercion to acquire Vinci's trade secrets and confidential information; its relationships with its suppliers, distributors, and customers; and its license to produce and sell Kate Spade-branded merchandise.

396.    As recounted above, Case-Mate intentionally, maliciously, and in bad faith pretended to be interested in buying all or part of Vinci's business as a pretext for gaining access to Vinci's trade secrets and confidential information, including information about Vinci's suppliers, distributors, and customers; information about Vinci's production process; and information about Vinci's License Agreement and relationship with Kate Spade. This is information that Vinci used all its skill, years of labor, and millions of dollars in expenditures to build over years producing iPhone cases and other accessories.

397.    As also recounted above, Case-Mate intentionally, maliciously, and in bad faith bought the Siena Loan not for the intention of acting as Vinci's good faith lender, proffering advances to its borrower when needed and earning a fair interest rate, but for the intention of misappropriating Vinci's trade secrets and confidential information and handicapping Vinci's ability to do business and pay its

royalties and fees to Kate Spade in order to destroy Vinci as an ongoing business.

398.    Through its malicious, intentional, and bad faith conduct as Vinci's lender, and by pretending to be conducting "due diligence" as Vinci's lender, Case-Mate was able to misappropriate Vinci's trade secrets and confidential information, including forecasts received from its customers about the merchandise they would buy from Vinci, information about Vinci's suppliers and the prices Vinci paid and its sources and methods of production, and information about Vinci's manufacturing process and design protocols.

399.    Case-Mate also exerted undue pressure and coercion on Vinci's suppliers and customers by providing them with false information about Vinci's authority and ability to produce and sell Kate Spade-branded merchandise and threatening them with severe legal consequences (including but not limited to the instigation of Chinese governmental action against them) if they continued to do business with Vinci instead of moving their business to Case-Mate. This was done not to compete fairly with Vinci, but to unfairly and wrongfully misappropriate and take advantage of Vinci's supplier, distributor, and customer relationships and its relationship with the Kate Spade Defendants.

400.    As a result of Case-Mate's unfair competition, Vinci has sustained, and will continue to sustain, damages in an amount to be determined at trial but not less than $75,000.00.

401.    As a result of Case-Mate's unfair competition, Vinci has suffered, and will continue to suffer, massive irreparable harm within the industry and trade and is thus entitled to obtain temporary, preliminary and permanent injunctive relief enjoining Defendant Case-Mate from continuing to engage in unfair competition.

### EIGHTH CLAIM FOR RELIEF
**Case-Mate's Breach of Fiduciary Duty**

402.    Vinci incorporates the preceding paragraphs as though fully set forth herein.

403.    When Case-Mate acquired the Siena Loan, it took on not only the rights of a lender, but also the responsibility to act fairly and in good faith.

72

404.    Moreover, through its actions in assuming direct and excessive control over and responsibility for Vinci's business while serving as Vinci's lender, Case-Mate created a fiduciary relationship with Vinci, which obligated it to act in Vinci's best interest rather than doing precisely the opposite—seeking to destroy Vinci's business and remove a competitor from the marketplace.

405.    Case-Mate's status as Vinci's lender put it in a position of unequal power over Vinci and enabled it to exercise dominion, direct and excessive control, and undue influence over Vinci's business operations. It did not merely act as a real lender, monitoring a borrower's business to ensure that its collateral was secure and the borrower was complying with the terms of the loan agreement. Rather, Case-Mate took the reins of Vinci's business and made management decisions itself.

406.    Case-Mate's undue and excessive control of Vinci's business included initially refusing to advance payments so Vinci could meet its payroll, and then approving payroll payments in detail. Case-Mate also insisted on sending funds to the payroll company directly rather than advancing the necessary funds to Vinci and allowing it to exercise its normal management responsibilities of managing the payroll and paying vendors. Case-Mate also sought to directly control which vendors would be paid, and to make those payments. It demanded reports about numerous, specific business operations issues, including vendor contracts, office space, leases, vendor lists, purchase orders, accounts payable, fall launch forecasts, product SKUs, customer forecast details and status, tooling costs, inventory lists of distributors, pallet spaces needed, etc. None of this is the sort of information needed by a lender. But it is exactly the sort of information a competitor intent on stealing a company's business would want.

407.    After creating a fiduciary relationship with Vinci, Case-Mate then proceeded to act in ways directly contrary to its fiduciary duty. Instead of advancing to Vinci the funds needed to maintain business operations and pay its debts, as the loan agreement required, Case-Mate halted advances while continuing to sweep Vinci's bank accounts as revenue came in, depriving Vinci of the funds needed to pay the Kate Spade Defendants and other creditors. Case-Mate also used the pretext of "due diligence"

to acquire Vinci's trade secrets and confidential information about its production processes and its supplier and customer relationships so that Case-Mate could use that information for its own advantage and step into Vinci's shoes once Case-Mate's and the Kate Spade Defendants' actions had destroyed Vinci's business.

408.    Moreover, mere days after acquiring the loan, Case-Mate announced its intention to foreclose on and sell Vinci's assets, proving that its intent all alone was to destroy Vinci rather than to act as its lender and help sustain its business.

409.    As a result of Case-Mate's breach of its fiduciary duty, Vinci has sustained, and will continue to sustain, damages in an amount to be determined at trial but not less than $75,000.00.

## NINTH CLAIM FOR RELIEF
### Kate Spade Defendants' Aiding and Abetting Case-Mate's Breach of Its Fiduciary Duty

410.    Vinci incorporates the preceding paragraphs as though fully set forth herein.

411.    The Kate Spade Defendants knowingly and intentionally aided and abetted Case-Mate's breach of its fiduciary duty, as described above, by providing Case-Mate with substantial assistance in conducting that breach and in achieving its ultimate goal—destroying Vinci and shifting Vinci's suppliers and customers to Case-Mate.

412.    The Kate Spade Defendants' assistance to Case-Mate included sharing confidential information with it about Vinci's performance as Licensee and its relationships with its suppliers and vendors and its production process; and working with Case-Mate to prevent ACS from purchasing the loan from Case- Mate, so that Case-Mate could continue to use its status as Vinci's lender to destroy its ability to conduct its business.

413.    As a result of Kate Spade's aiding and abetting Case-Mate's breach of its fiduciary duty, Vinci has sustained, and will continue to sustain, damages in an amount to be determined at trial but not less than $75,000.00.

## TENTH CLAIM FOR RELIEF

### Case-Mate's Breach of Confidentiality Agreements

414.    Vinci incorporates the preceding paragraphs as though fully set forth herein.

415.    The Confidentiality Agreements between Plaintiff and Case-Mate are valid and enforceable contracts.

416.    Vinci has performed all of its material obligations under the Confidentiality Agreements.

417.    Case-Mate has breached its obligations under Paragraph 2 of the Confidentiality Agreements by disclosing or divulging Vinci's confidential and sensitive business and financial information to third parties without the permission or authorization of Vinci.

418.    Case-Mate has breached its obligations under Paragraph 2 of the Confidentiality Agreements by disclosing or divulging or using Vinci's confidential and sensitive business and financial information in a manner detrimental to Vinci.

419.    Case-Mate has breached its obligations under Paragraph 2 of the Confidentiality Agreements by disclosing or divulging or using Vinci's confidential and sensitive business and financial information for the purpose of unfairly and improperly competing against Vinci, as described above.

420.    Case-Mate has breached its obligations under Paragraph 2 of the Confidentiality Agreements by disclosing or divulging or using Vinci's confidential and sensitive business and financial information for the sole purpose of putting Vinci out of business.

421.    The full scope of Case-Mate's breach of the Confidentiality Agreements has yet to be determined because Vinci does not yet have full knowledge of the confidential information disclosed divulged or used by Case-Mate.

422.    As a result of Case-Mate's breaches, Vinci has sustained, and will continue to sustain, damages in an amount to be determined at trial but not less than $75,000.00.

423.    As a result of Case-Mate's breaches, Vinci has suffered, and will continue to suffer, massive irreparable harm within the industry and trade and is thus entitled to obtain temporary,

preliminary and permanent injunctive relief enjoining Defendant Case-Mate from continuing to breach Paragraph 2 of the Confidentiality Agreements.

## ELEVENTH CLAIM FOR RELIEF
### The Kate Spade Defendants' Tortious Interference with Plaintiff's Contracts

424.    Vinci incorporates the preceding paragraphs as though fully set forth herein.

425.    Throughout the term of the License Agreement, Vinci has entered into contracts with various suppliers for the production of certain goods and with customers (retailers and distributors) for the distribution and sale of those goods.

426.    At all relevant times hereto, the Kate Spade Defendants had knowledge of Vinci's contracts with its suppliers and customers (retailers and distributors).

427.    The Kate Spade Defendants wrongfully, maliciously, and in bad faith interfered with Vinci's contracts and business relationships by dishonestly, unfairly, and improperly breaching Licensor's obligations under the License Agreement and by disseminating false information about Vinci's authority and ability to produce and sell Kate Spade-branded merchandise.

428.    The Kate Spade Defendants maliciously and in bad faith, without any legitimate justification, have induced Vinci's suppliers and customers to breach their contracts with Vinci by dishonestly, unfairly, and improperly issuing or disseminating unauthorized, untruthful, and improper communications to Vinci's suppliers and/or customers regarding Vinci's rights and obligations under the License Agreement and its ability to continue producing and to deliver Licensed Merchandise.

429.    The Kate Spade Defendants, without any legitimate justification, have intentionally and maliciously induced Vinci's suppliers and customers to breach their contracts with Vinci by dishonestly, unfairly, maliciously, and improperly disclosing or divulging, or causing the disclosure or divulgence of, Vinci's Confidential Information to Case-Mate.

430.    The Kate Spade Defendants have intentionally and maliciously engaged in these tortious and wrongful actions for the sole purpose of destroying Vinci's business relationships with its suppliers,

distributors, and customers and pressuring those suppliers, distributors, and customers to shift their business to Case-Mate.

431.     As a result of the Kate Spade Defendants' tortious interference with Vinci's contracts, Vinci's customers and suppliers have actually breached their contracts with Vinci.

432.     As a result of the Kate Spade Defendants' interference, Vinci has sustained, and will continue to sustain, damages in an amount to be determined at trial but not less than $75,000.00.

433.     As a result of the Kate Spade Defendants' interference, Vinci has suffered, and will continue to suffer, massive irreparable harm within the industry and trade and is thus entitled to obtain temporary, preliminary and permanent injunctive relief enjoining the Kate Spade Defendants from tortiously interfering with Vinci's contracts and contractual relations.

## TWELFTH CLAIM FOR RELIEF
### Case-Mate's Tortious Interference with Plaintiff's Contracts

434.     Vinci incorporates the preceding paragraphs as though fully set forth herein.

435.     Throughout the term of the License Agreement, Vinci has entered into contracts with various suppliers for the production of certain goods and with customers (retailers and distributors) for the distribution and sale of those goods.

436.     At all relevant times hereto, Case-Mate had knowledge of Vinci's contracts with its suppliers and customers (retailers and distributors).

437.     Case-Mate wrongfully, maliciously, and in bad faith interfered with Vinci's contracts and business relationships with its suppliers and customers by dishonestly, unfairly, and improperly breaching, or inducing the breach of, Licensor's obligations under the License Agreement, for the sole purpose of destroying Vinci's business and doing away with a prime competitor.

438.     Case-Mate, without any legitimate justification, has wrongfully and maliciously and in bad faith induced Vinci's suppliers and customers to breach their contracts with Vinci by dishonestly, unfairly, and improperly issuing or disseminating unauthorized, untruthful, and improper

communications to Vinci's suppliers and/or customers regarding Vinci's rights and obligations under the License Agreement and its ability to continue producing and to deliver Licensed Merchandise.

439.    Case-Mate, without any legitimate justification, has wrongfully and maliciously and in bad faith induced Vinci's suppliers and customers to breach their contracts with Vinci by dishonestly, unfairly, and improperly disclosing or divulging, or causing the disclosure or divulgence of, Vinci's Confidential Information to Case-Mate.

440.    Case-Mate's wrongful means amount to a crime or independent tort.

441.    As a result of Case-Mate's tortious interference with Vinci's contracts, Vinci's customers and suppliers have actually breached their contracts with Vinci.

442.    As a result of Case-Mate's interference, Vinci has sustained, and will continue to sustain, damages in an amount to be determined at trial but not less than $75,000.00.

443.    As a result of Case-Mate's interference, Vinci has suffered, and will continue to suffer, massive irreparable harm within the industry and trade and is thus entitled to obtain temporary, preliminary and permanent injunctive relief enjoining Case-Mate from tortiously interfering with Vinci's contracts and contractual relations.

**THIRTEENTH CLAIM FOR RELIEF**
**The Kate Spade Defendants' Tortious Interference**
**with Prospective Business Advantage and/or Business Relationships**

444.    Vinci incorporates the preceding paragraphs as though fully set forth herein.

445.    Throughout the term of the License Agreement, Vinci has had business relationships with its suppliers and customers (retailers and distributors).

446.    The Kate Spade Defendants, acting maliciously and in bad faith, used wrongful means to interfere with Vinci's business relationships by dishonestly, unfairly, and improperly breaching, or inducing the breach of, Licensor's obligations under the License Agreement.

447.    The Kate Spade Defendants, acting maliciously and in bad faith, used wrongful means to

interfere with Vinci's business relationships by dishonestly, unfairly, and improperly issuing or disseminating unauthorized, untruthful, and improper communications to Vinci's suppliers and/or customers regarding Vinci's rights and obligations under the License Agreement and its ability to continue producing and to deliver Licensed Merchandise.

448.   The Kate Spade Defendants, acting maliciously and in bad faith, used wrongful means to interfere with Vinci's business relationships by dishonestly, unfairly, and improperly disclosing or divulging, or causing the disclosure or divulgence of, Vinci's Confidential Information to Case- Mate, so that Case-Mate could use that information in an effort to put pressure on Vinci's suppliers and customers to cease doing business with Vinci and to do business with Case-Mate instead.

449.   The Kate Spade Defendants wrongfully interfered with Vinci's business relationships for the sole purpose of harming Vinci.

450.   The Kate Spade Defendants' wrongful means amount to a crime or independent tort.

451.   The Kate Spade Defendants' wrongful interference has harmed Vinci's reputation and credibility with its suppliers and customers such that some or all of those suppliers and customers will no longer work or contract with Vinci, resulting in the loss of future contracts and business relations with those suppliers and customers and the loss of future business and revenue.

452.   As a result of the Kate Spade Defendants' interference, Vinci has sustained, and will continue to sustain, damages in an amount to be determined at trial but not less than $75,000.00.

453.   As a result of the Kate Spade Defendants' interference, Plaintiff has suffered, and will continue to suffer, massive irreparable harm within the industry and trade and is thus entitled to obtain temporary, preliminary and permanent injunctive relief enjoining the Kate Spade Defendants from tortiously interfering with Vinci's prospective business advantage and/or business relationships.

### FOURTEENTH CLAIM FOR RELIEF
**Case-Mate's Tortious Interference with Prospective Business Advantage and/or Business Relationships**

454.   Vinci incorporates the preceding paragraphs as though fully set forth herein.

455.    Throughout the term of the License Agreement, Vinci has had business relationships with its suppliers and customers (retailers and distributors).

456.    Case-Mate used wrongful means to interfere with Vinci's business relationships by dishonestly, unfairly, and improperly inducing the breach of Licensor's obligations under the License Agreement.

457.    Case-Mate used wrongful means to interfere with Vinci's business relationships by dishonestly, unfairly, and improperly issuing or disseminating unauthorized, untruthful, and improper communications to Vinci's suppliers and/or customers regarding Vinci's rights and obligations under the License Agreement and its ability to continue producing and to deliver Licensed Merchandise.

458.    Case-Mate used wrongful means to interfere with Vinci's business relationships by dishonestly, unfairly, and improperly obtaining and using Vinci's Confidential Information in an effort to put pressure Vinci's suppliers and customers to cease doing business with Vinci.

459.    Case-Mate wrongfully interfered with Vinci's business relationships for the sole purpose of harming Vinci.

460.    Case-Mate's wrongful means amount to a crime or independent tort.

461.    Case-Mate's wrongful interference has harmed Vinci's reputation and credibility with its suppliers and customers such that some or all of those suppliers and customers will no longer work or contract with Vinci, resulting in the loss of future contracts and business relationships with those suppliers and customers and the loss of business and revenue.

462.    As a result of Case-Mate's interference, Vinci has sustained, and will continue to sustain, damages in an amount to be determined at trial but not less than $75,000.00.

463.    As a result of Case-Mate's interference, Vinci has suffered, and will continue to suffer, massive irreparable harm within the industry and trade and is thus entitled to obtain temporary, preliminary and permanent injunctive relief enjoining the Kate Spade Defendants from tortiously

interfering with Vinci's contracts and contractual relations.

## FIFTEENTH CLAIM FOR RELIEF
### Fraud as to Defendant Case-Mate

464.    Vinci incorporates the preceding paragraphs as if fully set forth herein.

465.    As described above, Defendant Case-Mate committed fraud by misleading Vinci into believing that Case-Mate's intent was to acquire Vinci in good faith.  In reality, Case-Mate sought and obtained Vinci's confidential information to enable Case-Mate's secret plan with the Kate Spade Defendants to destroy Vinci's business and take Vinci's place as the Kate Spade and Coach licensee, including by using Vinci's production processes, inventory (both completed and in-process goods), and confidential information to make the fall 2023 iPhone launch as Kate Spade's new licensee.

466.    Both at the time that Case-Mate entered into its Second Confidentiality Agreement with Vinci and at the later times that Case-Mate sought and obtained information from Vinci in connection with its diligence process, Case-Mate was separately negotiating a licensing arrangement with Kate Spade and Coach, had been doing so since March 2023, and would take over as Kate Spade licensee regardless of whether it purchased Vinci.  Case-Mate never disclosed this fact to Vinci.

467.    Case-Mate knew that it could not disclose its plan to Vinci because if Vinci knew about Case-Mate's true intentions, it never would have signed the Second Confidentiality Agreement and entered into a due diligence process with Case-Mate in which it turned over its most sensitive and confidential information, including sensitive and confidential details about its business with the Kate Spade Defendants.

468.    Yet, Case-Mate needed this information from Vinci in order to meet the iPhone 15 launch deadline once it replaced Vinci as the Kate Spade and Coach licensee.  Case-Mate intentionally solicited information from Vinci knowing that it planned to use the information for purposes other than evaluating a potential purchase of Vinci.  Case-Mate used these fraudulent and deceptive practices to solicit confidential information from Vinci in order to replace Vinci as the Kate Spade licensee, destroy Vinci's

business, and prepare for the iPhone 15 launch using Vinci's own production processes, plans, and business relationships.

469.    Case-Mate was obligated to disclose its scheme to Vinci, as it was peculiarly within Case-Mate's knowledge and could not have been discovered by Vinci.  Because Vinci was blind to Case-Mate's scheme, it justifiably entered into the Second Confidentiality Agreement with Case-Mate and did, in fact, provide sensitive due diligence to Case-Mate.

470.    Vinci was harmed by Case-Mate's conduct because it lost its most valuable license, was deprived of its business relationships with customers and suppliers and the present and future business that it would derive therefrom, and was unable to benefit from the work it had done to prepare for the iPhone 15 launch.

**SIXTEENTH CLAIM FOR RELIEF**
**Fraud as to Defendant Kate Spade New York**

471.    Vinci incorporates each of the preceding paragraphs as if fully set forth herein.

472.    As described above, Kate Spade  committed fraud by fraudulently inducing Vinci to prepare for the fall 2023 iPhone launch despite knowing that it would not continue with Vinci as a licensee, and by obtaining confidential information from Vinci under false pretenses in order to provide Case-Mate the information it needed to take over the fall 2023 iPhone launch from Vinci.

473.    Kate Spade  led Vinci to believe it would be responsible for executing the fall 2023 iPhone launch. But Kate Spade knew—and Vinci did not—as of April 2023 that it would terminate its relationship with Vinci and enlist Case-Mate to replace Vinci as its licensee and to fulfill the fall 2023 iPhone launch.

474.    Kate Spade obtained confidential information from Vinci in May and June 2023 under the pretense that Kate Spade would use this information to collaborate with Vinci on the iPhone 15 launch, when in fact Kate Spade provided this information to Case-Mate to enable Case-Mate to replace Vinci as Kate Spade's licensee and fulfill orders for the iPhone 15 launch in Vinci's stead.  Kate Spade knew

it would provide this information to Case-Mate when it requested it from Vinci.

475.    Kate Spade's actions were calculated to ensure that Vinci prepared for the fall 2023 iPhone launch so that Case-Mate (and ultimately Kate Spade) could benefit from that preparation. Kate Spade knew that Vinci was preparing for the launch and relying on Kate Spade's requests, recommendations and representations. Kate Spade further knew that Vinci was unaware of Kate Spade's intent to move on from Vinci and that Vinci would not have expended the time, money and resources it was devoting toward launch preparations were it in possession of Kate Spade's superior knowledge.

476.    Further, had Vinci known the information it provided to Kate Spade would be given to Case-Mate to enable it to benefit from Vinci's preparations, Vinci would not have provided the information.

477.    Yet, Kate Spade needed Vinci to continue its preparations for the iPhone 15 launch and needed Vinci's information to send to Case-Mate so that Case-Mate would have enough of a head start to meet the iPhone 15 launch once it ultimately replaced Vinci as the Kate Spade licensee.

478.    Kate Spade was obligated to disclose these facts to Vinci, as they were peculiarly within Kate Spade's knowledge, could not have been discovered by Vinci, and would plainly have impacted Vinci's decisions. Because Vinci was blind to Kate Spade's scheme, it justifiably continued preparing for the iPhone 15 launch and sent Kate Spade information in response to Kate Spade's requests thinking they were collaborating toward launch.

479.    Vinci was harmed by Kate Spade's actions because it expended significant resources on preparing for the iPhone 15 launch and was not able to reap any of the benefits. Vinci was also harmed because Kate Spade's fraudulent conduct caused Vinci's most valuable asset to fall into the hands of its competitor, Case-Mate.

### <u>SEVENTEENTH CLAIM FOR RELIEF</u>
**The Kate Spade Defendants' Breach of the Covenant of Good Faith and Fair Dealing**

480.    Vinci incorporates the preceding paragraphs as though fully set forth herein.

481.    The License Agreement, including the amendments thereto, is a valid and enforceable contract between Vinci and the Kate Spade Defendants.

482.    The Kate Spade Defendants have a duty to perform in conformity with the terms of the License Agreement, and in conformity with the implied covenant of good faith and fair dealing.

483.    The Kate Spade Defendants were required under their duty of good faith and fair dealing not to take any action that would violate the reasonable expectations of the parties from the time they entered into the agreement, and not to take any action that had the effect of destroying or injuring the right of Vinci to receive the fruits of the License Agreement.

484.    In violation of this duty of good faith and fair dealing, the Kate Spade Defendants intentionally and maliciously schemed to Replace Vinci as the Kate Spade Licensee, induced Vinci to prepare for the fall 2023 iPhone launch despite knowing that it would not continue with Vinci as licensee, obtained confidential information from Vinci on false pretenses in order to provide Case-Mate the information it needed to take over the fall 202 iPhone launch from Vinci, and sent bad faith communications to Vinci's customers and suppliers that trampled on Vinci's post termination rights and encouraged Case-Mate to do the same.

485.    Vinci either dutifully performed its obligations under the License Agreement or was prevented from performing those obligations by a Force Majeure Event.

486.    Vinci was harmed by the Kate Spade Defendants' actions because it expended significant resources on preparing for the iPhone 15 launch and was not able to reap any of the benefits.

487.    Vinci has been damaged by the Kate Spade Defendants' breach of the duty of good faith and fair dealing in an amount to be determined at trial but not less than $75,000.00.

**EIGHTEENTH CLAIM FOR RELIEF**
**In the Alternative, Civil Conspiracy Against Defendant Case-Mate**

488.    Vinci pleads this claim in the alternative as to Defendant Case-Mate.  To the extent Vinci has not alleged fraud against Case-Mate, Plaintiff incorporates each of the preceding paragraphs as if

fully set forth herein

489.    As described above, Case-Mate conspired with the Kate Spade Defendants to secretly replace Vinci with Case-Mate as Kate Spade's Licensee.  Case-Mate understood that it was important that Vinci not be aware that Kate Spade was about to replace Vinci, and agreed to hide this plan from Vinci.

490.    Case-Mate participated in surreptitiously depriving Vinci of the benefits of its time, money and resources in preparing for launch, including by obtaining launch-related information directly from Vinci under false pretenses.  Case-Mate intended to use that misappropriated information to further its conspiracy with Kate Spade to become Kate Spade's new licensee in time to meet the impending launch.  Additionally, Case-Mate requested that Kate Spade obtain confidential information from Vinci in May and June 2023 under the pretense that Kate Spade would use this information to collaborate with Vinci on the iPhone 15 launch, when in fact Kate Spade provided this information to Case-Mate so that Case-Mate could replace Vinci as Kate Spade's licensee and fulfill orders for the iPhone 15 launch in Vinci's stead

491.    Vinci was harmed by Case-Mate's participation in this scheme with Kate Spade because it was denied the opportunity to participate in the iPhone 15 launch and its most valuable assets fell into the hands of its competitor, Case-Mate.

**WHEREFORE**, Plaintiff demands the following relief:

A.    That judgment be entered in favor of Plaintiff on all causes of action pleaded herein;

B.    That the Kate Spade Defendants, together with their agents, servants, partners, affiliates, subsidiaries, employees, attorneys and all others acting in concert or participation with them, or any of them, be temporarily and preliminarily enjoined during the pendency of this action and permanently enjoined thereafter, from breaching Sections 3.2 of the License Agreement;

C.    That the Kate Spade Defendants, together with their agents, servants, partners, affiliates, subsidiaries, employees, attorneys and all others acting in concert or participation with

them, or any of them, be temporarily and preliminarily enjoined during the pendency of this action and permanently enjoined thereafter, from breaching Sections 12.2 and 12.3 of the License Agreement;

D.    That the Kate Spade Defendants, together with their agents, servants, partners, affiliates, subsidiaries, employees, attorneys and all others acting in concert or participation with them, or any of them, be temporarily and preliminarily enjoined during the pendency of this action and permanently enjoined thereafter, from breaching Section 15.2 of the License Agreement;

E.    That Defendant Case-Mate, together with its agents, servants, partners, affiliates, subsidiaries, employees, attorneys and all others acting in concert or participation with it, be temporarily and preliminarily enjoined during the pendency of this action and permanently enjoined thereafter, from directly or indirectly tortiously interfering with the License Agreement;

F.    That Defendant Case-Mate, together with its agents, servants, partners, affiliates, subsidiaries, employees, attorneys and all others acting in concert or participation with it, be temporarily and preliminarily enjoined during the pendency of this action and permanently enjoined thereafter from violating the Confidentiality Agreements between Case-Mate and Plaintiff.

G.    That Defendant Case-Mate, together with its agents, servants, partners, affiliates, subsidiaries, employees, attorneys and all others acting in concert or participation with it, be temporarily and preliminarily enjoined during the pendency of this action and permanently enjoined thereafter from engaging in unfair competition with Plaintiff.

I.    That Defendants, together with their agents, servants, partners, affiliates, subsidiaries, employees, attorneys and all others acting in concert or participation with them, or any of them, be temporarily and preliminarily enjoined during the pendency of this action and permanently enjoined thereafter, from directly or indirectly communicating, indicating, or suggesting to Plaintiff's suppliers or customers, the trade, and the public that Plaintiff is unable to continue to produce and to deliver Licensed Merchandise;

J.    That Defendants, together with their agents, servants, partners, affiliates, subsidiaries, employees, attorneys and all others acting in concert or participation with them, or any of them, be temporarily and preliminarily enjoined during the pendency of this action and permanently enjoined thereafter, from directly or indirectly tortiously interfering with Plaintiff's contracts and business relationships with its suppliers and customers, and Plaintiff's prospective business advantage resulting from its business relationships with its suppliers and customers;

K.    That the Kate Spade Defendants, together with their agents, servants, partners, affiliates, subsidiaries, employees, attorneys and all others acting in concert or participation with them, or any of them, be temporarily and preliminarily enjoined or required during the pendency of this action and permanently thereafter to inform Vinci's suppliers and customers in writing, through a "Letter of Authorization," that Vinci is authorized to develop, produce, manufacture, promote, advertise, distribute, & sell Kate Spade- branded authentic protective technology cases and mobile accessories, and related packaging

materials. The permanent injunction should terminate when the License Agreement terminates or expires, if the Court determines that the Agreement has not been validly terminated, or when Vinci has finished producing and delivering Licensed

Merchandise that is in process or for which written contracts have been received from customers, if the Court determines that the Agreement has been validly terminated but Vinci remains authorized under Section 12.3 of the License Agreement to complete production and delivery of such in-process or contracted-for Licensed Merchandise;

L.      That the Court enter a Declaratory Judgment that both the June 14, 2023 Notice of Termination and the July 18, 2023 Supplemental Notice of Termination are improper and invalid and that the License Agreement, as amended, remains in force;

M.      That Plaintiff be awarded compensatory and punitive damages, as well as attorneys' fees and costs, in an amount to be determined at trial, together with pre- judgment and post-judgment interest thereon; and

N.      That the Court grant such other and further relief as it shall deem just and proper.

Dated:  July 3, 2024                              Respectfully submitted,

                                                  By: /s/ Russell Capone
                                                     Russell Capone

                                                  Charles Low
                                                  **COOLEY LLP**
                                                  55 Hudson Yards
                                                  New York, NY  10001
                                                  Tel: 212-429-6800
                                                  rcapone@cooley.com
                                                  chlow@cooley.com

                                                  Michael Vatis
                                                  **BENESCH, FRIEDLANDER, COPLAN &**
                                                  **ARONOFF LLP**
                                                  1155 Avenue of the Americas, 26th Floor New York,
                                                  NY 10036
                                                  Tel: 646.593.7050
                                                  mvatis@beneschlaw.com

                                                  *Attorneys for Plaintiff*

# EXHIBIT I

SIENA LENDING GROUP LLC
9 W Broad Street, 6th Floor
Stamford, Connecticut 06902

February 10, 2023

VIA ELECTRONIC MAIL

Vinci Brands LLC
c/o CWD Armor Management, LLC
600 Superior Ave., #1800
Cleveland, OH 44114
Attention: Steve Latkovic
Email: sjl@candlewoodpartners.com

Re:    Notice of Event of Default and Reservation of Rights

Ladies and Gentlemen:

Reference is made to that certain Loan and Security Agreement dated as of August 6, 2021 (as amended, restated, supplemented or modified from time to time, the "***Loan Agreement***") by and among **VINCI BRANDS LLC, f/k/a ARMOR ACQUISITION LLC**, a Delaware limited liability company ("***Borrower*** ", and together with any other Person that from time to time becomes a Borrower under the Loan Agreement, collectively, the "***Borrowers***" and each individually, a "***Borrower***") and **SIENA LENDING GROUP LLC**, a Delaware limited liability company (together with its successors and assigns, "**Lender**" or "***us***"). Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

As set forth in the most recent accounts payable aging delivered by Borrower to us, as of February 5, 2023, the aggregate amount of Borrower's accounts payable is $28,168,001, of which (i) $19,674,172 is more than ninety days past due, (ii) $2,318,548 is more than sixty days past due, and (iii) $3,347,868 is more than thirty days due.  As more than 75% of Borrower's accounts payable are more than sixty days past due it is evident that Borrower is not able to pay its debts as they mature.  An Event of Default has occurred under Section 7.1(a) of the Loan Agreement due to the representations contained in Section 5.9(b)(i) that Borrower is able to pay its debts as they come due and Section 5.9(b)(ii) that Borrower has sufficient capital to carry on its business as now conducted and as proposed to be conducted being untrue and misleading in any material respect as of the date the last Loan was advanced to Borrower (such Event of Default, the "***Specified Event of Default***").

Lender hereby specifically reserves all of the rights and remedies available to it under the Loan Agreement, any of the other Loan Documents, applicable law and otherwise, as a result of the Specified Event of Default, including, without limitation, the right to charge interest at the Default Rate retroactively. Lender does not waive the Specified Event of Default or any other Event of Default which may have occurred prior to the date of this letter, which may exist on the date of this letter, or which may hereafter occur.  The specific identification of the Specified Event of Default does not constitute and shall not be deemed to constitute a waiver by the Lender of the Specified Event of Default, or any other Event of Default which may now or hereafter exist under the Loan Agreement or any of the other Loan Documents, or which may hereafter occur.  An Event of Default may only be waived pursuant to an agreement in writing executed

by Lender.  Any delay or failure by Lender in pursuing any rights or remedies as a result of any Event of Default or otherwise shall not be deemed a waiver of such Event of Default or any such rights or remedies.

Lender may, in its sole discretion, continue to make loans, advances and extensions of credit, including but not limited to Revolving Loans, as provided for in the Loan Agreement, to Borrower from time to time, on and after the date hereof.  The making of any loan, advance or Revolving Loans, or the extension of any other credit by Lender to Borrower, shall not constitute a waiver by Lender of the Specified Event of Default or any other Default or Event of Default (whether or not the Lender has knowledge thereof), or a waiver by Lender of any of its rights, whether under the Loan Agreement, any of the other Loan Documents, applicable law or otherwise, and all of such rights, and all other rights, powers and remedies are hereby expressly reserved.

The sending of this letter to Borrower should not be construed to limit the right of Lender to act without any other or further notice to Borrower in accordance with the terms of the Loan Agreement, any of the other Loan Documents, or applicable law.  Borrower is not entitled to rely upon any verbal statements made or purported to have been made by or on behalf of Lender in connection with any alleged agreement by Lender to refrain from exercising any of the rights under the Loan Agreement, any of the other Loan Documents, or applicable law.

This letter is without prejudice to, and Lender hereby specifically reserves, all of its rights and remedies.

[Remainder of Page Intentionally Left Blank]

Very truly yours,

**SIENA LENDING GROUP LLC**

By: *keith Holler*

Name: Keith Holler

Title: Authorized Signatory

By: *Steve Sanicola*

Name: Steve Sanicola

Title: Authorized Signatory

Copies to:

Benesch, Friedlander, Coplan & Aronoff LLP
41 S. High St., Suite 2600
Columbus, OH 43215
Attention:  Laura L. Hult
Email:  lhult@beneschlaw.com

[Signature Page for Notice of Default and Reservation of Rights Letter]

# EXHIBIT J



March 20, 2023

Vinci Brands LLC
Attn.: Legal Department
1775 Flight Way, Suite 300
Tustin, CA 92782
With a copy by email to Legal@vincibrands.com

Re: <u>Notice of Non-Payment</u>

To whom it may concern:

Reference is made to the license agreement between Coach Services, Inc. for the benefit of the Kate Spade New York brand ("Licensor") and Vinci Brands f/k/a Incipio, LLC ("Licensee") dated April 25, 2014, as well as the First Amendment dated August 31, 2015, Second Amendment dated January 16, 2017, Third Amendment dated November 28, 2018, Fourth Amendment dated November 13, 2019, Fifth Amendment dated July 1, 2020, and Sixth Amendment, with an effective date of January 1, 2022 (collectively, "License Agreement"). Capitalized terms used but not defined in this letter agreement have the respective meanings given to such terms in the License Agreement. Each of Licensor and Licensee is a "Party" and are collectively the "Parties."

This letter documents Licensee's failure to pay all required Guaranteed Minimum Royalties ("GMR"), Image Fund Payments, and Creative/Design Fee Payments in full despite the Parties' agreement to payment plans. Licensee's failure to pay all contractually required amounts in full constitutes an event of default under the License Agreement.

The License Agreement requires Licensee to pay all amounts due on a quarterly basis. Specifically,

In the letter agreement dated June 17, 2021 (attached as <u>Exhibit 1, pages 4-9</u>) the Parties agreed to adopt a modified payment plan governing Licensee's payment of all amounts due and payable under the Licensee Agreement for Contract Year 8, including Licensee's Guaranteed Minimum Royalties (GMR), Image Fund payments, and Creative/Design Fee payments. Licensee complied with the terms of the 2021 Payment Plan.

Licensee's GMR for Contract Year 9 (an 18-month period running until June 30, 2023) is ███████ In September 2022, the Parties agreed on a payment plan for Licensee's GMR, and estimated Image Fund, and estimated Creative/Design Fee payments in Contract Year 9, as documented in <u>Exhibit 2</u>. The September 2022 plan set forth in <u>Exhibit 2</u> permitted Licensee to pay all amounts due on a modified weekly basis.

As of December 2022, Licensee owed total GMR payments in the amount of ██████ as well as total estimated Image Fund payments in the amount of ██████ and total estimated Creative/Design Fee payments in the amount of ██████ In its letter of December 1, 2022 (attached as <u>Exhibit 1, pages 1-3</u>), Licensor and Licensee agreed to a further revised payment plan permitting Licensee to pay all amounts due on a modified monthly basis rather than a weekly basis as previously agreed, or quarterly basis as set forth in the License Agreement. The Parties aligned on the modified monthly plan in part to alleviate the added administrative burden on Licensor in managing weekly, rather than quarterly, payments.

On December 13, 2022, Licensee indicated via Zoom call that they would not make the November 2022 and December 2022 payments on time and that Licensee anticipated completing the estimated payments of ██████ due under the December 1, 2022 payment schedule by the close of Licensor's fiscal Q3. As a result, on February 14, 2023, the Parties agreed to still another modification of the prior-agreed payment plans (as documented in the Parties' email exchange attached as <u>Exhibit 3</u>). Such further plan required Licensee to pay two installments of ██████ to Licensor on January 31 and February 28, 2023 respectively, followed by a payment of ██████ no later than March 24, 2023. Licensee paid $50,000 on January 31, 2023 and $50,000 on February 28, 2023. However, on March 7, 2023 Licensee later indicated via Zoom call that it would not pay the remaining amount due ██████ by March 24, 2023 as agreed by the Parties. Instead, Licensee proposed on March 13, 2023 to pay $100,000 on March 24, 2023 and to remit the estimated balance in mid-April 2023 (per the Parties' email exchange attached as <u>Exhibit 4</u>).

Section 3.3(a) of the License Agreement provides that



In summary, Licensee's total payment obligations for Contract Year 9 that should have been paid by March 17, 2023, including GMR and estimated Image Fund and Creative/Design payments, equals ██████ As of March 17, 2023, Licensee has paid Licensor ██████ for Contact Year 9. Licensee has failed to pay Licensor GMR, estimated Image Fund payments, and estimated Creative/Design payments in the combined amount of ██████ as required under the License Agreement ("Amount Due").[1]

This letter serves as notice to Licensee under Section 3.3(a) of the License Agreement that Licensee has failed to pay the Amount Due. Licensee must therefore pay the entire Amount Due

---

[1] The Amount Due does not include (i) Licensee's GMR obligations for Licensor's Q4 2023 in the amount of ██████, and (ii) estimated Image Fund & Creative/Design Fee payments for Licensor's Q3 2023 (estimated as ██████ and Q4 2023 (estimated as ██████.

no later than Thursday, March 23 in order to cure its default. Pursuant to Section 3.5 of the License Agreement, if Licensee fails to cure its default on or before Thursday, March 23, Licensor may immediately terminate the License Agreement by written notice to Licensee.

     This letter is sent without waiver or prejudice to any rights, remedies, claims, or defenses that Licensor may have with respect to the License Agreement, all of which are expressly reserved. We look forward to your reply.

                             Sincerely,
                             **Coach Services, Inc.**
                             **(For Kate Spade New York)**

                             By: _____
                             Name: Jackee de Lagarde
                             Title:  VP of Global Licensing

Cc:    Charlotte Warshaw
       VP, Global Licensing & North America Wholesale
       Kate Spade New York

       Damaris Fernandez-Baez
       Senior Director, Finance
       Kate Spade New York

       Jonathan Malki
       Director, Senior Counsel
       Tapestry, Inc.

**Exhibit 1**



December 1, 2022

Vinci Brands LLC
Attn.: Legal Department
1775 Flight Way, Suite 300
Tustin, CA 92782
With a copy by email to Legal@vincibrands.com

Re: <u>Approved Payment Plan – Kate Spade New York License Agreement</u>

To whom it may concern:

Reference is made to the license agreement between Coach Services, Inc. for the benefit of the Kate Spade New York brand ("Licensor") and Vinci Brands f/k/a Incipio, LLC ("Licensee") dated April 25, 2014, as well as the First Amendment dated August 31, 2015, Second Amendment dated January 16, 2017, Third Amendment dated November 28, 2018, Fourth Amendment dated November 13, 2019, Fifth Amendment dated July 1, 2020, and Sixth Amendment, with an effective date of January 1, 2022 (collectively, "License Agreement"). Capitalized terms used but not defined in this letter agreement have the respective meanings given to such terms in the License Agreement. Each of Licensor and Licensee is a "Party" and are collectively the "Parties."

In the letter agreement dated June 17, 2021 (attached as <u>Exhibit A</u>) the Parties agreed to adopt a modified payment plan governing Licensee's payment of all amounts due and payable under the Licensee Agreement for Contract Year 8, including Licensee's Guaranteed Minimum Royalties (GMR), Image Fund payments, and Creative/Design Fee payments. From and after the date of this letter agreement, the Parties now agree to the following payment plan setting forth the schedule of Licensee's payment of all amounts due to Licensor under the License Agreement for Contract Year 9, an 18-month contract period from 1/1/2022 - 6/30/2023, with a GMR of ███████ As of December 1, 2022, Licensee owes total GMR payments in the amount of ███████ total estimated Image Fund payments in the amount of ███████ and total estimated Creative/Design Fee payments in the amount of ███████, as further set forth below:

    :

1



     The Parties acknowledge and agree that nothing in this letter agreement reduces Licensee's payment obligations under the License Agreement. Licensee remains responsible for achieving all Guaranteed Minimum Net Sales ("GMNS") amounts, and for paying all amounts due and payable under the License Agreement, including all Guaranteed Minimum Royalty amounts ("GMR"), as well as all Sales Royalties in excess of Licensee's GMR.

     Except as expressly set forth in this letter, all terms and conditions of the License Agreement remain in full force and effect. This letter is not intended to be a complete statement of Licensor's rights and is sent without prejudice to or waiver of any and all rights, remedies, and defenses owned by or available to Licensor, all of which are expressly reserved.

                    Sincerely,
                    **Coach Services, Inc.**
                    **(For Kate Spade New York)**

                    By: _____
                    Name:  Charlotte Warshaw
                    Title:   VP of Americas Wholesale and
                            Global Licensing

**<u>CONFIRMED, AGREED TO AND ACCEPTED</u>:**

Vinci Brands LLC

By: _____

Name:

Title:

**<u>Exhibit A</u>**



June 17, 2021

Incipio, LLC
Attn.: Legal Department
17192 Murphy Avenue, #19219
Irvine, CA 92623
With a copy by email to Legal@incipio.com

Re: <u>License Agreement – Contract Year 8 (2021)</u>

Dear Joe,

Reference is made to the license agreement between Coach Services, Inc. ("Licensor") and Incipio, LLC ("Licensee") dated April 25, 2014, as well as the First Amendment dated August 31, 2015, Second Amendment dated January 16, 2017, Third Amendment dated November 28, 2018, Fourth Amendment dated November 13, 2019, and the Fifth Amendment dated July 1, 2020 (collectively, "License Agreement"). Capitalized terms used but not defined in this letter agreement have the respective meanings given to such terms in the License Agreement.

In view of the continuing circumstances surrounding the Covid-19 pandemic, the Parties agree as follows with respect to Contract Year 8 (2021) only and not to any other Contract Year:

1.    <u>GMR and Payment Schedule</u>. Licensee is responsible for achieving its Guaranteed Minimum Net Sales ("GMNS") amounts, and for paying all amounts due and payable under the License Agreement, including all Guaranteed Minimum Royalty amounts ("GMR"), as well as all Sales Royalties in excess of Licensee's GMR.

For and during Contract Year 8 (2021), notwithstanding anything to the contrary set forth in the License Agreement, the Parties agree that the GMR payable by Licensee shall be reduced to ███████████    In addition, Licensee agrees to pay all GMR amounts, as well as all Creative/Design Fee, and Image Fund fee Payments, according to the following quarterly overview, and the detailed schedule attached as <u>Exhibit A</u>.

| GMR Payments by Quarter | Q1 2021 | Q2 2021 | Q3 2021 | Q4 2021 | Q1 2022 | Q2 2022 | Total |
|---|---|---|---|---|---|---|---|
|  | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| *Due date for GMR to be paid-in-full* | *4/30/21* | *7/30/21* | *10/29/21* | *1/28/22* | *4/29/22* | *6/30/22* |  |

| Other Fees | *Actual* | *Forecast* | *Forecast* | *Forecast* | | | |
|---|---|---|---|---|---|---|---|
| **Incipio Payments by Quarter** | **Q1 2021** | **Q2 2021** | **Q3 2021** | **Q4 2021** | **Q1 2022** | **Q2 2022** | **Total** |
| Image | ██ | ██ | ██ | ██ | | | ██ |
| Creative | ██ | | | | | | ██ |
| Combined | ██ | ██ | ██ | ██ | █ | █ | ██ |
| *Due date for fees to be paid-in-full* | *7/30/21* | *8/27/21* | *11/26/21* | *2/25/21* | | | |

The Parties will true-up forecast amounts to actual amounts once each quarter is complete.

Licensee acknowledges and understands that if Licensee's Net Sales of Licensed Merchandise results in Licensee accruing actual Sales Royalties that exceed Licensee's amended GMR of ████████ Licensee shall be liable for paying the overage of Sales Royalties to Licensor.

2. 

The waivers and approvals set forth in this letter are restricted to Contract Year 8 (2021) only, and does not extend to any other Contract Year or to any other provision or term of the License Agreement. Except as expressly set forth in this letter, all terms and conditions of the License Agreement remain in full force and effect.

This letter is not intended to be a complete statement of Licensor's rights and is sent without prejudice to or waiver of any and all rights, remedies, and defenses owned by or available to Licensor, all of which are expressly reserved.

Sincerely,
**Coach Services, Inc.**
**(For Kate Spade New York)**

By: *Charlotte Warshaw*
DocuSigned by:
—77502402FB904BE...
Name: Charlotte Warshaw
Title:  VP of Americas Wholesale and
Global Licensing

**CONFIRMED, AGREED TO AND ACCEPTED:**

Incipio, LLC

By: _____

Name:    Joe Sklencar

Title:    Chief Financial Officer

## Exhibit A

| Date | GMR | Creative | Image | Total |
|---|---|---|---|---|
| 4/9/2021 | | | | |
| 4/16/2021 | | | | |
| 4/23/2021 | | | | |
| 4/30/2021 | | | | |
| 5/7/2021 | | | | |
| 5/14/2021 | | | | |
| 5/21/2021 | | | | |
| 5/28/2021 | | | | |
| 6/4/2021 | | | | |
| 6/11/2021 | | | | |
| 6/18/2021 | | | | |
| 6/25/2021 | | | | |
| 7/2/2021 | | | | |
| 7/9/2021 | | | | |
| 7/16/2021 | | | | |
| 7/23/2021 | | | | |
| 7/30/2021 | | | | |
| 8/6/2021 | | | | |
| 8/13/2021 | | | | |
| 8/20/2021 | | | | |
| 8/27/2021 | | | | |
| 9/3/2021 | | | | |
| 9/10/2021 | | | | |
| 9/17/2021 | | | | |
| 9/24/2021 | | | | |
| 10/1/2021 | | | | |
| 10/8/2021 | | | | |
| 10/15/2021 | | | | |
| 10/22/2021 | | | | |
| 10/29/2021 | | | | |
| 11/5/2021 | | | | |
| 11/12/2021 | | | | |
| 11/19/2021 | | | | |
| 11/26/2021 | | | | |
| 12/3/2021 | | | | |
| 12/10/2021 | | | | |
| 12/17/2021 | | | | |
| 12/24/2021 | | | | |
| 12/31/2021 | | | | |
| 1/7/2022 | | | | |

| Date | | | | | | | | |
|------|---|---|---|---|---|---|---|---|
| 1/14/2022 | █ | | █ | | █ | | █ | |
| 1/21/2022 | █ | | █ | | █ | | █ | |
| 1/28/2022 | █ | | █ | | █ | | █ | |
| 2/4/2022 | █ | | █ | | █ | | █ | |
| 2/11/2022 | █ | | █ | | █ | | █ | |
| 2/18/2022 | █ | | █ | | █ | | █ | |
| 2/25/2022 | █ | | █ | | █ | | █ | |
| 3/4/2022 | █ | | | | | | █ | |
| 3/11/2022 | █ | | | | | | █ | |
| 3/18/2022 | █ | | | | | | █ | |
| 3/25/2022 | █ | | | | | | █ | |
| 4/1/2022 | █ | | | | | | █ | |
| 4/8/2022 | █ | | | | | | █ | |
| 4/15/2022 | █ | | | | | | █ | |
| 4/22/2022 | █ | | | | | | █ | |
| 4/29/2022 | █ | | | | | | █ | |
| 5/6/2022 | █ | | | | | | █ | |
| 5/13/2022 | █ | | | | | | █ | |
| 5/20/2022 | █ | | | | | | █ | |
| 5/27/2022 | █ | | | | | | █ | |
| 6/3/2022 | █ | | | | | | █ | |
| 6/10/2022 | █ | | | | | | █ | |
| 6/17/2022 | █ | | | | | | █ | |
| 6/24/2022 | █ | | | | | | █ | |
| 7/1/2022 | █ | | | | | | █ | |
| | █ | | █ | | █ | | █ | |

Incipio / KSNY Royalty Fees Payment Schedule



| Month | YR | Pay Date | GMR | Image | Creative | Total |
|---|---|---|---|---|---|---|
| 11 | 2022 | 11/4/22 | | | | |
| 11 | 2022 | 11/11/22 | | | | |
| 11 | 2022 | 11/18/22 | | | | |
| 11 | 2022 | 11/25/22 | | | | |
| 12 | 2022 | 12/2/22 | | | | |
| 12 | 2022 | 12/9/22 | | | | |
| 12 | 2022 | 12/16/22 | | | | |
| 12 | 2022 | 12/23/22 | | | | |
| 12 | 2022 | 12/30/22 | | | | |
| 1 | 2023 | 1/6/23 | | | | |
| 1 | 2023 | 1/13/23 | | | | |
| 1 | 2023 | 1/20/23 | | | | |
| 1 | 2023 | 1/27/23 | | | | |
| 2 | 2023 | 2/3/23 | | | | |
| 2 | 2023 | 2/10/23 | | | | |
| 2 | 2023 | 2/17/23 | | | | |
| 2 | 2023 | 2/24/23 | | | | |
| 3 | 2023 | 3/3/23 | | | | |
| 3 | 2023 | 3/10/23 | | | | |
| 3 | 2023 | 3/17/23 | | | | |
| 3 | 2023 | 3/24/23 | | | | |
| 3 | 2023 | 3/31/23 | | | | |
| 4 | 2023 | 4/7/23 | | | | |
| 4 | 2023 | 4/14/23 | | | | |
| 4 | 2023 | 4/21/23 | | | | |
| 4 | 2023 | 4/28/23 | | | | |
| 5 | 2023 | 5/5/23 | | | | |
| 5 | 2023 | 5/12/23 | | | | |
| 5 | 2023 | 5/19/23 | | | | |
| 5 | 2023 | 5/26/23 | | | | |
| 6 | 2023 | 6/2/23 | | | | |
| 6 | 2023 | 6/9/23 | | | | |
| 6 | 2023 | 6/16/23 | | | | |
| 6 | 2023 | 6/23/23 | | | | |
| 6 | 2023 | 6/30/23 | | | | |
| 7 | 2023 | 7/7/23 | | | | |
| 7 | 2023 | 7/14/23 | | | | |
| 7 | 2023 | 7/21/23 | | | | |
| 7 | 2023 | 7/28/23 | | | | |

2022 GMR — Creative  Image

2022 GMR Paid
2022 GMR Owed

*Based on current forecast*

**Exhibit 2**

**From:** Mallory Dittmer <mallory@brandxbrandconsulting.com>

**Date:** Friday, September 2, 2022 at 11:07 PM

**To:** Damaris Fernandez-Baez <DFernandez-Baez@katespade.com>

**Cc:** Chris Thurman <cthurman@vincibrands.com>, Jackee de Lagarde <jdelagarde@katespade.com>, Alexis Nguyen <anguyen4@tapestry.com>, Amy Romano <ARomano@tapestry.com>, Ava Scavone <ascavone@katespade.com>, Nick Uva <nuva@tapestry.com>, Rachel Rosen <rrosen@tapestry.com>, Joe Sklencar <jsklencar@vincibrands.com>, Lane Timian <ltimian@vincibrands.com>

**Subject:** Re: FW: Invoice & Payment Consolidation for Kate Spade x Vinci Brands

** This Email has been sent from an External Party **

Hi Damaris and team,

Thank you for your patience in getting back to you. We agree to close on 2021 per the latest reconciliation, and are proposing the attached payment schedule for 2022. Given the continued strains on the industry, supply chain, and freight cost, we ask to continue weekly payments to help with cash flow.

Because the industry was hit so hard in Q1/Q2 of this year (due to poor iPhone availability last launch), Vinci are playing a bit of catch-up now on Q2 GMR, but will be caught up next week and then ahead of schedule for Q3 and forward. Per this schedule:

| 2022* | 2022* | 2022 | 2022 | 2023 | 2023 | |
|---|---|---|---|---|---|---|
| Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | |
| 5% | 5% | 30% | 40% | 10% | 10% | 100% |

GMR Payments
2022 Q2 - Paid by 9/9, past due from 8/15
2022 Q3 - Paid by 10/28, due 11/15
2022 Q4 - Paid by 1/27, due 2/15
2023 Q1 - Paid by 4/28, due 5/15
2023 Q2 - Paid by 7/28, due 8/15

This schedule also pays for Image Fund & Design Fee in advance following the forecast.

Please let us know your availability to discuss further next week.

Thanks and have a nice holiday weekend!

Mallory

Incipio / KSNY Royalty Fees Payment Schedule

| | | | | | | |
|---|---|---|---|---|---|---|
| 2022 GMR | ███████ | | | Creative | Image | |
| 2022 GMR Paid | ██████ | | | | | |
| 2022 GMR Owed | ██████ | | | | | |

| Month | YR | Pay Date | GMR | Based on current forecast Image | Creative | Total |
|---|---|---|---|---|---|---|
| 1 | 2022 | 1/7/22 | | | | $0.00 |
| 1 | 2022 | 1/14/22 | | | | $0.00 |
| 1 | 2022 | 1/21/22 | | | | $0.00 |
| 1 | 2022 | 1/28/22 | | | | $0.00 |
| 2 | 2022 | 2/4/22 | | | | $0.00 |

████████████████████████████████████████████

| Month | YR | Pay Date | |
|---|---|---|---|
| 7 | 2022 | | █ |
| 7 | 2022 | 9/2/22 | █ |
| 7 | 2022 | | █ |
| 7 | 2022 | | █ |
| 7 | 2022 | 9/9/22 | █ |
| 8 | 2022 | | █ |
| 8 | 2022 | 9/16/22 | █ |
| 8 | 2022 | | █ |
| 9 | 2022 | 9/23/22 | █ |
| 9 | 2022 | | █ |
| 9 | 2022 | 9/30/22 | █ |
| 9 | 2022 | | █ |
| 9 | 2022 | 10/7/22 | █ |
| 9 | 2022 | | █ |
| 10 | 2022 | 10/14/22 | █ |
| 10 | 2022 | | █ |
| 10 | 2022 | 10/21/22 | █ |
| 10 | 2022 | 10/28/22 | █ |

**<u>Exhibit 3</u>**

## Re: KS meeting with Vinci

 ● **Joe Sklencar <jsklencar@vincibrands.com>**                                    Tuesday, February 14, 2023 at 6:40 PM

**To:** ● Jackee de Lagarde;  ● Damaris Fernandez-Baez;  ● Brian Stech;  ● Lane Timian;  ● Mallory Dittmer;  **Cc:**  ● Raul Granero;  +3 more ⌄

Hi Jackee!

Sorry for the late reply.  Missed the first one and I am traveling today.

Our plan is to meet the dates listed in your email.

Thanks!

Joe

**Joe Sklencar | Chief Financial Officer**

Vinci Brands | m. 714.267.0438 | e. jsklencar@vincibrands.com

A picture containing shape  Description automatically generated

confidentiality statement: https://www.incipio.com/confidentiality

**From:** Jackee de Lagarde <JdeLagarde@katespade.com>
**Date:** Thursday, February 9, 2023 at 1:07 PM
**To:** Joe Sklencar <jsklencar@vincibrands.com>, Damaris Fernandez-Baez <DFernandez-Baez@katespade.com>, Brian Stech <brian@vincibrands.com>
**Cc:** Raul Granero <rgranero@tapestry.com>, Jim Capiola <jcapiola@tapestry.com>, Charlotte Warshaw <CWarshaw@katespade.com>, mallory <mallory@brandxbrandconsulting.com>, Lane Timian <ltimian@vincibrands.com>
**Subject:** Re: KS meeting with Vinci

Hi Joe,

In order for us to recognize the last payment in time for our Q3 (Jan-March 2023) quarter close, we'll need the final March payment wired no later than **3/24**.

**Please confirm your understanding of this date change.**

We'll continue to connect bi-weekly with you and the team to make sure we are still on schedule for the 2/28 ▇▇ payment and the balance now due no later than 3/24.

1. ▇▇▇ - due 1/31 - paid 1/31 (*thank you*)
2. ▇▇▇ **due 2/28**
3. ▇▇▇ - **due no later than 3/24**
   a.  this number may flex based on the Image and Creative Fee actuals for Q2 Oct-Dec 2022, which we are reviewing 2/21

Thx
Jackee

jackee de lagarde
vp, global licensing
kate spade new york

m 917.226.8171
2 park avenue
new york  ny 10016



**<u>Exhibit 4</u>**

**Re: Vinci CY Q4 / FY Q2**



**Mallory Dittmer** <mallory@on-brandgroup.com>                    Monday, March 13, 2023 at 3:36 PM
To: Jackee de Lagarde

> KSNY Payment Cons...
> 19.3 KB

Download · Preview

** This Email has been sent from an External Party **

Hi Jackee,

See attached.

There were ▇▇▇ in excess royalties billed for Q1 and Q2 CY22, but to simplify the consolidation I removed those completely to show where we net out.

The goal of the payment plans, up until last week's update, was always to pay Kate Spade early/on time from a contractual standpoint.

Contractually, ▇▇▇ additional was due 11/15, is very late, and is now expected to be paid mid-April.

Contractually, ▇▇▇ was due 2/15, is just under a month late today, and is now expected to be paid mid-April.

Based on the payment plan, the ▇▇▇ to be paid mid-April will actually include a ▇▇▇ pre-payment towards CY Q1 which is not due until 5/15.

I can appreciate the difficulty in missing quarter-end, but hope this helps conversations internally.

Thanks,
Mallory

On Mon, Mar 13, 2023 at 8:48 AM Mallory Dittmer <mallory@on-brandgroup.com> wrote:

Hi Jackee,

Yes, I just wanted to check one item with Chris but he was out Friday. Should be able to send over this afternoon.

Thanks,
Mallory





# EXHIBIT K

# V I N C I

March 22, 2023

Kate Spade, LLC
Attn: Licensing Director
2 Park Avenue
New York, NY 10016

With a copy to:
Tapestry, Inc.
Attn: General Counsel
10 Hudson Yards
New York, NY 10001

Re: Notice of Non-Payment letter dated March 20, 2023

To whom it may concern:

Reference is made to the March 20, 2023 letter Re: Notice of Non-Payment concerning the License Agreement between Kate Spade New York ("Licensor") and Vinci Brands f/k/a Incipio, LLC ("Licensee"), whereby Licensor threatens to terminate the License Agreement pursuant to Sections 3.3(a) and 3.5 of the Agreement for alleged non-payment by Licensee according to the terms agreed to by the Parties.

This letter documents Licensee's exercise of rights under Section 21.11 and Schedules 3.3(g) and 8 of the License Agreement to preserve and facilitate productive discussion between the Parties as to a path forward.

Licensee has worked diligently with Licensor to meet a number of the payment milestones for the Guaranteed Minimum Royalties ("GMR"), Image Fund Payments, and Creative/Design Fee Payments as set forth in the Agreement. As Licensee has explained to Licensor numerous times, there have been unexpected, extraneous market conditions that have caused Licensee to modify the original payment schedule to accommodate for the decreased volume in sales.

As explained by Licensee to Licensor on December 13, 2022, Apple was unable to deliver iPhone 14 devices to market expectations as COVID restrictions had significantly impacted production at their primary assembly facility in China (see Exhibit A). Such supply issues continue to have a materially negative impact and ripple effect on the mobile accessory market. Thus, it should be of no surprise to Licensor that Licensee needs additional time to make payments. To be clear, it is not a question of whether payments will be made, it is a question of when.

However, in view of Licensor's threat to terminate the License Agreement pursuant to Sections 3.3(a) and 3.5, Licensee would like to reiterate Licensee's rights under the Agreement that provide relief to Licensee and render Licensor's threat premature. As mentioned in Licensee's March 21, 2023 email, these rights include provisions in Section 6 and Schedules 3.3(g) and 8 of the Sixth Amendment to the License Agreement, effective as of January 1, 2022.

Specifically, the Sixth Amendment to the License Agreement, includes as Section 6, a Force Majeure provision which is directly relevant to the circumstances leading to Licensee's alleged failure to pay the payments due for Contract Year 9. The provision, incorporated in the License Agreement as Section 21.11, provides that "[n]either Party shall be liable for loss or damage or be deemed to be in default under this Agreement if such Party is prevented or delayed from timely performing any obligation or condition under this Agreement by … epidemic; pandemic; public health emergency, … quarantine, business shutdowns; …, or other cause or circumstance beyond a Party's reasonable control (each a 'Force Majeure Event')." Here, as Licensee has communicated to Licensor on numerous occasions, Apple was unable to ship new iPhone models due to disruptions created by the COVID lockdowns at their primary assembly factory, Foxconn, in Zhenghou, China. The material shortage in devices sent sales plummeting and brought the mobile accessory industry to a standstill, resulting in significant disruption to Licensee's business.

As such, Licensee cannot be deemed in default of the License Agreement. Furthermore, because a Force Majeure Event occurred, the Parties must "meet and negotiate in good faith concerning any terms of the Agreement that either of the Parties wishes to address in light of such Force Majeure Event."

In addition, Licensor also ignores relevant portions of Schedule 8 of the Sixth Amendment in the referenced letter. Licensor correctly notes that the Guaranteed Minimum Royalties (GMR) owed for Contract Year 9 is $6,000,000. However, Schedule 8 provides that "[t]he Parties hereby agree to renegotiate in good faith the GMR for a given Contract Year if any of the following takes place . . . 3. There is an unexpected variance (favorable or negative) in launch years or product introduction, or there are material device shortages or recalls outside of Licensee's control." This provision is directly relevant because a material device shortage outside Licensee's control has occurred. Schedule 3.3(g) includes a similar provision relating to Minimum Net Sales.

To that end, Licensee exercises its rights under Section 21.11 and Schedules 3.3(g) and 8 of the License Agreement and reserves all other rights and defenses. In view of Licensee's rights pursuant to these provisions, the appropriate next step is for the Parties to engage in mutual good faith negotiations concerning the Parties' obligations under the License Agreement. There is concern that that Licensor's unilateral termination of this Agreement without such good faith negotiations would constitute a breach.

We look forward to having a productive discussion where both Parties can continue the relationship under mutually acceptable terms in view of these extenuating circumstances. Please let us know your availability for a discussion.

Sincerely,

Vinci Brands, LLC


By: _____

Name: Brian Stech

Title: Chief Executive Officer


Cc:     Jason Bingham

Chief Financial Officer

Vinci Brands


Manish K. Mehta

Partner

Benesch Friedlander Coplan & Aronoff LLP

EXHIBIT A

---------- Forwarded message ----------
From: **Mallory Dittmer** <mallory@brandxbrandconsulting.com>
Date: Tue, Dec 13, 2022 at 1:29 PM
Subject: KSNY x Vinci call follow up
To: Jackee DeLagarde <JdeLagarde@katespade.com>, Damaris Fernandez-Baez <DFernandez-Baez@katespade.com>, Ava Scavone <ascavone@katespade.com>
Cc: Joe Sklencar <jsklencar@vincibrands.com>, Lane Timian <ltimian@vincibrands.com>


Hi Jackee, Damaris, and Ava,

Thank you for the call regarding the Vinci payments. Below are the data points and links that were presented for your reference. Chris is working on the updated royalty report now and will resubmit shortly.

**Sep 7:** Apple announces iPhone 14
#3 in Third Party Retail Sell-Thru, First 2 Weeks (Casemate #4, Vinci 30% higher!)
#3 in Share of Voice (Casemate #10)

**Sep 9:** First day of preorders, deliveries already pushed to mid-Oct
https://www.cnet.com/tech/mobile/iphone-14-pro-deliveries-already-slip-to-october/

**Nov. 2 / 6:** Apple announces primary iPhone 14 Pro & Pro Max factory operating under "significantly reduced capacity"
https://www.cnbc.com/2022/11/06/apple-warns-covid-restrictions-in-china-are-hurting-iphone-production-.html
https://www.apple.com/newsroom/2022/11/update-on-supply-of-iphone-14-pro-and-iphone-14-pro-max/

**Nov. 16:** Ship times slip past Christmas
https://www.cnbc.com/2022/11/16/iphone-14-pro-ship-times-slip-past-christmas-.html?utm_term=Autofeed&utm_medium=Social&utm_content=Intl&utm_source=Twitter#Echobox=1668627446

**Dec 1:** CNN releases footage of Foxconn protests
https://www.cnn.com/videos/business/2022/12/01/china-covid-protests-foxconn-iphone-factory-wang-dnt-ebof-vpx.cnn

**Dec 5:** Foxconn "executives were quoted as telling Reuters that full production would resume between late December and early January."
https://edition.cnn.com/2022/12/05/tech/apple-china-foxconn-zhengzhou-production-hnk-intl/index.html

**Vinci strong performance within the constraints of the industry:**

**Vinci Share of Shelf and Placements are up YoY**
 +14% at Verizon, won Operational Excellence Award in 2022
+9% at Best Buy, seeing expansion and growth as BBY consolidated brands
+50% at Best Buy Canada, continue to take space from competitors, Vendor of the Year finalist in 2022
-2% at Target, one sku lost despite 100+ pegs cut across competitors
+18% US wireless dealers, +138% on average CA wireless dealers

**Vinci ranked #4 and is the ONLY third party mobile tech brand with growth YTD thru Aug '22**
1. Otterbox -4.4%
2. Tech 21 -6.5%
3. Speck -7.7%
**4. Vinci +0.4%**
**5. Casemate -14.9%**

**Vinci #2 and is one of only TWO third party mobile tech brands with sell-through growth YTD thru Aug '22**
1. Body Glove +16.5%
**2. Vinci Brands +7.7%**
3. Gear4 -0.7%
4. Otterbox -1.7%
5. Tech 21 -8.8%
**6. Casemate -15.3%**

**Vinci and Body Glove were also the only third party mobile tech brands that great in market share $ and Units**

Please let us know if you have any questions.

Thanks,
Mallory

--
**Mallory Dittmer**
Brand x Brand Consulting

# EXHIBIT L



March 31, 2023

Vinci Brands LLC
Attn.: Legal Department
1775 Flight Way, Suite 300
Tustin, CA 92782

Attn. Brian Stech, Chief Executive Officer - brian@vincibrands.com
With a copy by email to Legal@vincibrands.com

Re: <u>Reply to Vinci's Response Letter</u>

Dear Brian:

This letter is written in response to your letter, dated March 22, 2023 (the "Response Letter"), which was sent after Licensor sent Licensee a Notice of Non-Payment, dated March 20, 2023, (the "Notice Letter").

Reference is made to the license agreement, dated April 25, 2014, between Coach Services, Inc., for the benefit of the kate spade new york brand, ("Licensor") and Vinci Brands f/k/a Incipio, LLC ("Licensee"), as well as the First Amendment dated August 31, 2015, Second Amendment dated January 16, 2017, Third Amendment dated November 28, 2018, Fourth Amendment dated November 13, 2019, Fifth Amendment dated July 1, 2020, and Sixth Amendment, dated January 1, 2022 (collectively, the "License Agreement"). Capitalized terms used but not defined in this letter have the respective meanings given to such terms in the License Agreement. Each of Licensor and Licensee is a "Party" and are collectively the "Parties."

While we have sent you a separate letter notifying Licensee that it is in default, we also wanted to respond to some of the points in your Response Letter. Surprisingly, rather than acknowledging its outstanding payment obligations and focusing on a payment plan and path forward, the Response Letter ignores and misinterprets key terms of the License Agreement.

The Force Majeure Event discussion in the Response Letter is incorrect and a non-starter to any discussions about a payment plan. Despite the clear language in the License Agreement, Licensee now asserts that a Force Majeure Event has occurred and claims it excuses its non-payment. Among the reasons the Force Majeure Event language does not apply are the following:

- Section 21.11 expressly states that "the occurrence of a Force Majeure Event … ***does not affect Licensee's obligation to timely make any required payment***…" (emphasis added).

- Licensee failed to deliver prompt formal notice of any alleged Force Majeure Event, or its expected duration, which were required by the License Agreement.

- The Response Letter, dated March 22, 2023, is the first time a Force Majeure Event has been raised by Licensee. Notably, the Parties have been discussing a payment plan since September 2022, several months prior to any mention by Licensee concerning production issues related to the iPhone 14, on December 13, 2022 (*see* Response Letter, Exhibit A).

The Response Letter also purports to "exercise Licensee's rights" under the terms of Section 21.11 (directing the Parties to "meet and negotiate in good faith concerning any terms of the Agreement that either of the Parties wishes to address in light of such Force Majeure Event"), as well as the terms of Schedule 8[1] (concerning renegotiation of Licensee's GMR due to unexpected conditions outside the Parties' control). Licensee's supposed invocation of these rights ignores the months of repeated discussions and the fact that Licensor agreed to a string of payment plans delaying Licensee's increasingly growing outstanding payment totals.

Finally, the Response Letter mischaracterizes the Notice Letter as a "threat to terminate" the License Agreement. The Notice Letter put Licensee on formal notice that it has failed to pay all amounts owed under the License Agreement and set the period within which Licensee was obligated to cure its default, all as required by Section 3.3 of the License Agreement. As such failure to pay was not cured, Licensor is entitled to hold Licensee in default.

We are willing to discuss a potential path forward, but Licensee's acknowledgement of its payment obligations and making the outstanding payments is critical if Licensor and Licensee are to consider any continuing partnership.

This letter is sent without waiver of or prejudice to any rights, remedies, claims, or defenses that Licensor may have with respect to the License Agreement, each of which are expressly reserved. All terms and conditions of the License Agreement remain in full force and effect.

Sincerely,

Jonathan Malki
Director, Senior Counsel
Tapestry, Inc.

---

[1] Nothing in this letter shall be taken as a concession or agreement that any term of the License Agreement, including Schedule 8 or Schedule 3.3(g), warrants renegotiation or is being renegotiated.

Cc:    Charlotte Warshaw
Vice President, Global Licensing & North America Wholesale
kate spade new york

Jackee de Lagarde
Vice President, Global Licensing
kate spade new york

Damaris Fernandez-Baez
Senior Director, Finance
kate spade new york

Amy Melican
Vice President, Deputy General Counsel
Tapestry, Inc.

# EXHIBIT M

♠

# kate spade

NEW YORK

March 31, 2023

Vinci Brands LLC
Attn.: Legal Department
1775 Flight Way, Suite 300
Tustin, CA 92782

Attn. Brian Stech, Chief Executive Officer - brian@vincibrands.com
With a copy by email to Legal@vincibrands.com

Re: <u>Notice of Default</u>

Dear Brian:

Reference is made to the license agreement, dated April 25, 2014, between Coach Services, Inc., for the benefit of the kate spade new york brand, ("Licensor") and Vinci Brands f/k/a Incipio, LLC ("Licensee"), as well as the First Amendment dated August 31, 2015, Second Amendment dated January 16, 2017, Third Amendment dated November 28, 2018, Fourth Amendment dated November 13, 2019, Fifth Amendment dated July 1, 2020, and Sixth Amendment, dated January 1, 2022 (collectively, the "License Agreement"). Capitalized terms used but not defined in this letter have the respective meanings given to such terms in the License Agreement. Each of Licensor and Licensee is a "Party" and are collectively the "Parties."

Reference is further made to Licensor's Notice of Non-Payment, dated March 20, 2023, (the "Notice Letter") and Licensee's response, dated March 22, 2023 (the "Response Letter"). The Notice Letter documents Licensee's failure to pay all required Guaranteed Minimum Royalties ("GMR"), Image Fund Payments, and Creative/Design Fee Payments in full. The Notice Letter also recounts the Parties' several evolving payment plans intended to facilitate Licensee's payment of the minimum amounts due under the License Agreement. The Notice Letter also put Licensee on notice, in accordance with the terms of the License Agreement, of its obligation to pay all amounts owed to Licensor within three (3) days, in order to cure its default, as required by Section 3.3(a) of the License Agreement.

All outstanding payments (*i.e.*, the gross amount of ▮▮▮▮▮▮▮▮) were due to Licensor in full no later than March 25, 2023. No payment was made by that date. On March 29, 2023, Licensee made a payment of $100,000.00 (One Hundred Thousand Dollars) to Licensor, but did not pay the full amount owed to Licensor within three (3) days of its receipt of the Notice Letter. ***This letter therefore serves as notice of Licensee's default pursuant to Section 3.3(a) of the License Agreement.***

Sincerely,

**Coach Services, Inc.  (For kate spade new york)**

By: _Jim Capiola_
      0DB808AC216F4D9...

Jim Capiola
Senior Vice President, Chief Financial Officer

Cc:    Charlotte Warshaw
       Vice President, Global Licensing & North America Wholesale
       kate spade new york

       Jackee de Lagarde
       Vice President, Global Licensing
       kate spade new york

       Damaris Fernandez-Baez
       Senior Director, Finance
       kate spade new york

       Amy Melican
       Vice President, Deputy General Counsel
       Tapestry, Inc.

       Jonathan Malki
       Director, Senior Counsel
       Tapestry, Inc.

# EXHIBIT N

January 26, 2023

Case-Mate, Inc.
115 Perimeter Center Place, Suite 1150
Atlanta, GA  30346

*Re: CONFIDENTIALITY AGREEMENT*

       In connection with your consideration in a possible financial arrangement (the "Transaction") with Vinci Brands LLC (the "Company"), you understand that prior to or during the course of negotiations in respect of the Transaction, certain confidential information concerning the Company and/or the Company's affiliates may be disclosed to you, your directors, officers, employees, partners, members, financing sources, financial advisors, attorneys accountants or agents (collectively, but excluding any of your affiliates, your "Representatives"), either in written form, orally or otherwise (collectively, the "Evaluation Material").  In consideration of the Company agreeing to make the Evaluation Material available to you or your Representatives, you agree as follows:

1.    No disclosure of your interest in the Transaction or the Company will be made by you or your Representatives prior to the date of closing of the Transaction between you and the Company, except as may be otherwise (a) agreed upon in writing by you and the Company, or (b) required by applicable law or regulatory authority, but only after you have complied with the requirements of paragraph 5 herein.

2.    The fact that the Company is providing Evaluation Material to you, the fact that the parties have had, are having or may have discussions concerning the Transaction, and any negotiations that may occur between you and/or your Representatives and the Company shall also be deemed Evaluation Material and treated in accordance with the provisions hereof. All Evaluation Material will be held in complete confidence and, without the Company's prior written consent, will not be disclosed, in whole or in part, to any other person (other than such of your Representatives who need access to any such materials or information for purposes of your evaluating or negotiating the Transaction), and no Evaluation Material shall be used in any way directly or indirectly detrimental to the Company or its affiliates or for any business or competitive purpose other than your evaluation or negotiation of the Transaction. The term "Evaluation Material" does not include any information:

    (a)    which was in your or your Representatives' possession prior to the date of this agreement and was obtained on a non-confidential basis from a source that you reasonably believe was not prohibited by a contractual, legal or fiduciary obligation to the Company from disclosing such information to you;

    (b)    which at the time of disclosure to you or your Representatives is in the public domain or which after such disclosure comes into the public domain through no breach of the terms of this Agreement by you or your Representatives;

    (c)    which was available to you or your Representatives on a non-confidential basis from a source other than the Company or its advisors, provided that such source is not known to you at the time of your disclosure to be prohibited from disclosing such information to you by a legal, contractual or fiduciary obligation to the Company; or

    (d)    which is developed by you or your Representatives from information which you or your Representatives have or receive from a source that you reasonably believe was not prohibited by a contractual, legal or fiduciary obligation to the Company or any of its Representatives from disclosing such information to you.

3.    You shall be responsible for ensuring that your Representatives adhere to the terms of the undertakings of this agreement as if such persons were original parties hereto.

4.    You agree not to reproduce or copy by any means any Evaluation Material without the Company's prior written permission, except as reasonably required to accomplish the Transaction.  You and your Representatives will return to the Company upon demand, or in the event you cease to be interested in pursuing the Transaction (and you hereby agree to provide the Company with prompt notice of such determination), all Evaluation Material provided to you or your Representatives, including all copies thereof which may have been made by or on behalf of you or your Representatives, and you shall destroy, or cause to be destroyed, all notes or memoranda or other stored information of any kind prepared by you or your Representatives relating to the Evaluation Material or negotiations generally; <u>provided</u>, that all Evaluation Material will remain subject to the terms of this agreement. Notwithstanding the foregoing, Evaluation Material may be retained for legal or regulatory purposes only and neither you nor your Representatives are required to destroy any computer records or files containing Evaluation Material that have been created pursuant to automatic archiving or backup procedures.

January 26, 2023

5.  If you or your Representatives become (or if it is reasonably likely that you or they shall become) legally compelled to disclose any Evaluation Material, prompt notice of such fact shall be given to the Company so that appropriate action may be taken by the Company prior to making such disclosure, and you agree to cooperate with the Company in any manner reasonably requested by the Company. If a disclosure of the Evaluation Material is required or we waive compliance with the applicable terms of this agreement, the person required to disclose the Evaluation Material will furnish only that portion of the Evaluation Material which such person is advised by its counsel is legally required to be disclosed and will exercise its reasonable efforts to obtain reliable assurances that confidential treatment will be accorded the Evaluation Material. Notwithstanding the foregoing, no prior notice or other action shall be required in respect of disclosures of the Evaluation Material to financial regulatory authorities having jurisdiction over you or your Representatives in connection with routine regulatory examinations, unless the requests by such regulatory authorities are specifically targeted at the Evaluation Material or the Transaction.

6.  Without prejudice to any other rights or remedies the Company may have, you acknowledge and agree that money damages would not be an adequate remedy for any breach of this agreement and that the Company shall be entitled to the remedies of injunction, specific performance and other equitable relief for any threatened or actual breach of this agreement. You agree to, and to use your best efforts to cause your Representatives to, waive any requirement for the securing or posting of any bond in connection with any such remedy.

7.  You acknowledge that, except as may be set forth in a definitive, written agreement executed by the Company in respect of the Transaction, neither the Company, its affiliates, nor any of its or their directors, officers, employees or advisors shall have made or be deemed to have made, or shall be responsible for, any representations or warranties, express or implied, with respect to the accuracy or completeness of the Evaluation Material supplied under this agreement. Further, it is acknowledged hereby by you that only those representations and warranties made by the Company in a definitive, written agreement in respect of the Transaction executed and delivered by an officer of each party or other authorized person on behalf of each party shall have any force or effect.

8.  You acknowledge that the Company and the Company's advisors shall be free to conduct the process in respect of the Transaction as they in their sole discretion shall determine, including, without limitation, negotiating and/or terminating negotiations with any prospective or interested parties at any time, with or without any reason.

9.  No failure or delay by the Company in exercising any right, power or privilege under this agreement shall operate as a waiver thereof, and no waiver, amendment, supplement or modification hereof shall be effective, unless in writing and signed by an officer of the Company or other authorized person on its behalf.

10. The illegality, invalidity or unenforceability of any provision hereof under the laws of any jurisdiction shall not affect its legality, validity or enforceability under the laws of any other jurisdiction, nor the legality, validity or enforceability of any other provision.

11. This agreement shall terminate twelve (12) months from the date hereof; provided that the expiration of such period shall not affect the Company's right to enforce any claims of the Company arising out of your conduct or activities prior to the expiration.

12. This agreement shall be governed by and construed in accordance with the laws of the State of Ohio, applicable to contracts made and to be performed therein.

13. In the event of any litigation or proceeding relating to this agreement, the prevailing party(ies) in such litigation or proceeding shall be entitled to recover from the non-prevailing party(ies) all such costs and expenses (including, without limitation, all court or other tribunal costs and reasonable attorneys' fees) incurred by the prevailing party(ies) in connection with such litigation or proceeding.

14. This agreement is for the benefit of each of the parties and their respective successors and assigns.

Very truly yours,
Vinci Brands, LLC

By:    _____
Stephen J. Latkovic
Manager


Accepted and agreed to as of the 26th day of January, 2023.

Case-Mate, Inc.

By:    _____
Name:    Tuan Pham
Title:    CFO

# EXHIBIT O

April 18, 2023

Keshav Mehta
Case-Mate Inc
115 Perimeter Center Pl NE
Ste 1150
Dunwoody GA 30346

*Re: CONFIDENTIALITY AGREEMENT*

Dear Case-Mate Inc;

      In connection with your consideration in a possible financial arrangement (the "Transaction") with Project Shield (the "Company"), you understand that prior to or during the course of negotiations in respect of the Transaction, certain confidential information concerning the Company and/or the Company's affiliates may be disclosed to you, your directors, officers, employees, partners, members, financing sources, financial advisors, attorneys accountants or agents (collectively, but excluding any of your affiliates, your "Representatives"), either in written form, orally or otherwise (collectively, the "Evaluation Material"). In consideration of the Company agreeing to make the Evaluation Material available to you or your Representatives, you agree as follows:

1.   No disclosure of your interest in the Transaction or the Company will be made by you or your Representatives prior to the date of closing of the Transaction between you and the Company, except as may be otherwise (a) agreed upon in writing by you and the Company, or (b) required by applicable law or regulatory authority, but only after you have complied with the requirements of paragraph 5 herein.

2.   The fact that the Company is providing Evaluation Material to you, the fact that the parties have had, are having or may have discussions concerning the Transaction, and any negotiations that may occur between you and/or your Representatives and the Company shall also be deemed Evaluation Material and treated in accordance with the provisions hereof. All Evaluation Material will be held in complete confidence and, without the Company's prior written consent, will not be disclosed, in whole or in part, to any other person (other than such of your Representatives who need access to any such materials or information for purposes of your evaluating or negotiating the Transaction), and no Evaluation Material shall be used in any way directly or indirectly detrimental to the Company or its affiliates or for any business or competitive purpose other than your evaluation or negotiation of the Transaction. The term "Evaluation Material" does not include any information:

    (a)   which was in your or your Representatives' possession prior to the date of this agreement and was obtained on a non-confidential basis from a source that you reasonably believe was not prohibited by a contractual, legal or fiduciary obligation to the Company from disclosing such information to you;

    (b)   which at the time of disclosure to you or your Representatives is in the public domain or which after such disclosure comes into the public domain through no breach of the terms of this Agreement by you or your Representatives;

    (c)   which was available to you or your Representatives on a non-confidential basis from a source other than the Company or its advisors, provided that such source is not known to you at the time of your disclosure to be prohibited from disclosing such information to you by a legal, contractual or fiduciary obligation to the Company; or

    (d)   which is developed by you or your Representatives from information which you or your Representatives have or receive from a source that you reasonably believe was not prohibited by a contractual, legal or fiduciary obligation to the Company or any of its Representatives from disclosing such information to you.

3.   You shall be responsible for ensuring that your Representatives adhere to the terms of the undertakings of this agreement as if such persons were original parties hereto.

4.   You agree not to reproduce or copy by any means any Evaluation Material without the Company's prior written permission, except as reasonably required to accomplish the Transaction. You and your Representatives will return to the Company upon demand, or in the event you cease to be interested in pursuing the Transaction (and you hereby agree to provide the Company with prompt notice of such determination), all Evaluation Material provided to you or your Representatives, including all copies thereof which may have been made by or on behalf of you or your Representatives, and you shall destroy, or cause to be destroyed, all notes or memoranda or other stored information of any kind prepared by you or your

April 18, 2023

Page 2

Representatives relating to the Evaluation Material or negotiations generally; <u>provided</u>, that all Evaluation Material will remain subject to the terms of this agreement. Notwithstanding the foregoing, Evaluation Material may be retained for legal or regulatory purposes only and neither you nor your Representatives are required to destroy any computer records or files containing Evaluation Material that have been created pursuant to automatic archiving or backup procedures.

5.  If you or your Representatives become (or if it is reasonably likely that you or they shall become) legally compelled to disclose any Evaluation Material, prompt notice of such fact shall be given to the Company so that appropriate action may be taken by the Company prior to making such disclosure, and you agree to cooperate with the Company in any manner reasonably requested by the Company. If a disclosure of the Evaluation Material is required or we waive compliance with the applicable terms of this agreement, the person required to disclose the Evaluation Material will furnish only that portion of the Evaluation Material which such person is advised by its counsel is legally required to be disclosed and will exercise its reasonable efforts to obtain reliable assurances that confidential treatment will be accorded the Evaluation Material. Notwithstanding the foregoing, no prior notice or other action shall be required in respect of disclosures of the Evaluation Material to financial regulatory authorities having jurisdiction over you or your Representatives in connection with routine regulatory examinations, unless the requests by such regulatory authorities are specifically targeted at the Evaluation Material or the Transaction.

6.  You shall not, and shall not permit your Representatives who have received confidential information to, directly or indirectly, solicit for employment or engagement, or hire or engage, any management-level employee of the Company or its subsidiaries with whom you or your Representatives has first had contact or who first became known to you in connection with your evaluation of this possible financial arrangement with the Company, provided, that the foregoing shall not prohibit any such action due to or through (i) general solicitations of employment not targeted or directed at the Company, its subsidiaries or its or their employees, (ii) any person referred by search firms not directed by you or your Representatives to target such employees, (iii) any person contacting you or your affiliates on their own initiative who has been terminated by the Company at least 6 months prior, or (iv) any person who is no longer employed by the Company or any of its subsidiaries for at least 6 months.

7.  Without prejudice to any other rights or remedies the Company may have, you acknowledge and agree that money damages would not be an adequate remedy for any breach of this agreement and that the Company shall be entitled to the remedies of injunction, specific performance and other equitable relief for any threatened or actual breach of this agreement. You agree to, and to use your best efforts to cause your Representatives to, waive any requirement for the securing or posting of any bond in connection with any such remedy.

8.  You acknowledge that, except as may be set forth in a definitive, written agreement executed by the Company in respect of the Transaction, neither the Company, its affiliates, nor any of its or their directors, officers, employees or advisors shall have made or be deemed to have made, or shall be responsible for, any representations or warranties, express or implied, with respect to the accuracy or completeness of the Evaluation Material supplied under this agreement. Further, it is acknowledged hereby by you that only those representations and warranties made by the Company in a definitive, written agreement in respect of the Transaction executed and delivered by an officer of each party or other authorized person on behalf of each party shall have any force or effect.

9.  You acknowledge that the Company and the Company's advisors shall be free to conduct the process in respect of the Transaction as they in their sole discretion shall determine, including, without limitation, negotiating and/or terminating negotiations with any prospective or interested parties at any time, with or without any reason.

10. No failure or delay by the Company in exercising any right, power or privilege under this agreement shall operate as a waiver thereof, and no waiver, amendment, supplement or modification hereof shall be effective, unless in writing and signed by an officer of the Company or other authorized person on its behalf.

11. The illegality, invalidity or unenforceability of any provision hereof under the laws of any jurisdiction shall not affect its legality, validity or enforceability under the laws of any other jurisdiction, nor the legality, validity or enforceability of any other provision.

12. This agreement shall terminate twelve (12) months from the date hereof; provided that the expiration of such period shall not affect the Company's right to enforce any claims of the Company arising out of your conduct or activities prior to the expiration.

April 18, 2023                                                                                    Page 3

13. This agreement shall be governed by and construed in accordance with the laws of the State of Ohio, applicable to contracts made and to be performed therein.

14. In the event of any litigation or proceeding relating to this agreement, the prevailing party(ies) in such litigation or proceeding shall be entitled to recover from the non-prevailing party(ies) all such costs and expenses (including, without limitation, all court or other tribunal costs and reasonable attorneys' fees) incurred by the prevailing party(ies) in connection with such litigation or proceeding.

15. This agreement is for the benefit of each of the parties and their respective successors and assigns.

Very truly yours,
Project Shield

By: _____
     Manager

Accepted and agreed to as of the 18th day of April 2023.

Case-Mate Inc

By: _____
Name:    Keshav Mehta
Title:      COO

# EXHIBIT P



NEW YORK

June 14, 2023

Vinci Brands LLC
Attn.: Legal Department
1775 Flight Way, Suite 300
Tustin, CA 92782

With a copy by email to Legal@vincibrands.com

Re: <u>Notice of Termination</u>

To whom it may concern:

Reference is made to the license agreement, dated April 25, 2014, between Coach Services, Inc., for the benefit of the kate spade new york brand, ("Licensor") and Vinci Brands f/k/a Incipio, LLC ("Licensee"), as well as the First Amendment dated August 31, 2015, Second Amendment dated January 16, 2017, Third Amendment dated November 28, 2018, Fourth Amendment dated November 13, 2019, Fifth Amendment dated July 1, 2020, and Sixth Amendment, dated January 1, 2022 (collectively, the "License Agreement"). Capitalized terms used but not defined in this letter have the respective meanings given to such terms in the License Agreement. Each of Licensor and Licensee is a "Party" and are collectively the "Parties."

Reference is further made to Licensor's Notice of Default dated March 31, 2023 (the "Default Letter") and to Licensor's Notice of Non-Payment, dated March 20, 2023, (the "Notice Letter"). The Default Letter notified Licensee that it was in default pursuant to Section 3.3(a) of the License Agreement, due to Licensee's failure to pay all required Guaranteed Minimum Royalties ("GMR"), Image Fund Payments, and Creative/Design Fee Payments as documented in the Notice Letter. Licensee has not sought to cure its default pursuant to Section 3.3(a) by paying all amounts owed to Licensor.

***<u>This letter therefore serves as notice pursuant to Section 3.5(a) of the License Agreement of Licensor's termination of the License Agreement with immediate effect. As of the date of this Notice of Termination, Licensee is not authorized to take any further action with respect to the manufacture, distribution, promotion, or sale of Licensed Merchandise or to otherwise take any action with respect to the Licensed Marks except as expressly authorized by Licensor in writing.</u>***

This letter is sent without waiver of or prejudice to any rights, remedies, claims, or defenses that Licensor may have with respect to the License Agreement, all of which are expressly reserved, including, without limitation, with respect to the payment of Licensee's financial obligations under Sections 7, 8, and 9 of the License Agreement. Subject to the limitations and other provisions of the License Agreement, Sections 11-12, 14-18, and 21, as well as any other provision that in order to give proper effect to its intent should survive such termination, shall survive the termination of the License Agreement.

Sincerely,

**Coach Services, Inc.** **(For kate spade new york)**

By: Jim Capiola

Jim Capiola
Senior Vice President, Chief Financial Officer

Cc:    Jason Bingham
       Chief Financial Officer
       Vinci Brands LLC

       Charlotte Warshaw
       Vice President, Global Licensing & North America Wholesale
       kate spade new york

       Jackee de Lagarde
       Vice President, Global Licensing
       kate spade new york

       Amy Melican
       Vice President, Deputy General Counsel
       Tapestry, Inc.

       Jonathan Malki
       Director, Senior Counsel
       Tapestry, Inc.

       Steve Latkovic
       Managing Director
       Candlewood Partners, LLC

# EXHIBIT Q

**From:** Saumil Mody
**Date:** 2023-06-15 16:36
**To:** kurt.cheng; kevinchen
**CC:** Clark Bradley; Claire Wang; wilson gao
**Subject:** URGENT! Kate Spade / Coach - Salmon

Hi Salmon Team - Effective immediately, Case-Mate has signed an exclusive multi-year licensing partnership agreement with KATE SPADE NEW YORK and COACH to design, manufacture and sell phone cases and other mobile accessories globally.

Note: Case-Mate has no affiliation with the prior licensee. We cannot answer or speak to ANYTHING about them.

We want to work with everyone to have a smooth start to the business. For this, please assist for the following:

1.a. Please see attached a Kate Spade existing product SKU list (Kate Spade SKUs.xlsx). Please inform if your factory is the existing vendor for any of these SKUs. If yes, please put your name in the Vendor column and provide the quotation for the same for reorders. Please also inform who is the packaging vendor for each SKU.
1.b. Please also assist to review the attached Kate Spade Catalog (2023-KSNY-Master-Catalog.pdf). If you see an item in the Catalog that is produced by your factory, but it is missing from the SKU list, please assist to add it to the bottom of the list together with the same details.

2. Please inform if your factory has the approved artwork and tooling to produce the designs shown in attached (KS TJX.png) file for the following devices:
iPhone 14 Pro Max
iPhone 14/13
iPhone 13 Pro Max

3. We want to work with your factory to make 2023 iPhone launch for any Kate Spade / Coach item that you have developed for them. For this:
a. Please review attached (KSNY FA23 - New Prints 01.12.23.pdf), (KSNY FW23 - ALL IN ONE

TRACKER_3.9.pdf) & (KSNY FW23 - ALL IN ONE TRACKER_4.19.pdf) files and confirm whether your factory has the approved or latest artworks to produce the designs. Please provide a detailed status list for this. Please also provide the mass production quotation for these designs.

b. Please inform what are the tools your factory has already fabricated for these devices that are available to Case-Mate for running mass production? Please provide a list. If you developed a design using an existing iPhone 14 tool but haven't fabricated the same tools for the 2023 iPhones yet, please provide a quotation for the cost and lead-time for fabricating these.

Please let us know if you have any questions about above.

Thanks,
Saumil Mody.
V.P. - Engineering & Sourcing
+1.765.409.3883



# EXHIBIT R

# kate spade

## NEW YORK

**LETTER OF AUTHORIZATION**

**Authorized Licensee: Case-Mate, Inc.**

THIS LETTER OF AUTHORIZATION confirms that the Authorized Licensee identified below is permitted to engage in the Authorized Activity (described below) for the Authorized Items (described below) pursuant to an ongoing business relationship and licensing arrangement.

**Kate Spade LLC**, a subsidiary of Tapestry, Inc., is the sole and exclusive owner worldwide of the Kate Spade New York brand, and all associated trademarks for use in connection with handbags, luggage, small leather goods, shoes, watches, eyewear, jewelry, clothing, and other related products, accessories, and packaging (collectively, the "KSNY Brand"). These trademarks include, but are not limited to, the KATE SPADE NEW YORK and KATE SPADE word marks and the Kate Spade New York Spade Lock Up Logo (collectively, the "KSNY Trademarks").

The authorization set forth here shall not be transferred or assigned to any other person or entity without the express prior written authorization of Kate Spade LLC. There shall be no disposition of KSNY Brand inventory other than that expressly authorized in writing by Kate Spade LLC in a separate writing.

This authorization will remain in effect until **June 30, 2024**. Notwithstanding the foregoing, Kate Spade LLC may, at any time in its sole discretion, modify or cancel this Letter of Authorization with a signed writing.

| | |
|---|---|
| **Authorized Licensee**: | **Case-Mate, Inc.**<br>990 Hammond Drive, Suite 700<br>Atlanta, GA 30328 |
| **Authorized Activity**: | Develop, produce, manufacture, promote, advertise, distribute, & sell |
| **Authorized Items**: | Authentic protective technology cases and mobile accessories, and related packaging materials. |
| **Executed Authorization**: | **Kate Spade LLC**<br>2 Park Avenue<br>New York, NY 10016<br>USA<br><br>c/o<br>Tapestry, Inc.<br>10 Hudson Yards<br>New York, NY 10001<br>USA |

_____     Date: June 16, 2023
**Jonathan Malki**
Senior Intellectual Property Counsel & Assistant Secretary
Email: Jmalki@tapestry.com
Facsimile: + 1 212-615-2541

# EXHIBIT S
# (FILED UNDER SEAL)

# EXHIBIT T

**From:** Margaret Chang Liao <MLiao@scp4me.com>
**Date:** June 20, 2023 at 12:55:30 PM PDT
**To:** Sonny Haddad <sh@bhpc.com>, Marshall Clark
<mclark@vincibrands.com>, Josh Phillips <jphillips@vincibrands.com>
**Cc:** Solomon Chen <SChen@scp4me.com>, Scott Shanks
<SShanks@scp4me.com>, Keith Kam <KKam@scp4me.com>
**Subject: FW: update**

Hi Onward Team,

Wanted to provide the below communication that was sent to us from Case-Mate today. Please see below. Please let us know if there are any actions required from us.

Thanks.



**Margaret Chang Liao**
*Corporate Controller*
**Superior Communications**
Phone / 626.388.1983

This email, and any attachments, are intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. It is the property of Superior Communications. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email, any attachments thereto, and any use of the information contained is strictly prohibited. If you have received this email in error, please notify Superior Communications and permanently delete the original and any copy thereof.

**From:** Scott Shanks <SShanks@scp4me.com>

**Sent:** Tuesday, June 20, 2023 12:35 PM
**To:** Margaret Chang Liao <MLiao@scp4me.com>
**Subject:** Fwd: update

Scott Shanks
President
Superior Communications



**Scott Shanks**
*President*
**Superior Communications**
Phone / 1.248.535.2767

Begin forwarded message:

> **From:** Steve Marzio <steve.marzio@case-mate.com>
> **Date:** June 20, 2023 at 1:49:33 PM EDT
> **To:** Scott Eppert <SEppert@scp4me.com>, Scott Shanks
> <SShanks@scp4me.com>
> **Subject: update**

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

> Hi Scott & Scott ???
> ??
> I want to reiterate that as per the attached, Case-Mate is the new owner of the global license for Kate Spade phone cases & mobile accessories.?? We expect this matter could become litigious between relevant parties so wanted to make sure you understand all the facts clearly.?? Please note, the legal counsel for Kate Spade is listed on this attached communication should you value further clarification.??
> ??
> As a valued partner to Case-Mate and a highly recognized distribution leader in the industry, you may want to immediately ensure that you are sourcing/selling product from the legal vendor.
> ??
> Feel free to call me with any questions.
> ??
> Steve

??
**steve marzio**
**ceo | case-mate**
**m** 770.337.0399
**www.case-mate.com**
??
??

# EXHIBIT U



June 22, 2023

Pacificomm
attn: Craig Kingshott
Managing Director
craigk@pacificomm.com.au

**<u>CONFIDENTIAL – NOT FOR EXTERNAL DISTRIBUTION</u>**

Re: <u>kate spade new york – Case-Mate, Inc. Technology Cases & Mobile Accessories</u>

Dear Craig:

This letter is sent on behalf of Tapestry, Inc. and its subsidiaries Coach Services, Inc. and Kate Spade LLC, for and on behalf of the kate spade new york brand (collectively, "Kate Spade"). Kate Spade is the sole and exclusive owner worldwide of the kate spade new york brand, and all associated trademarks for use in connection with technology cases and mobile accessories. These trademarks include, but are not limited to, the KATE SPADE NEW YORK and KATE SPADE word marks and the Spade Lock Up Logo (collectively, the "KSNY Trademarks").

We write for two reasons.

**First, this letter confirms that as of today and going forward Case-Mate, Inc., is Kate Spade's <u>only and exclusive licensee,</u> and is the sole partner authorized to use the KSNY Trademarks and other intellectual property owned by Kate Spade to produce, manufacture, promote, advertise, distribute, and sell technology cases and mobile accessories, and related packaging.** We are working closely with and supporting Case-Mate in the manufacture, distribution and sale of Kate Spade products, and we look forward to Case-Mate receiving your orders with respect to Kate Spade's technology cases and mobile accessories, including with respect to the expected Apple devices launching in September 2023 and all prior and future Apple and non-Apple tech accessories and programs.

The attached authorization affirms that Case-Mate is Kate Spade's exclusive licensee.

Second, we have learned that Vinci Brands, LLC ("Vinci') may be attempting to create confusion with our and Case-Mate's customers with respect to the status of its relationship with Kate Spade. However, please be aware that Vinci has publicly and accurately acknowledged that on June 14, 2023 Kate Spade notified Vinci that it was terminating the license agreement with Vinci.

We appreciate your quick partnership with Case-Mate given the accelerated timeline needed to meet Case-Mate and Kate Spade's orders for the expected Apple devices launching in September

2023.  I am available to answer any questions you may have and would welcome the opportunity to do so to the extent any confusion has arisen due to Vinci's conduct.

Sincerely,

**Tapestry, Inc.**

By:    Charlotte Warshaw
       _____
       Charlotte Warshaw
       VP of Americas Wholesale, Travel Retail and Global Licensing
       kate spade new york


cc:    Jackee de Lagarde (via email)
       Vice President, Global Licensing, kate spade new york

       Steve Marzio (via email)
       CEO, Case-Mate, Inc.

       Kristen Roney (via email)
       Case-Mate, Inc.

# kate spade

## NEW YORK

**LETTER OF AUTHORIZATION**

**Exclusive Authorized Licensee: Case-Mate, Inc.**

THIS LETTER OF AUTHORIZATION confirms that the Exclusive Authorized Licensee identified below is the sole and exclusive licensee of Kate Spade, LLC permitted to engage in the Authorized Activity (described below) for the Authorized Items (described below) pursuant to an ongoing business relationship and licensing arrangement.

**Kate Spade LLC**, a subsidiary of Tapestry, Inc., is the sole and exclusive owner worldwide of the Kate Spade New York brand, and all associated trademarks for use in connection with handbags, luggage, small leather goods, shoes, watches, eyewear, jewelry, clothing, and other related products, accessories, and packaging (collectively, the "KSNY Brand"). These trademarks include, but are not limited to, the KATE SPADE NEW YORK and KATE SPADE word marks and the Kate Spade New York Spade Lock Up Logo (collectively, the "KSNY Trademarks").

The authorization set forth here shall not be transferred or assigned to any other person or entity without the express prior written authorization of Kate Spade LLC. There shall be no disposition of KSNY Brand inventory other than that expressly authorized in writing by Kate Spade LLC in a separate writing.

This authorization will remain in effect until **June 30, 2024**. Notwithstanding the foregoing, Kate Spade LLC may, at any time in its sole discretion, modify or cancel this Letter of Authorization with a signed writing.

| | |
|---|---|
| **Authorized Licensee:** | **Case-Mate, Inc.**<br>990 Hammond Drive, Suite 700<br>Atlanta, GA 30328 |
| **Authorized Activity:** | Develop, produce, manufacture, promote, advertise, distribute, & sell |
| **Authorized Items:** | Authentic protective technology cases and mobile accessories, and related packaging materials. |
| **Executed Authorization:** | **Kate Spade LLC**<br>2 Park Avenue<br>New York, NY 10016<br>USA<br><br>c/o<br>Tapestry, Inc.<br>10 Hudson Yards<br>New York, NY 10001<br>USA |

_____    Date: June 22, 2023

**Jonathan Malki**
Senior Intellectual Property Counsel & Assistant Secretary
Email: Jmalki@tapestry.com
Facsimile: + 1 212-615-2541

# EXHIBIT V
# (FILED UNDER SEAL)

# EXHIBIT W

June 19, 2023

Kate Spade, LLC
Attn: Licensing Director
2 Park Avenue
New York, NY 10016

With a copy to:
Tapestry, Inc.
Attn: General Counsel
10 Hudson Yards
New York, NY 10001

and

Coach Services, Inc.
Jim Capiola
Senior Vice President, Chief Financial Officer

Re: Communications with Vinci Suppliers and Customers

To whom it may concern:

     Reference is made to the License Agreement, dated April 25, 2014, between Kate Spade, LLC ("Licensor") and Incipio Technologies, Inc. the First Amendment, dated August 31, 2015; the Second Amendment, dated January 16, 2017; the Third Amendment, dated November 28, 2018; the Fourth Amendment, dated November 13, 2019; the Fifth Amendment, dated July 1, 2020; and the Sixth Amendment, dated January 1, 2022 (collectively, the "License Agreement"). Further reference is made to the Consent to Assignment and Amendment of License Agreement, dated January 13, 2016, between Licensee (Incipio) and Kate Spade through which Incipio assigned all of its rights and obligations under the License (and any Amendments thereto) to Incipio, LLC and Kate Spade consented to that assignment; the Sale Agreement, dated August 6, 2021, between Vinci Brands LLC ("Licensee" or "Vinci") and Incipio, LLC, whereby Incipio, LLC transferred and assigned, and Vinci accepted and assumed, the License Agreements and all Amendments thereto; and the Termination of License Agreement—Notice of Licensor's Exercise of Rights letter from Coach Services, Inc. (for kate spade new york) to Vinci, dated June 15, 2023 ("Termination Letter").

     Licensee has become aware that a communication from Licensor and/or Tapestry, Inc. has been disseminated to suppliers and customers of Licensee, in the form of a "LETTER OF AUTHORIZATION," whereby Licensor "confirms" that Case-Mate, Inc. is an "Authorized Licensee" and is authorized by Licensor to "develop, produce, manufacture, promote, advertise, distribute, & sell" "authentic protective technology cases and mobile accessories, and related packaging materials." See Attachment A. This letter further states, "There shall be no disposition of KSNY Brand inventory other than that expressly authorized in writing by Kate Spade LLC in a separate writing." Licensee has also become aware of communications by Case-Mate, Inc. to suppliers and customers of Licensee interfering with the contracts and business relationships between those entities and Licensee. See Attachment B. Those communications incorrectly and unlawfully claim that Case-Mate has an exclusive licensing agreement with Kate Spade to design, manufacture and sell phone cases and other mobile accessories globally. Case-Mate further instructs Licensee's suppliers to provide Case-Mate with information concerning the suppliers' production of

Kate Spade-branded merchandise and their artwork and tooling to produce that merchandise. Finally, those communications indicate Case-Mate's plain intention to interfere with Licensee's contracts and business relationships by taking the place of Licensee with regard to the production and delivery of Kate Spade-branded protective technology cases and mobile accessories and related packaging materials.

***The communications by Licensor, Tapestry, and Case-Mate to Licensee's suppliers have caused and will cause massive and irreparable harm to Licensee***.  This harm adds to compounds the massive and irreparable harm caused by Licensor's violation of Section 3.2 of the Licensing Agreement by unilaterally announcing to the public and/or trade that Licensor had terminated the License Agreement, without obtaining Licensee's agreement on a joint statement announcing the termination and on the timing of that announcement. Licensor's failure to comply with its obligations under Section 3.2 of the License Agreement has thus resulted in unauthorized, untruthful, and actionable communications to Licensee's suppliers.

The Licensing Agreement has not been validly terminated, and therefore Licensee is still permitted to produce Licensed Merchandise until the termination date (June 30, 2025) or until such time as the Licensing Agreement is properly terminated.  Even if the Termination Letter constituted a valid termination of the License Agreement (and it does not), Licensor's and Tapestry's actions are unlawful and in violation of the Agreement, including those provisions that survive termination. Moreover, as the Termination Letter itself acknowledges, Vinci is permitted by Section 12 of the License Agreement to complete production of Licensed Merchandise which is in process, or for which written orders have been received from customers.

***Vinci therefore demands that Licensor and Tapestry cease and desist from any further instructions, directives, or communications with Licensee's suppliers, customers, the trade, or the public indicating or suggesting that Licensee is no longer able to manufacture Licensed Merchandise, and from making any announcements to the trade or the public concerning the purported termination.  In addition, Vinci demands that Licensor and Tapestry direct Case-Mate, in writing and with a copy to Vinci, to cease making the same or similar communications to Licensee's suppliers, customers, the trade, or the public, and to cease holding itself out as holding an exclusive licensing agreement with Kate Spade to design, manufacture and sell phone cases and other mobile accessories globally.***

Vinci further demands that Licensor and Tapestry, by 5 pm EDT on June 20, 2023, send a letter to any supplier or customer of Licensee to which a "LETTER OF AUTHORIZATION" regarding Case-Mate has been disseminated, or to any other person or entity to which any other communication (verbal or written) has been made that states or suggests that Licensee is no longer able to produce Licensed Merchandise, notifying them that Licensee in fact remains able to produce, manufacture, and deliver Kate Spade-branded protective technology cases and mobile accessories and related packaging materials until June 30, 2025 (the end of the Renewal Term specified in the Sixth Amendment) .  This letter must take the same form as the "LETTER OF AUTHORIZATION" Licensor and Tapestry sent regarding Case-Mate, and a copy must also be delivered to Licensee so that it may also send this letter to its suppliers and customers  (See Attachment C for form and content of letter Licensor and/or Tapestry must send on Licensor's letterhead.) If Licensor and Tapestry fail to send these letters to all relevant suppliers, retailers, and other persons or entities

(including a copy to Licensee) by 5 pm EDT on June 20, 2023, Licensee will seek all available legal remedies, including, but not limited to, an application for temporary and preliminary injunctive relief.

Sincerely,

Vinci Brands LLC

By:

 s/Steve Latkovic
Name: Steve Latkovic
Title: Manager
CWD Armor Management LLC

Cc:

Jason Bingham
Chief Financial Officer
Vinci Brands LLC

Steve Selna
Manish Mehta
Paul Del Aguila
Michael Vatis
Partners
Benesch Friedlander Coplan & Aronoff LLP

**Attachment A**

# kate spade

NEW YORK

**LETTER OF AUTHORIZATION**

**Authorized Licensee: Case-Mate, Inc.**

THIS LETTER OF AUTHORIZATION confirms that the Authorized Licensee identified below is permitted to engage in the Authorized Activity (described below) for the Authorized Items (described below) pursuant to an ongoing business relationship and licensing arrangement.

**Kate Spade LLC**, a subsidiary of Tapestry, Inc., is the sole and exclusive owner worldwide of the Kate Spade New York brand, and all associated trademarks for use in connection with handbags, luggage, small leather goods, shoes, watches, eyewear, jewelry, clothing, and other related products, accessories, and packaging (collectively, the "KSNY Brand"). These trademarks include, but are not limited to, the KATE SPADE NEW YORK and KATE SPADE word marks and the Kate Spade New York Spade Lock Up Logo (collectively, the "KSNY Trademarks").

The authorization set forth here shall not be transferred or assigned to any other person or entity without the express prior written authorization of Kate Spade LLC. There shall be no disposition of KSNY Brand inventory other than that expressly authorized in writing by Kate Spade LLC in a separate writing.

This authorization will remain in effect until **June 30, 2024**. Notwithstanding the foregoing, Kate Spade LLC may, at any time in its sole discretion, modify or cancel this Letter of Authorization with a signed writing.

| | |
|---|---|
| **Authorized Licensee:** | **Case-Mate, Inc.**<br>990 Hammond Drive, Suite 700<br>Atlanta, GA 30328 |
| **Authorized Activity:** | Develop, produce, manufacture, promote, advertise, distribute, & sell |
| **Authorized Items:** | Authentic protective technology cases and mobile accessories, and related packaging materials. |
| **Executed Authorization:** | **Kate Spade LLC**<br>2 Park Avenue<br>New York, NY 10016<br>USA<br><br>c/o<br>Tapestry, Inc.<br>10 Hudson Yards<br>New York, NY 10001<br>USA |

_____    Date: June 16, 2023

**Jonathan Malki**
Senior Intellectual Property Counsel & Assistant Secretary
Email: Jmalki@tapestry.com
Facsimile: + 1 212-615-2541

## Attachment B

**From:** Saumil Mody
**Date:** 2023-06-15 16:36
**To:** ▮▮▮▮▮▮
**CC:** Clark Bradley, Claire Wang, wilson gao
**Subject:** URGENT! Kate Spade / Coach - ▮▮▮▮▮▮

Hi ▮▮▮▮▮▮e immediately, Case-Mate has signed an exclusive multi-year licensing partnership agreement with KATE SPADE NEW YORK and COACH to design, manufacture and sell phone cases and other mobile accessories globally.

Note: Case-Mate has no affiliation with the prior licensee. We cannot answer or speak to ANYTHING about them.

We want to work with everyone to have a smooth start to the business. For this, please assist for the following:

1. Please see attached a Kate Spade existing product SKU list (Kate Spade SKUs.xlsx). Please inform if your factory is the existing vendor for any of these SKUs. If yes, please put your name in the Vendor column and provide the quotation for the same for reorders. Please also inform who is the packaging vendor for each SKU.

2. b. Please also assist to review the attached Kate Spade Catalog (2023-KSNY-Master- Catalog.pdf). If you see an item in the Catalog that is produced by your factory, but it is missing from the SKU list, please assist to add it to the bottom of the list together with the same details.

2. Please inform if your factory has the approved artwork and tooling to produce the designs shown in attached (KS TJX.png) file for the following devices:
iPhone 14 Pro Max iPhone 14/13 iPhone
13 Pro Max

3. We want to work with your factory to make 2023 iPhone launch for any Kate Spade / Coach item that you have developed for them. For this:
a. Please review attached (KSNY FA23 - New Prints 01.12.23.pdf), (KSNY FW23 - ALL IN ONE TRACKER_3.9.pdf) & (KSNY FW23 - ALL IN ONE TRACKER_4.19.pdf) files and confirm whether your factory has the approved or latest artworks to produce the designs. Please provide a detailed status list for this. Please also provide the mass production quotation for these designs.
b. Please inform what are the tools your factory has already fabricated for these devices that are available to Case-Mate for running mass production? Please provide a list. If you developed a design using an existing iPhone 14 tool but haven't fabricated the same tools for the 2023 iPhones yet, please provide a quotation for the cost and lead-time for fabricating these.

Please let us know if you have any questions about above. Thanks,

Saumil Mody.
V.P. - Engineering & Sourcing
+1.765.409.3883

Attachment C

# kate spade

### NEW YORK

**LETTER OF AUTHORIZATION**

**Authorized Licensee: Vinci Brands LLC**

THIS LETTER OF AUTHORIZATION confirms that the Authorized Licensee identified below is permitted to engage in the Authorized Activity (described below) for the Authorized Items (described below) pursuant to an ongoing business relationship and licensing arrangement.

**Kate Spade LLC**, a subsidiary of Tapestry, Inc., is the sole and exclusive owner worldwide of the Kate Spade New York brand, and all associated trademarks for use in connection with handbags, luggage, small leather goods, shoes, watches, eyewear, jewelry, clothing, and other related products, accessories, and packaging (collectively, the "KSNY Brand"). These trademarks include, but are not limited to, the KATE SPADE NEW YORK and KATE SPADE word marks and the Kate Spade New York Spade Lock Up Logo (collectively, the "KSNY Trademarks").

The authorization set forth here shall not be transferred or assigned to any other person or entity without the express prior written authorization of Kate Spade LLC.

This authorization will remain in effect until **June 30, 2025**.

| | |
|---|---|
| **Authorized Licensee:** | **Vinci Brands LLC**<br>1775 Flight Way, Suite 300<br>Tustin, CA 92782 |
| **Authorized Activity:** | Develop, produce, manufacture, promote, advertise, distribute, & sell |
| **Authorized Items**: | Authentic protective technology cases and mobile accessories, and related packaging materials. |
| **Executed Authorization:** | **Kate Spade LLC**<br>2 Park Avenue<br>New York, NY 10016<br>USA<br><br>c/o<br>Tapestry, Inc.<br>10 Hudson Yards<br>New York, NY 10001<br>USA |

s/Jonathan Malki_____          Date: June 20, 2023
**Jonathan Malki**
Senior Intellectual Property Counsel & Assistant Secretary
Email: Jmalki@tapestry.com
Facsimile: + 1 212-615-2541

# EXHIBIT X



July 18, 2023

Vinci Brands LLC
Attn.: Legal Department
1775 Flight Way, Suite 300
Tustin, CA 92782

With a copy by email to Legal@vincibrands.com

Re: **Notice of Termination - Supplemental**

To whom it may concern:

Reference is made to the terminated license agreement, dated April 25, 2014, between Coach Services, Inc., for the benefit of the kate spade new york brand, ("KSNY") and Vinci Brands f/k/a Incipio, LLC ("Vinci") as amended (the "License Agreement"). Capitalized terms used but not defined in this letter have the respective meanings given to such terms in the License Agreement. Each of Licensor and Licensee is a "Party" and are collectively the "Parties."

As you know, Kate Spade terminated the License Agreement by its Notice of Termination, dated June 14, 2023, due to Vinci's uncured failure to pay all required amounts. Kate Spade's termination of the License Agreement due to Vinci's persistent non-payment was, and remains, valid.  We are writing to advise you that Kate Spade has additional grounds for termination of the License Agreement.  As discussed below:

*first*, upon information and belief, Kate Spade provides notice that there was an ***automatic termination*** of the License Agreement under Sections 3.3(d) and 3.5 as early as February 2023, well-before the June 14th termination of the License Agreement.

*second*, upon information and belief, Kate Spade provides notice of termination of the License Agreement under Section 3.5 as a result of Vinci having intentionally concealed its material default and breach under Sections 3.3(d) and 3.5 from Kate Spade, as well as its material breach of Section 3.6(a) (discussed below), 11.8,[1] and 11.10. Section 3.3(d) of the License Agreement provides that Vinci is in default if it "defaults, subject to applicable cure or waiver provisions, on any obligation in excess of $1,000,000 which is secured by a security interest in Licensed Merchandise." In addition, Section 3.5 states that "in the event of default under Section[ ] 3.3 . . . (d) . . ., ***this Agreement will terminate automatically***."

Based on information provided in the Third Declaration of Steve Latkovic ("Latkovic Dec.") filed with the U.S. District Court for the Southern District of New York, submitted in further support of Plaintiff's Motion for a Preliminary Injunction, Temporary Restraining Order ("Vinci's Motion") in *Vinci Brands LLC v. Coach Services, Inc. et al*., 1:23-cv-05138-LGS (the "Vinci Action") and in Vinci's Reply Brief in Support of Vinci's Motion in the Vinci Action, Kate Spade believes the agreement automatically terminated, possibly as early as February 2023.

---

[1] Section 11.8 expressly requires that Vinci "pay punctually and discharge when due … any indebtedness" except where such debt is less than $1 million or is subject to a bona fide dispute.

Notably, in both the Latkovic Dec. and the Reply Brief filed in the Vinci Action, Vinci admitted that in February 2023, Vinci defaulted on its loan obligations to its then-creditor Siena Lending Group LLC:

> As a result of this cash squeeze and shortage, Vinci was unable to make certain payments to its lender, Siena Lending Group, LLC ("Siena") such that Siena, on February 10, 2023, issued a Notice of Event of Default and Reservation of Rights to Vinci … notifying Vinci that Siena deemed Vinci in default of its payment obligations under a Loan Agreement between Siena and Vinci. (Latkovic Decl., ¶ 51)

Siena's loan to Vinci was for at least $28 million, far in excess of $1 million dollars (Latkovic Decl., Ex. 1-I). Further, Siena's loan was also secured by a security interest in the Licensed Merchandise (*See* Licensor Consent Agreement dated November 23, 2021, ¶ 1, 4-5) (attached as Exhibit 1). For more than five months, Vinci concealed from Kate Spade its default to Siena and its breach of the License Agreement. Now that Vinci has admitted its default and breach, it is clear that there was an automatic termination of the License Agreement, as far back as February 2023, long before June 14th.

***This letter therefore serves as notice of the automatic termination of the License Agreement pursuant to Sections 3.3(d) and 3.5 as of February 2023, well before June 14, 2023.***

Vinci is, again, reminded that it is not authorized to take any further action with respect to the manufacture, distribution, promotion, or sale of Licensed Merchandise or to otherwise take any action with respect to the Licensed Marks except as provided under Section 12 of the License Agreement – including, without limitation holding itself out as a licensee of Kate Spade, when it plainly is not.

Section 3.6(a) further prohibits Vinci from taking any actions with respect to the Licensed Marks and Kate Spade brand, and further underscores that Vinci breached the License Agreement not just by defaulting on its loan to Siena, but also in concealing the breach from Kate Spade:

> "Notwithstanding anything to the contrary herein, if [Vinci] defaults … on any obligation in excess of the amount set forth in 3.3(d) above which is secured by a security interest in any Licensed Merchandise automatically and simultaneously therewith [Vinci] no longer shall have the right to sell or otherwise transfer Licensed Merchandise or otherwise use the Licensed Mark(s) until: (i) its notifies Licensor in writing of the occurrence of such default on any such obligation; and (ii) Licensor notifies it in writing that Licensor has elected to waive its right under Section 3.3(d) to terminate this Agreement by reason thereof."

Vinci failed to properly notify Kate Spade of its default under Section 3.3(d) and material breach of Section 3.3(d) and in any event Kate Spade never waived its rights to terminate. In addition, Vinci's default to Siena—causing Siena to exercise its remedies under its loan—and Vinci's deliberate concealment of such default from Kate Spade constituted still another material breach, in this case of Section 11.10 of the License Agreement.[2]

---

[2] Section 11.10 provides that "[w]ith respect to any indebtedness for borrow money by Licensee that is secured by a first priority security interest in any of the Licensee's assets, Licensee shall not cause or suffer to exist any event of

Accordingly, for all the reasons set forth in its Notice of Termination and this Notice of Termination – Supplemental, the License Agreement is conclusively and irrevocably deemed terminated, as long ago as February 2023, well before June 14, 2023.

Kate Spade also reserves all its rights with respect to Vinci's concealment of its default to Siena and of any additional breaches resulting from that concealment, default, and/or Vinci's failures to comply with provisions of the License Agreement, including Section 3.6(a), Section 11.8, and Sections 12.1 through 12.4, applicable as a result of such default.

This letter is sent without waiver of or prejudice to any rights, remedies, claims, or defenses that Licensor may have with respect to the License Agreement or at law, all of which are expressly reserved.

Sincerely,

**Coach Services, Inc.  (For kate spade new york)**

By: _____
Charlotte Warshaw
V.P., Global Licensing & North America Wholesale
kate spade new york

Cc:     Jason Bingham
        Chief Financial Officer
        Vinci Brands LLC

        Steve Latkovic
        Managing Director
        Candlewood Partners, LLC

        Jackee de Lagarde
        Vice President, Global Licensing
        kate spade new york

        Amy Melican
        Vice President, Deputy General Counsel
        Tapestry, Inc.

        Jonathan Malki
        Director, Senior Counsel
        Tapestry, Inc.

---

default under such indebtedness as a result of which the lender shall have accelerated such indebtedness or exercise any remedies of lender against such Licensee assets. Licensee shall promptly notify Licensor in writing in the event that a lender (i) delivers written notice of default to Licensee under such indebtedness and (ii) as a result of such default, has accelerated such indebtedness or has exercised such default remedies against any Licensee assets."

**Exhibit 1**

DocuSign Envelope ID: F6633DEB-8948-40A3-862C-8105EF693BF0

# LICENSOR CONSENT AGREEMENT

This LICENSOR CONSENT AGREEMENT ("**_Agreement_**"), entered into this 23 day of November, 2021 by and among **COACH SERVICES, INC.,** a Delaware corporation with its principal place of business at 10 Hudson Yards, New York, NY 10001, on behalf of the Kate Spade New York brand (the "**_Licensor_**"), **VINCI BRANDS LLC**, a Delaware limited liability company with its principal place of business at 600 Superior Ave., #1800, Cleveland, OH 44114 ("**_Licensee_**"), and **SIENA LENDING GROUP LLC** (together with it successors and assigns, "**_Lender_**"), having a mailing address at 9 W Broad Street, Stamford, 6th Floor, CT 06902.

WHEREAS, Licensor has entered into a License Agreement on behalf of the Kate Spade New York brand with Licensee dated April 25, 2014, as amended by the First Amendment to License Agreement dated August 31, 2015, the Second Amendment to License Agreement dated January 16, 2017, the Third Amendment to License Agreement dated November 28, 2019, the Fourth Amendment to License Agreement dated November 13, 2019, the Fifth Amendment to License Agreement dated July 1, 2020, and the Sixth Amendment to License Agreement with an effective date of January 1, 2022 (as amended, modified, replaced or restated from time to time, the "**_License_**");

WHEREAS, Licensee entered into a certain Loan and Security Agreement among Lender, Licensee and certain other entities dated as of August 6, 2021 (as the same has been and may be amended or otherwise modified or replaced from time to time, the "**_Loan Agreement_**"), pursuant to which Licensee granted to Lender a security interest in, among other things, its existing and future inventory, including all Licensed Products, which for the purposes hereof, means and includes inventory subject to the License regardless of the extent to which such inventory is subject to any patent, trademark or other intellectual property rights of Licensor or whether any logo, brand, design, name, or mark of Licensor appears on such inventory, and accounts receivable and general intangibles (including the rights arising under the License); and

WHEREAS, Lender and Licensee desire to set forth certain terms and conditions applicable to any enforcement by Lender of its security interest in the Licensed Products and License.

NOW THEREFORE, with the foregoing background incorporated herein by reference, in consideration of the premises and other good and valuable consideration, the sufficiency of which is hereby acknowledged, and notwithstanding any provision in the License which may be to the contrary, the parties agree as follows:

1.      Licensor acknowledges and consents to the grant by Licensee to Lender of a security interest in, and collateral assignment of the rights under, the Licensed Products and the License.

2.      Licensor confirms that (a) the License is presently in effect, (b) the current term of the License presently expires on June 30, 2025, and (c) it has no knowledge of any outstanding breach or default by Licensee under the License.

3.      Licensee agrees to deliver to Lender a copy of any notice of default or termination under the License upon receipt of such notice (such notice, a "Default Notice"). Such Default Notice shall specify what default(s) is/are outstanding. Subject to the terms of Section 3.3(a) of the License Agreement (except that Lender shall have 3 business days from its receipt of the Default Notice to cure such default), on the first instance of Licensee's failure to pay any funds owing to Licensor, Lender shall have the option (but not the obligation) to effect a cure of such monetary default by Licensee under the License, prior to termination of the License.

140690.01121/126660556v.8

4.    (a) Lender agrees that it will notify Licensor in writing, consistent with the terms of Section 20.1 of the License Agreement as amended, and via email to one or more addresses if designated by Licensor to Lender ("***Enforcement Notice***") in the event that Lender elects to exercise its rights under this ***paragraph 4***.  Such Enforcement Notice may be given, and Lender's rights hereunder may be exercised regardless of whether Lender has taken possession (which it shall have the option to do) of the Licensed Products and regardless of whether Licensee is in default under the License.  Licensor acknowledges and agrees that at any time following the occurrence of any Event of Default under the Loan Agreement, Lender shall have the option, in its sole discretion, to exercise any and all rights and remedies Lender may have with respect to the Licensed Products under the Loan Agreement or related agreements, or under the Uniform Commercial Code, or any other applicable law, including (without limitation) the following:

i)    Lender may take possession of all or a portion of the Licensed Products;

ii)    Subsequent to Lender delivering an Enforcement Notice to Licensor, Lender may contact, send notices to, and communicate with, any Approved Customer or Approved Distributor for the purpose of selling Licensed Products to such Approved Customer or Approved Distributor; provided that in no event at any time shall Lender directly advertise for sale (whether by general solicitation or otherwise) any Licensed Products to end-user consumers (other than general sales of Licensed Products through Licensee's E-Commerce Website (including without limitation Incipio.com);

iii)    Lender may monetize the Licensed Products in whole or in part from time to time subject to Section 4(b)(ii); and

iv)    All collections of accounts receivable generated from the Licensed Products shall be free and clear of any rights, claims or interests of Licensor and Licensor shall have no rights, claims or interests in any proceeds of the Licensed Products, subject to Lender's payment obligations under ***paragraph 4(b)(ii)***.

(b) Notwithstanding anything to the contrary contained in this Agreement, the following provisions shall apply to Lender's right to monetize the Licensed Products:

i)    Licensor shall have the option, in its sole discretion, to purchase any of the Licensed Products prior to Lender taking any further action to monetize such Licensed Products, as follows:

(1)  Lender shall provide Licensor a complete list of the Licensed Product ("***Product List***") together with any Enforcement Notice, or if not immediately available to Lender, ten (10) U.S. business days from the date of delivery of such Enforcement Notice (or such later time as Licensor agrees in its reasonable discretion);

(2)  Within ten (10) business days from receiving the Product List, Licensor shall provide written notification to Lender ("***Licensor Notice***") which Licensed Products, if any, it will purchase;

(3)  The price for any Licensed Product purchased by Licensor under this Section 4(b) shall be as set forth in Schedule 4.4 of the License as amended (and for purposes of clarity, sales to Licensor shall not incur any royalty fees); and

(4)  Licensor shall pay Lender for Licensed Product upon receipt by Licensor of such Licensed Product, complete with such invoices and/or shipping receipt as is customary.

DocuSign Envelope ID: F6633DEB-8948-40A3-862C-8105EF6936E0

ii)      Lender shall only monetize the Licensed Products: (1) in the Territory, as set forth in Schedule 1.1. of the License, (2) by sale to the Approved Customers and Approved Distributors and through Licensee's E-Commerce Website (including without limitation Incipio.com), in each case, pursuant to Schedule 4.1 of the License, and (3) consistent in all respects with the Approved Marketing and Advertising parameters, as set forth in Section 7 of the License.  Lender further agrees that its monetization of Licensed Products (except with respect to any sale to Licensor pursuant to Section 4(b)(i) above) is subject to payment of: (A) all amounts due under Schedule 9 (Sales Royalty), plus (B) a payment in the amount of five percent (5.0%) of the net cash proceeds received by Lender in connection with the sale of Licensed Products (which payment is on account of any Image Fund (4%) and/or Creative / Design Fee (1%) owing to Licensor).

5.      Lender agrees that in the event it exercises its rights under ***paragraph 4*** above, Lender will pay to Licensor all amounts set forth in Section 4(b)(ii) above and all royalties due under the License as set forth in Section 4(b)(ii) relating to and arising only from the Licensed Products and calculated in accordance with the License only (as in effect on the date hereof) with respect to actual Licensed Products monetized by Lender.  No license, royalty or other fees shall be owing with respect to any Licensed Products which may be acquired by Licensor.  Notwithstanding anything to the contrary contained herein, Lender shall not be liable to Licensor for any fees or royalties with respect to the sale or monetization of Licensed Products except as set forth in Section 4(b)(ii) and Lender shall not be liable for any minimum guaranteed royalties or any other minimum guaranteed payment set forth in the License; provided however that nothing herein shall limit Licensee's obligations to Licensor under the License.

6.      Nothing in this Agreement shall relieve the Licensee from its obligations and liabilities under the License.

7.      Nothing contained herein shall be deemed to constitute Lender as a licensee except to the extent Lender is obtaining or deemed to be obtaining pursuant to the terms of this Agreement a nonexclusive license to utilize intellectual property rights of Licensor to exercise its rights and carry out the terms hereof.  Lender shall not be deemed to have assumed or otherwise be responsible or liable for any duties, undertakings or obligations (whether royalty fees or otherwise) of any kind or nature of Licensee at any time.  In the event Lender exercises its rights hereunder, Lender's sole obligation to Licensor is set forth in ***paragraphs 4 and 5*** above and Lender shall not have any other liability, duty or responsibility of any kind to Licensor.  Nothing herein contained is intended to (a) restrict, impair or affect Lender's rights with respect to any assets of Licensee other than the Licensed Products and the License, (b) compel Lender to exercise its rights hereunder in whole or in part, (c) compel Lender to return, destroy or otherwise deal with any Licensed Products not sold by Lender, (d) limit or restrict Lender from providing any notices to any secured party or other obligor of the sale, disposition or foreclosure of Licensee's assets or property to the extent such notices are required by, or necessary to comply with, the Uniform Commercial Code or applicable law; or (e) exercise its rights in any order with respect to any of the Licensed Products.  All rights and remedies of Lender hereunder or with respect to the Licensed Products are cumulative.

8.      This Agreement represents the entire agreement between the parties with respect to the subject matter contained herein and supersedes any prior or contemporaneous agreement, whether written or oral on such subject matter.  No provision of this Agreement may be waived or modified except in writing signed by the party against whom enforcement is sought.  This Agreement shall inure to the benefit of Lender and its successors and assigns.  This Agreement, and all matters arising out of or relating to this Agreement, shall be construed in accordance with the laws of the State of New York without regard to conflict of law principles. Any disputes arising out of this Agreement shall be submitted to the State and Federal courts located in the City, County, and State of New York.  This Agreement may

3

be executed in any number of counterparts, which, taken together, shall constitute one original document. Signature by facsimile or PDF will bind the parties hereto.

9.      Any communications or notices to be given or sent to any of Licensor, Licensee or Lender pursuant to the terms hereof may be sent to the appropriate party at the address of such party set forth in the preamble hereto (or as otherwise instructed by any party hereto by written notice to the others) either by hand delivery or by nationally recognized overnight courier, and shall be deemed to have been given on the date actually so delivered (if sent by hand delivery) or one (1) business day after delivery to the overnight courier (if sent by overnight courier).

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, and intending to be legally bound, the parties hereto have executed this agreement as of the date first written above.


**LICENSOR:**                                **COACH SERVICES, INC**

By: _Charlotte Hillman Warshaw_
    77502402FB904BE...
    _____

Name:    Charlotte Hillman Warshaw

Title:    VP of Americas Wholesale and Global Licensing


[Signature Page to Licensor Consent Agreement]

**LICENSEE:**                                        **VINCI BRANDS LLC**

By: _____

Name:  Brian Stech

Title:  Chief Executive Offcer

[Signature Page to Licensor Consent Agreement]

**LENDER:**

**SIENA LENDING GROUP LLC**

By: _____

Name: Keith Holler

Title: Authorized Signatory

By: _____

Name: Steven Sanicola

Title: Authorized Signatory

[Signature Page to Licensor Consent Agreement]

# EXHIBIT Y
# (FILED UNDER SEAL)