**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| VINCI BRANDS LLC,<br><br>               Plaintiff,<br><br>     v.<br><br>COACH SERVICES, INC., KATE SPADE, LLC, TAPESTRY, INC., and CASE-MATE, INC.,<br><br>               Defendants. | Civil Action No. 1:23-cv-05138-LGS-VF |

**PLAINTIFF VINCI BRANDS LLC'S REPLY IN SUPPORT**
**OF ITS MOTION FOR LEAVE TO FILE A THIRD AMENDED COMPLAINT**

## I. PRELIMINARY STATEMENT

Case-Mate uses 12 of the 21 pages of its brief trying to spin its own self-serving narrative about this case that bears no resemblance to reality. But the supposed "facts" Case-Mate leans on so heavily lie outside the four corners of Vinci's proposed Third Amended Complaint ("TAC"), and are thus entirely irrelevant to the question of whether Vinci's proposed amendments would be futile. As Case-Mate acknowledges, "leave to amend will be denied as futile only if the proposed new claim cannot withstand a 12(b)(6) motion to dismiss for failure to state a claim." Opp. at 13 (quoting *Milanese v. Rust-Oleum*, 244 F.3d 104, 110 (2d Cir. 2001) (citation omitted)). What Case-Mate fails to acknowledge, though, is that in assessing whether a new claim can withstand a 12(b)(6) motion to dismiss, a court must look only to the facts alleged in the complaint, assume them to be true, and draw all reasonable inferences in favor of the party proposing the amendment.

Surely Case-Mate's counsel know this. The fact that they nevertheless chose to spend well over half of their brief presenting their own (false) version of events rather than dealing with the facts alleged in the TAC is therefore telling: they know that the facts alleged in the TAC are more than sufficient to withstand a 12(b)(6) motion to dismiss, and so attempt to divert the Court with their own version of events. This gambit should be rejected. Case-Mate bears the burden of proving that the amendments would be futile, *Xerox Corp. v. Lantronix, Inc.*, 342 F.Supp.2d 362, 370 (W.D.N.Y. 2018), and it has plainly failed to do that. Vinci's Motion for Leave to Amend should therefore be granted.

## II. FACTUAL BACKGROUND

For the past ten years, Vinci (formerly Incipio) held something Case-Mate desperately wanted — a License Agreement with Kate Spade. TAC ¶ 3. When Vinci fell on hard times due to worldwide supply-chain failures and a shortage of new phones needing cases, Case-Mate used its posture as a potential buyer of Vinci's assets to mine Vinci for confidential business information

1

regarding Vinci's License Agreement and its efforts to prepare for the iPhone 15 launch. *Id.* at ¶ 24. Even as the Case-Mate executive team gleaned key information from Vinci's confidential documents and obtained information about Vinci's suppliers and customers, its CEO and Vice President of Business Development aggressively pursued a relationship with the Kate Spade Defendants. *Id.* at ¶¶ 23-24. Using knowledge from the VP's time at Vinci/Incipio, Case-Mate scored a meeting with Kate Spade licensing executives. *Id.* at ¶ 119.

From there, the plan took shape quickly. To maintain access to Vinci's documents as the Kate Spade Defendants pushed Vinci towards launch, Case-Mate continued to string Vinci along in the guise of a good-faith purchaser. *Id.* at ¶ 24. To give itself leverage, it bought Vinci's debt and put a stranglehold on Vinci's available cash. *Id.* at ¶ 25. In the Spring of 2023, Kate Spade clandestinely decided to terminate Vinci, and, critically, to conceal that decision until June 14, 2023. *Id.* at ¶ 27. By not telling Vinci what was coming, Kate Spade and Case-Mate ensured that Vinci continued to work with its suppliers and customers to make launch so that Case-Mate could take over at the eleventh hour and reap all the benefits of Vinci's preparatory work, while Vinci incurred all the costs. *Id.* at ¶ 21.

Vinci's license was non-exclusive, and Case-Mate could have gotten into the Kate Spade tech accessory business without triggering this lawsuit. *Id.* at ¶ 39. But becoming a Kate Spade licensee was not enough for Case-Mate. It also wanted to take out Vinci, a primary competitor, at its moment of weakness (which Case-Mate knew about in detail, from its purported "due diligence" access to all of Vinci's books). *Id.* at ¶¶ 24, 172, 175.  It used its new status as lender to starve Vinci of key funding, even for payroll and amounts due to vendors and creditors, including Kate Spade. *Id.* at ¶ 198. Its executive team, in discussions that have been only begrudgingly produced, chafed at the idea that Vinci would continue to exist, or that it had any right to use any

dollars from its accounts receivable: one of its executives wrote on May 26, 2023, "I want to slaughter the pig, not keep feeding it." (CM058785.)

Sure enough, only nine days after acquiring the Siena Loan, Case-Mate announced that it was dropping the axe on Vinci, holding a public auction of the loan's "collateral," including Vinci's inventory of Kate Spade-branded merchandise. *Id.* at ¶ 26. The "slaughter" was carefully planned: Case-Mate organized the auction in a manner that ensured no other party would be able to bid on the collateral, allowing it to purchase the Kate Spade-branded merchandise for pennies on the dollar and then sell it as the new Kate Spade licensee. *Id*. (This ploy failed only because of the arrival of new funding from ACS, which gave Case-Mate a windfall by paying off the loan in full.) *Id.* at ¶ 152.

Despite the fact that both Vinci and Case-Mate had non-exclusive license agreements—Case-Mate undertook to spread the message to Vinci's suppliers and customers that Case-Mate was now the *exclusive* licensee and Vinci had no authority to produce or sell Kate Spade-branded merchandise. *Id.* at ¶¶ 28, 236-257. It did this purely to crush its competition and to take over Vinci's business, since there was no possible way Case-Mate could make the September iPhone launch on its own at that late date. *Id.* at ¶ 138. Thus, Case-Mate requested a letter of authorization from the Kate Spade Defendants that it could disseminate to Vinci's customers and suppliers, claiming that Case-Mate was now the only authorized licensee, and pressuring them to switch their business to Case-Mate. *Id.* at ¶ 244. The confusion created by these deceptive communications brought Vinci's business to a grinding halt—manufacturers and customers canceled orders and refused to do business with Vinci absent express authorization from Kate Spade — authorization Kate Spade was required to give even after Vinci's termination, but refused to provide until it was ordered to do so by the Court later that year. *Id.* at ¶¶ 256-258; 256; 267-277.

3

In the end, Case-Mate got what it wanted: the Kate Spade License Agreement and elimination of its competitor, Vinci. This action was brought to provide appropriate compensation for all the Defendants' violations of the relevant contracts and the common law. And the amendments are justified because discovery to date has revealed facts and torts that Vinci did not know about when it filed its earlier complaints.

### III.  ARGUMENT

Case-Mate's self-serving recitation of its version of the facts is irrelevant to the Motion. Determinations of futility on a motion for leave to amend are made under the same standard as that used under Rule 12(b)(6): that is, "without resort to any…evidence [outside the face of the complaint]." *7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*, 314 F. Supp. 3d 497, 502, n.2 (S.D.N.Y. 2018), *aff'd*, 771 F. App'x 498 (2d Cir. 2019). Furthermore, "[a]s with a motion to dismiss, the court must accept as true all well-pleaded facts and draw all reasonable inferences in the moving party's favor." *Prose Shipping Ltd. v. Integr8 Fuels Inc.*, No. 21-CV-341 (VSB), 2022 WL 280456, at *2 (S.D.N.Y. Jan. 31, 2022).

Thus, the pertinent question is not how Case-Mate perceives reality, but whether, on its face, the TAC plausibly states a claim for relief. The answer is "yes." Case-Mate's attempt to transform this motion for leave to amend into a motion for summary judgment is procedurally improper, and any reference to cherry-picked or manufactured evidence beyond the proposed TAC and its exhibits should be disregarded.

#### A. *The Third Amended Complaint States A Claim For Fraud.*

Case-Mate relies heavily on its improper extrinsic evidence in trying to stymie Vinci's well-pled claim for fraud. Its leading argument is that the Court should not allow Vinci to file the TAC because "it is riddled with inaccuracies and misstatements of the evidence and testimony," and "presents the Court with a farcical story of betrayal and schemes to destroy." Opp. at 13. Without

4

so much as a pinkie-swear, it assures the Court that "the facts show there was no fraud or conspiracy that caused any damages to Vinci." *Id.* But as discussed above, Case-Mate's version of the facts is irrelevant.

Case-Mate does not confront the TAC's allegations that support Vinci's fraud claim because those allegations make plain that the claim is well-pled. Vinci has alleged with particularity that (1) Case-Mate scoped out Vinci as its target for "slaughter" under the guise of due diligence in connection with a potential acquisition of Vinci's business; (2) Case-Mate never disclosed to Vinci during this process that it was negotiating a license agreement with Kate Spade to take over the license from Vinci; (3) in particular, Case-Mate's CEO Steve Marzio and its Vice President of Business Development Kristen Roney hid this fact from Vinci during their diligence-related discussions; (4) Vinci would not have pursued any transaction, or given any of its information to Case-Mate had it known of these facts; and (5) Case-Mate needed to hide its scheme with Kate Spade from Vinci so that Vinci would continue preparing for the iPhone 15 launch, allowing Case-Mate to step into Vinci's shoes at the last minute and meet the launch date (with all the associated revenue). *See* TAC ¶¶ 136-185, 464-69.

Case-Mate next asserts that Vinci's fraud claim is duplicative of its breach of contract claim, "making amendment futile." Opp. at 15. But as is plainly stated in the TAC, Vinci's fraud claim is based on allegations that Case-Mate's failure to disclose that it was negotiating, and ultimately entered into, a license agreement with Kate Spade fraudulently induced Vinci to pursue a potential acquisition by Case-Mate, enter into the non-disclosure agreements with Case-Mate, and send Case-Mate its most sensitive and confidential business information, including information that helped Case-Mate step into Vinci's shoes for the iPhone 15 launch. *See* TAC ¶¶ 168, 171-77, 464-70. As explained in depth in Vinci's opening brief, these issues are both collateral

5

to the non-disclosure agreement and premised on Case-Mate's superior knowledge in inducing Vinci to execute and perform under the agreement, and are therefore not duplicative of Vinci's contract claims. *See BJB Ltd v. iStar Jewelry LLC*, 533 F. Supp. 3d 83, 102-103 (E.D.N.Y. 2021) (holding that fraud claim could proceed alongside contract claim because post-contractual misrepresentations of present fact were collateral to the agreement); *First Bank of Am. v. Motor Car Funding, Inc.*, 257 A.D.2d 287, 292 (1st Dep't 1999) (holding that repeated misrepresentations concerning present facts during the course of the parties' contract made to induce plaintiff's performance constituted fraud).

Next, Case-Mate argues that Vinci has not alleged that Case-Mate had a duty to disclose. Case-Mate claims that because the Second Confidentiality Agreement covered only Case-Mate's diligence into Vinci's Incase brand, which does not manufacture or sell Kate Spade branded goods, Case-Mate had no duty under the "special facts" doctrine to disclose its plan to enter into a license agreement with Kate Spade. Opp. at 16. While Vinci disputes that the Second Confidentiality Agreement was so limited, Case-Mate's argument regarding the scope of the Second Confidentiality Agreement is self-defeating. If, as Case-Mate claims, the Second Confidentiality Agreement applied only to the exchange of information regarding Vinci's Incase brand, then the information that Case-Mate received through deception, pertaining to Vinci's Kate Spade business, would not have been covered by the terms of that contract. If that were so, there would be no breach-of-contract claim applicable to Case-Mate's diligence into acquiring Vinci's larger business, and Vinci's argument that Case-Mate defrauded it during that diligence would necessarily not be duplicative of a breach-of-contract claim. Nor would the two causes of action involve the same damages.

Vinci's proposed pleading falls squarely within the standard for a situation creating a noncontractual duty to disclose important information. *E.g.*, *Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 244 (S.D.N.Y. 2006) (duty exists collateral to contract duties (i) "where the party has made a partial or ambiguous statement"; (ii) "when the parties stand in a fiduciary or confidential relationship with each other"; or (iii) "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge."). As explained in Vinci's opening brief, the TAC alleges that Case-Mate had a duty to disclose its impending agreement to replace Vinci as the Kate Spade licensee while it was performing due diligence to acquire Vinci — a duty not arising from the Second Confidentiality Agreement — because it had superior knowledge and knew that Vinci was acting to its own detriment on the basis of a mistaken belief. Br. at 13; *see also e.g.*, TAC ¶¶ 137 (alleging that "by early April 2023, the Kate Spade Defendants began more formal discussions and meetings with Case-Mate about replacing Vinci as Kate Spade's licensee," and that "Vinci had no reason to suspect that Defendants were colluding behind its back" for numerous reasons); 138 (alleging that it was critical that Vinci remain unaware of the scheme); 168 ("Prior to executing the Second Confidentiality Agreement, Case-Mate did not tell Vinci that it was simultaneously negotiating with Kate Spade to replace Vinci as licensee—information that would have caused Vinci not to disclose its confidential business information to Case-Mate"); 159 ("Cognizant of the fact that they could not tell Vinci it was a lame duck and was about to be terminated—Defendants endeavored to obtain information critical to Case-Mate's preparations for launch from Vinci under false pretenses"); 466-68 (explaining that Case-Mate was separately negotiating a license agreement at the time they started doing due diligence into Vinci and knew that it could not disclose that plan to Vinci, because Vinci would not have signed the Second Confidentiality Agreement had it

known). These are not contract claims. Vinci has also pled that Case-Mate made misstatements that were collateral to the Second Confidentiality Agreement. As explained in Vinci's opening brief, Case-Mate outright lied to Vinci at times about why it needed certain pieces of information and how it was going to use that information. These misstatements were misrepresentations of present fact rather than promises of future performance. *See BJB Ltd*, 533 F. Supp. 3d at102-103; *First Bank of Am.*, 257 A.D.2d at 292.

Finally, Case-Mate argues that its omissions were not collateral or extraneous to the Second Confidentiality Agreement, because (a) Case-Mate and Kate Spade had not "met in person or negotiated or agreed to any specific terms, as of April 18th"; and (b) Vinci purportedly knew that Case-Mate and Kate Spade were talking before Vinci shared its License Agreement with Case-Mate.[1] These assertions ask the Court to draw strained inferences in the defendant's favor: they might be considered in a jury trial, but are wildly out of place here. Simply put, there is nothing about a fraudulent scheme that requires an in-person meeting. A scheme can be carried out by phone, Zoom, email, or any other form of communication, and the allegations in the TAC show that Case-Mate did just that. Likewise, the assertion that Case-Mate and Kate Spade did not have a fully-baked agreement by the date the Second Confidentiality Agreement was signed is irrelevant to the sufficiency of the allegations in the TAC. The TAC alleges that Case-Mate and Kate Spade began discussing replacing Vinci as the Kate Spade licensee when they signed an NDA on March 16, 2023, and by April 13, Kate Spade was already funneling to Case-Mate key information it needed to take over for Vinci. TAC ¶¶ 136-37, 141. These are well-pled allegations supporting Vinci's fraud claim, and Case-Mate's continued reliance on "facts" that are neither alleged in the

---

[1] In order to properly plead a fraud claim alongside a breach of contract claim, Vinci may show *either* that Case-Mate had a duty to disclose separate from its duty under the contract *or* that Case-Mate's omissions and misstatements were collateral to the contract, but it need not show both. *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996).

TAC nor in documents incorporated by reference therein is an improper attempt to turn this motion to amend into an adjudication on the merits. [2] There is no basis under the Rule 12 standard to block the filing of Vinci's fraud claim; the Motion to Amend should be granted,

### B. *The Third Amended Complaint States A Claim For Civil Conspiracy.*

Allegations of conspiracy are proper when they show that substantive tortious acts flowed from a common scheme or plan and connect each defendant with an actionable injury. *Innovative Networks, Inc. v. Satellite Airlines Ticketing Centers, Inc.*, 871 F. Supp. 709, 731 (S.D.N.Y. 1995). The TAC alleges that Case-Mate and the Kate Spade Defendants worked together to defraud Vinci, steal its relationships, and deprive it of the fruits of its License Agreement. But the conspiracy claim is important, because it is possible that only KSNY, and not Case-Mate, will be held to have had a duty of disclosure to Vinci. In that scenario, the civil conspiracy claim, pled in the alternative, will ensure that Case-Mate is nonetheless held responsible for its role in the purposeful and sustained fraud that helped cripple its competitor. *See* Fed. R. Civ. P. 8(d)(2); *Almazan v. Almazan*, No. 14-CV-311 AJN, 2015 WL 500176, at *13, n.4 (S.D.N.Y. Feb. 4, 2015) ("The Federal Rules expressly allow for pleading in the alternative.").

Vinci sufficiently pleads a civil conspiracy claim against Case-Mate. The underlying tort that supports this claim is the Kate Spade Defendants' fraud. Vinci alleges that Case-Mate joined with Kate Spade in a common scheme or plan for the Kate Spade Defendants to commit fraud against Vinci by hiding key facts about its plan to replace Vinci with Case-Mate. This deception caused Vinci to spend time, money, and resources preparing for the launch, which it would not have done if it had known that the conspirators planned to prevent Vinci from participating in the launch itself and would let Case-Mate reap the benefits of Vinci's work. TAC ¶¶ 490-491. The

---

[2] The Court should disregard Case-Mate's argument regarding Vinci's knowledge of Case-Mate and Kate Spade's communications for the same reason.

9

Defendants agreed that Kate Spade would deceive Vinci so that Vinci would continue to perform launch work. *Id.* ¶ 489. Along the way, Case-Mate committed an overt act by directing the Kate Spade Defendants to seek confidential information from Vinci under false pretenses for Case-Mate's own use, which the Kate Spade Defendants did. *Id.* ¶ 490. And Vinci was plainly damaged by the fraud conspiracy — indeed, Case-Mate acted out of a stated desire to "slaughter the pig" and eliminate a competitor. *Id.* ¶ 491; CM058785. All these elements are properly pled, with supporting facts that are not just plausible but indeed have already been proven in discovery; accordingly, the Third Amended Complaint plausibly states a claim for civil conspiracy and amendment would not be futile.

### C. *The Third Amended Complaint Strengthens Vinci's Already Sufficient Claims.*

The Third Amended Complaint does not seek to amend the remaining claims against Case-Mate, so Case-Mate's discussion of these claims is superfluous. Nevertheless, to the extent the Third Amended Complaint bolsters the factual support for the remaining claims, it does so to conform to the evidence and not because the Second Amended Complaint was in any way deficient. Case-Mate purports to incorporate its mooted motion to dismiss. But that Motion was and is meritless, for reasons already explained. *See* ECF 225 (Vinci's Opp. to Case-Mate's Motion to Dismiss the Second Amended Complaint).

### IV.    CONCLUSION

For the foregoing reasons, and the reasons set forth in its opening brief, Vinci respectfully requests that the Court grant the Motion.

| | |
|---|---|
| Dated: August 2, 2024 | Respectfully submitted,<br><br>By: *s/Michael Vatis*<br>Michael Vatis<br>James E. von der Heydt (admitted PHV)<br>Susan M. White (admitted PHV)<br>Caroline R. Hamilton (admitted PHV)<br>**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**<br>1155 Avenue of the Americas, 26th Floor New York, NY 10036<br>Tel: 646.593.7050<br>mvatis@beneschlaw.com<br>jvonderheydt@beneschlaw.com<br>swhite@beneschlaw.com<br>chamilton@beneschlaw.com<br><br>Paul Del Aguila (admitted PHV)<br>Dickinson Wright<br>55 W. Monroe St. Suite 1200<br>Chicago, IL 60603<br>Tel: 312-641-0060<br>Pdelaguila@dickinson-wright.com<br><br>Russell Capone<br>Charles Low<br>**COOLEY LLP**<br>55 Hudson Yards<br>New York, NY 10001<br>Tel.: 212-429-6800<br>rcapone@cooley.com<br>chlow@cooley.com<br><br>*Attorneys for Vinci Brands LLC* |