UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X
                        :

VINCI BRANDS LLC,              :

                        :

             Plaintiff,  :       23 Civ. 5138 (LGS)

        -against-       :

                        :      **OPINION & ORDER**

COACH SERVICES, INC., et al.,  :

                        :

           Defendants. :

                        :
-------------------------------------------------------- X

LORNA G. SCHOFIELD, District Judge:

Plaintiff Vinci Brands LLC ("Vinci") brings this action against Coach Services, Inc.

("Coach"), Kate Spade, LLC ("Kate Spade"), and Tapestry, Inc., as well as Case-Mate, Inc.

("Case-Mate").  On November 4, 2024, Defendant Case-Mate filed its answer to Vinci's Third

Amended Complaint and asserted claims against, among others, Third-Party ACS Group

Acquisitions, LLC ("ACS").  On November 8, 2024, ACS filed its answer to Case-Mate's third-

party claims and asserted claims against Defendants Case-Mate and Kate Spade (the "ACS

Counterclaims").  Both Case-Mate and Kate Spade moved to dismiss the ACS Counterclaims

under Rule 12(b)(6) for failure to state a claim.[1]  For the following reasons, the motions are

granted in part and denied in part.

I.      **BACKGROUND**

Familiarity with the underlying facts is assumed.  *See Vinci Brands LLC v. Coach Servs.,*

*Inc.*, No. 23 Civ. 5138, 2023 WL 5950690, at *1 (S.D.N.Y. Sept. 13, 2023) (granting in part and

---

[1] On February 21, 2025, Case-Mate amended its answer, counterclaim and third-party claims,
including those against ACS.  The Court granted ACS's request that its previously filed answer
and the ACS Counterclaims be deemed to apply to Case-Mate's amended pleading and that Case-
Mate and Kate Spade's fully briefed motions to dismiss the ACS Counterclaims remain pending.

denying in part cross-motions for a preliminary injunction), *reconsideration denied*, No. 23 Civ. 5138, 2024 WL 3675938 (S.D.N.Y. Aug. 5, 2024).  The following facts are taken from the ACS Counterclaims and documents the ACS Counterclaims incorporate by reference.  *See Clark v. Hanley*, 89 F.4th 78, 93 (2d Cir. 2023).

### A.    Vinci's Credit Structure

This action arises out of Kate Spade's termination of Vinci's license, under which Vinci had been manufacturing and selling Kate Spade-branded mobile phone cases and similar products for almost a decade.  In 2021, Vinci entered into secured loan agreements with Siena Lending Group LLC ("Siena") and Monroe Capital Management Advisors, LLC ("Monroe").  Siena held the senior security interest in substantially all of Vinci's assets, including the Kate Spade license, and Monroe held a secondary security interest in the same collateral.  Under Siena and Monroe's Intercreditor Agreement, if Siena decided to sell all of its interest, then Monroe would have a right of first offer ("ROFO") to purchase Siena's interest.

### B.    Case-Mate and Kate Spade's Relationship

In 2022, Vinci's competitor, Case-Mate, started to pursue a licensing relationship with Kate Spade in Vinci's place.  The opportunity arose in late 2022, when an unprecedented shortage of iPhones heavily impacted the phone case industry and Vinci's business.  Kate Spade began to pressure Vinci about making royalty payments and on March 20, 2023, issued Vinci a Notice of Non Payment.  Meanwhile, Kate Spade and Case-Mate began confidential discussions about Case-Mate replacing Vinci as licensee.  On March 31, 2023, Kate Spade declared Vinci in default of, but did not terminate, the license agreement.

Vinci was under financial pressure and had been seeking a capital infusion.  On April 16, 2023, Vinci's investment banker contacted Case-Mate about a possible "strategic transaction."

Initially, Case-Mate explored the purchase of all or part of the Vinci business.  Unknown to Vinci, Case-Mate and Kate Spade were progressing in their discussions.  On May 1, 2023, Case-Mate and Kate Spade discussed Case-Mate's taking over Vinci's inventory and tools so that Case-Mate could make the Fall 2023 iPhone 15 launch after taking over the Kate Spade license.  By mid-May 2023, Kate Spade and Case-Mate had agreed on terms by which Case-Mate would replace Vinci as the licensee.

Around May 8, 2023, Siena was pressuring Vinci to pay off the senior loan; Kate Spade was continuing to pressure Vinci about royalty payments, but had issued approvals to Vinci for new designs; and Vinci needed cash to fund its operations.  Siena declared Vinci's senior loan in default and, on May 11, 2023, sent a notice of auction to liquidate all of Vinci's assets.  Around the same time, Case-Mate devised a plan to acquire Vinci's senior debt rather than all of Vinci's business.  As Vinci's senior creditor, Case-Mate would be able to foreclose on the inventory securing the loan, force Vinci out of business and secure the inventory for the Fall iPhone launch.

On May 16, 2023, Siena sold the senior loan to Case-Mate which became Vinci's senior lender.  Case-Mate thus acquired a first lien on the collateral, which consisted largely of the Kate Spade license agreement and Vinci's Kate Spade inventory.  Eight days later, Case-Mate began procedures to foreclose on the collateral.

### C.    ACS's Takeover

To save the company and its inventory, Vinci sought funding from ACS to pay Kate Spade the necessary royalties and pay off the senior debt to avoid an auction of Vinci's inventory.  On June 1, 2023, Vinci introduced ACS to Kate Spade.  The next day, Kate Spade had a call with ACS, in which ACS explained that it would provide Vinci the necessary capital

for the iPhone 15 launch.  But Kate Spade's only question was whether ACS would pay the $4 million Vinci owed Kate Spade.  ACS responded that Vinci disputed the amount, but ACS was confident the dispute could be resolved and that ACS would ensure that Vinci had the necessary funds to make the payment.

Although ACS was willing to pay off the senior loan, Case-Mate resisted because it wanted to obtain the collateral, which was needed for the Fall 2023 iPhone launch after Case-Mate replaced Vinci.  So, Case-Mate opted to sell the loan instead of accepting a payoff, a stalling tactic that would require the junior lender's consent and enable the auction of collateral to go forward.  When the junior lender quickly consented, Case-Mate refused to sell the loan and sought instead to auction the collateral.  On June 5, 2023, ACS prevented the auction by providing the funds to pay off the senior loan, a move that Case-Mate could not prevent.  ACS also acquired Vinci's junior loan from Monroe.

### D.    Kate Spade's Termination

On June 14, 2023, Kate Spade informed ACS that Kate Spade was terminating Vinci's license.  Case-Mate began to contact Vinci's suppliers and customers, stating that Case-Mate was the exclusive licensee and pressuring them to stop doing business with Vinci.  To facilitate its takeover of Vinci's assets, Case-Mate also used Vinci's inventory list, which Kate Spade had obtained from ACS and shared with Case-Mate.  On June 16, 2023, Vinci filed this action.

## II.    STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007));[2] *accord Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021).  It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[] . . . claims across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570; *accord Bensch v. Est. of Umar*, 2 F.4th 70, 80 (2d Cir. 2021).  Under Rule 12(b)(6), courts "accept as true all well-pleaded factual allegations, draw all reasonable inferences in the plaintiff's favor, and assess the complaint to determine whether those allegations plausibly establish entitlement to relief."  *Tripathy v. McKoy*, 103 F.4th 106, 113 (2d Cir. 2024).  A court does not consider "conclusory allegations or legal conclusions couched as factual allegations." *Dixon v. von Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021).

For issues of state law, New York law governs because the parties' submissions assume that New York law applies.  *See In re Snyder*, 939 F.3d 92, 100 n.2 (2d Cir. 2019) ("[I]mplied consent is . . . sufficient to establish the applicable choice of law[.]").

## III.    DISCUSSION

Because ACS withdrew several claims in its opposition, the remaining claims asserted in the ACS Counterclaims are: (1) fraud, asserted against Kate Spade (First Counterclaim) and Case-Mate (Second Counterclaim); (2) breach of the implied covenant of good faith and fair dealing against Case-Mate (Sixth Counterclaim); (3) tortious interference with contract against Case-Mate (Seventh Counterclaim) and (4) unjust enrichment against Case-Mate (Eighth Counterclaim).  For the following reasons, the Second and Sixth Counterclaims against Case-Mate are dismissed; the First Counterclaim against Kate Spade and Seventh and Eighth Counterclaims against Case-Mate survive.

---

[2] Unless otherwise indicated, in quoting cases, all internal quotation marks, footnotes and citations are omitted, and all alterations are adopted.

### A.    Fraud Claim Against Kate Spade (First Counterclaim)

ACS alleges two theories of fraud against Kate Spade. The first is that Kate Spade induced ACS to send Kate Spade Vinci's inventory list and other confidential information under false pretenses. The second is that Kate Spade failed to disclose its decision to replace Vinci with Case-Mate as Kate Spade's licensee, and had Kate Spade disclosed its decision, ACS would not have provided funding to Vinci. The first theory survives because it sufficiently alleges the elements of a fraud claim. The second theory is dismissed for inadequately pleading that Kate Spade had a duty to disclose its licensing decision.

Under New York law, a fraud claim has five elements:

(1) a misrepresentation or a material omission of fact, (2) which is either untrue and known to be untrue or recklessly made, (3) made for the purpose of inducing the other party to rely upon it, (4) justifiable reliance of the other party on the misrepresentation or material omission, and (5) injury.

*Golobe v. Mielnicki*, 2025 WL 864512, at *3 (N.Y. Mar. 20, 2025). Allegations of fraud must "state with particularity the circumstances constituting the fraud . . . ." Fed. R. Civ. P. 9(b). But intent and knowledge may be alleged generally. *Id.*

### 1.    False Pretenses

The ACS Counterclaims adequately plead a fraud claim against Kate Spade, alleging that Kate Spade requested and obtained Vinci's inventory list under the false pretense that Kate Spade needed the information to decide how to move forward on a potential deal with ACS and Vinci. The ACS Counterclaims allege that during ACS and Kate Spade's call on June 6, 2023, Kate Spade's representative "indicated that she was still thinking about how she wanted to move forward, but if [ACS] could send a copy of Vinci's current on-hand inventory of Kate Spade products, it would help her in her deliberations." By then, no decision remained to be made about how to move forward with Vinci, nor could the inventory list facilitate decision-making,

because, according to the ACS Counterclaims, Kate Spade had already decided to terminate Vinci and replace it with Case-Mate. Relying on Kate Spade's misstatement, ACS provided Vinci's inventory list. Kate Spade and Case-Mate then used the list to further their plan to acquire Vinci's inventory (ACS's collateral), to the detriment of ACS.

Kate Spade's argument that it was entitled to request the inventory list because it had a right to inspect the inventory produced by Vinci is unpersuasive. Section 6.11 of the License Agreement permits Kate Spade to inspect facilities used by Vinci in connection with Kate Spade-branded merchandise upon reasonable advance notice, not to obtain Vinci's inventory list immediately upon request. Section 12.1(b) of the License Agreement requires Vinci to share its complete inventory schedule, but not until thirty days after termination. Kate Spade obtained the inventory list long before Vinci was contractually obligated to provide it, thus gaining an advantage in seizing Vinci's inventory.

### 2. Fraudulent Omission

ACS's other fraud theory, based on material omissions regarding Kate Spade's licensing decision, is dismissed. The ACS Counterclaims allege that Kate Spade knew it would reach a license agreement with Case-Mate as of May 2023 and had committed to Case-Mate that Vinci's license agreement would be terminated. Yet, despite that knowledge, Kate Spade never disclosed to ACS -- including during a June 2, 2023, call between representatives of Kate Spade and ACS -- that Kate Spade had already agreed to terminate Vinci and replace it with Case-Mate as licensee and that Kate Spade had promised Case-Mate Vinci's related inventory. The ACS Counterclaims allege that while failing to disclose those facts, Kate Spade knew that ACS was going to pay off the Case-Mate loan, acquire the Monroe Loan, become Vinci's new lender and provide funding to Vinci on the premise that Vinci's license agreement would continue. The

ACS Counterclaims allege that ACS would not have taken those actions but for Kate Spade's omission.

Under New York law, when a fraud claim is based on "fraudulent omission," the complaint must allege "that the defendant had a duty to disclose material information and that it failed to do so." *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1108 (N.Y. 2011). "A duty to disclose arises in one of three circumstances: where the parties are in a fiduciary relationship; under the special facts doctrine, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge; or where a party has made a partial or ambiguous statement, whose full meaning will only be made clear after complete disclosure." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 582 (2d Cir. 2005) (New York law). Only the special facts doctrine is relevant here; the ACS Counterclaims do not plead a fiduciary relationship or any partial or ambiguous statement. They plead only arm's length discussions between Kate Spade and ACS, and the fraud allegations rely entirely on Kate Spade's omissions.

The ACS Counterclaims do not sufficiently plead a duty to disclose based on the special facts doctrine. "The special facts doctrine . . . applies only in business dealings between parties to a prospective transaction." *Merkin v. Berman*, 1 N.Y.S.3d 21, 23 (1st Dep't 2014); *accord Chartwell RX, LLC v. Inmar, Inc.*, 620 F. Supp. 3d 59, 72 (S.D.N.Y. 2022) (New York law). The doctrine also "requires satisfaction of a two-prong test: that the material fact was information peculiarly within the knowledge of one party and that the information was not such that [it] could have been discovered by the other party through the exercise of ordinary intelligence." *LMM Cap. Partners, LLC v. Mill Point Cap., LLC*, 207 N.Y.S.3d 38, 43 (1st Dep't 2024). New York courts have stated that ordinary intelligence includes, "at the very

least, a duty to inquire." *Jana L. v. W. 129th St. Realty Corp.*, 802 N.Y.S.2d 132, 135

(1st Dep't 2005).

The special facts doctrine did not require disclosure by Kate Spade to ACS for two

reasons.  First, the two entities were not engaged "in business dealings between parties to a

prospective transaction."  *Merkin*, 1 N.Y.S.3d at 23.  The ACS Counterclaims do not plead that

Kate Spade was ACS's counterparty in the transactions ACS was about to enter, namely, paying

off the Case-Mate loan, acquiring the Monroe loan and funding Vinci.  The sole alleged

interaction between ACS and Kate Spade was their June 2, 2023, conversation in which ACS

provided assurances to Kate Spade about Vinci's ability to perform its obligations to Kate Spade.

The special facts doctrine did not require disclosure by Kate Spade to ACS because of the nature

of their dealings and relationship.  *See Inmar*, 620 F. Supp. 3d at 74-75 (holding that the plaintiff

failed to plead a plausible fraud claim because "[t]here was no prospective transaction" and

therefore no duty to disclose under the special facts doctrine).

Second, the ACS Counterclaims do not plead that ACS asked Kate Spade about the

future of Vinci's license agreement.  To the extent ACS considered that agreement material to

the transactions ACS was contemplating, "ordinary intelligence" -- i.e., prudent business practice

-- should have prompted ACS to ask Kate Spade about the viability of the agreement.  *See Am.

Med. Distributors v. Macdonald Tuskey*, No. 16 Civ. 6016, 2018 WL 1478301, at *3 (S.D.N.Y.

Mar. 23, 2018) (declining to apply the special facts doctrine under New York law, in part

because one party "could have inquired prior to or at closing whether [the other party] had or

intended to take actions that would or could impair the value of its shares").

The ACS Counterclaims do not plead facts sufficient to show that Kate Spade had a duty to disclose that it planned to terminate the Vinci license agreement or that the special facts doctrine created any duty of disclosure by Kate Spade to ACS.

### B.    Claims Against Case-Mate

#### 1.    Fraud (Second Counterclaim)

The fraud claim against Case-Mate asserts that Case-Mate failed to disclose to ACS that Case-Mate had negotiated and agreed with Kate Spade to replace Vinci as Kate Spade's licensee, and that ACS relied on this omission when ACS paid off the Case-Mate loan.  The claim is dismissed for failing to plead facts showing that Case-Mate had any duty to disclose to ACS Case-Mate's licensing role with Kate Spade.  As above, a fraud claim based on "fraudulent omission," must allege "that the defendant had a duty to disclose material information and that it failed to do so." *Mandarin*, 944 N.E.2d at 1108.  The ACS Counterclaims make only the conclusory allegation that "Case-Mate had a duty and an obligation to disclose them to ACS." There are no allegations describing the source of any such duty.

ACS argues that Case-Mate had a duty under the special facts doctrine.  As with Kate Spade, this argument falls short for the same two reasons.  First, as discussed above, ACS had a duty at least to inquire and conduct due diligence about the license agreement, which ACS is not alleged to have done.  The ACS Counterclaims fail to provide any reason that Case-Mate had a duty to offer that information unprompted.  *See Silver Point Cap. Fund, L.P. v. Riviera Res., Inc.*, 155 N.Y.S.3d 155, 156 (1st Dep't 2021) (holding that the special facts doctrine did not apply to minority shareholders' fraud claims because the shareholders were "sophisticated parties" who "agreed to go forward with a transaction without either demanding access to the omitted information or assurances in the form of representations and warranties").

Second, the relationship between ACS and Case-Mate and the ultimate harm suffered by ACS, did not give rise to a duty.  The ACS Counterclaims allege that the two entities had been engaged in "business dealings between parties to a prospective transaction," *Merkin*, 1 N.Y.S.3d at 23, namely the purchase by ACS of the Case-Mate loan.  A duty to disclose might have arisen in that context, but the prospective transaction never occurred and never harmed ACS, because Case-Mate allegedly backed out, preferring to sell (to itself) the collateral at auction instead.  To avoid this outcome, the ACS Counterclaims assert that ACS acted unilaterally and simply paid off the loan in full on Vinci's behalf, which Case-Mate could not prevent.  Thus, the transaction that harmed ACS did not result from any fraudulent inducement by Case-Mate or any business deal between ACS and Case-Mate.  Instead, ACS entered into an arrangement with Vinci (not Case-Mate) to satisfy Vinci's obligation under the Case-Mate loan.  Whether these facts are viewed in terms of no duty to disclose, or no causation and reliance, the fraud claim by ACS against Case-Mate fails.

### 2.    Breach of Implied Covenant of Good Faith and Fair Dealing (Sixth Counterclaim)

The Sixth Counterclaim alleges a breach by Case-Mate of the implied covenant of good faith and fair dealing arising from the Intercreditor Agreement, which was originally between Monroe and Siena, Vinci's lenders.  Because ACS acquired the Monroe loan, ACS brings the claim as assignee of Monroe against Case-Mate as assignee of Siena.  In substance, the claim alleges that Case-Mate violated the duty of good faith by diminishing the value of the collateral underlying what had been the Monroe loan, and by taking over the license agreement and destroying Vinci's business.  The claim is dismissed because the Intercreditor Agreement does not give rise to a duty by either party to protect the collateral.

"In New York, all contracts" -- including the Intercreditor Agreement at issue here -- "imply a covenant of good faith and fair dealing . . . ." *Cordero v. Transamerica Annuity Serv. Corp.*, 211 N.E.3d 663, 670 (N.Y. 2023). "This implied covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* "No obligation can be implied, however, which would be inconsistent with other terms of the contractual relationship." *Id.* Courts "will infer that contracts include any promises which a reasonable person in the position of the promisee would be justified in understanding were included at the time the contract was made." *Id.*

Contrary to ACS's assertion, the Intercreditor Agreement does not impose on the senior lender an obligation to safeguard the collateral for the junior lender. The principal purpose of the Intercreditor Agreement was to "confirm the relative priority of [the parties'] respective security interests" and "provide for the application . . . of proceeds" consistent with those priorities. Consequently, the agreement is aimed primarily at protecting the interest of the senior lender (Case-Mate) as against the junior lender (ACS), and the agreement creates virtually no duties running from Case-Mate to ACS. The Intercreditor Agreement expressly disavows any duty of either lender "to act or refrain from acting in a manner that allows, or results in, the occurrence or continuance of an event of default." Neither party even has any duty "to advise" the other party of information regarding "circumstances bearing upon the risk of nonpayment." "[A] reasonable person in the position of [ACS] would not be justified in believing" that the Intercreditor Agreement requires Case-Mate to safeguard the junior lender's ability to collect on the loan or, specifically, to protect the collateral for the junior lender's benefit. *Cordero*, 211 N.E.3d at 671.

ACS also asserts that the U.C.C. imposed duties on the senior lender to preserve the value of the collateral for the benefit of the junior lender. However, ACS fails to identify which provisions of the U.C.C. it relies on or the scope of Case-Mate's duties under those provisions. Assuming without deciding that the source of such duties is U.C.C. § 9-207 (governing the duties of secured parties having possession of collateral, including to "use reasonable care in the custody and preservation of collateral in the secured party's possession"), the ACS Counterclaims fail to plead with particularity how Case-Mate breached those duties or how a breach of those duties supports any cause of action pleaded in the ACS Counterclaims. To the extent the ACS Counterclaims allege a breach of a duties owed under the U.C.C., that claim is dismissed.

### 3. Tortious Interference with Contract (Seventh Counterclaim)

The Seventh Counterclaim alleges in substance that Case-Mate tortiously interfered with the junior loan agreement between Vinci and ACS by driving Vinci out of business and stealing Vinci's assets, resulting in Vinci's inability to repay the loan. The tortious interference with contract claim against Case-Mate is sufficiently pleaded.

To state a claim for tortious interference with contract, a plaintiff must plead that the "plaintiff had a valid contract with [third parties]; defendants had knowledge of that contract and its relevant terms; defendants intentionally and improperly induced a breach of that contract; and plaintiff sustained damages caused by that conduct." *Sutton 58 Assocs. LLC v. Pilevsky*, 164 N.E.3d 984, 995 (N.Y. 2020). "A tortious interference with contract claim should be dismissed where the plaintiff fails to sufficiently allege that the contract would not have been breached but for the defendant's conduct." *111 W. 57th Inv. LLC v. 111 W57 Mezz Inv. LLC*, 198 N.Y.S.3d

521, 524 (1st Dep't 2023), *leave to appeal granted*, 252 N.E.3d 534 (N.Y. 2025); *accord*

*Plymouth Cap., LLC v. Montage Fin. Grp., Inc.*, 219 N.Y.S.3d 372, 376 (2d Dep't 2024).

The ACS Counterclaims allege a valid loan agreement between Vinci and ACS, which arose on June 5, 2023, when ACS acquired the Monroe junior loan. The ACS Counterclaims further allege that Case-Mate was aware of Vinci's loan obligation to ACS on the junior loan and intentionally induced Vinci's breach of those loan obligations to ACS by hindering Vinci's efforts to make permitted post-termination sales to its customers.

Case-Mate argues that because Vinci had already defaulted on its prior loan obligations to Siena and Monroe, Case-Mate's conduct could not be the "but for" cause of Vinci's defaulting on the ACS loan. This argument is unpersuasive because the ACS Counterclaims allege that Case-Mate's conduct caused not only a default under the loan agreement but also caused Vinci to breach its loan obligations to ACS. The ACS Counterclaims support an inference that, but for Case-Mate's conduct, Vinci would not have breached its loan obligation on the junior loan to ACS.

### 4.    Unjust Enrichment (Eighth Counterclaim)

The ACS Counterclaims plead unjust enrichment "in the alternative." The theory of the claim is that "Case-Mate received the benefit of having its [senior] loan repaid all while actively taking steps to destroy Vinci's business, and [replace] Vinci as Kate Spade's licensee," such that Vinci could not satisfy its obligations to ACS, which had paid off the senior debt and acquired the junior debt. The motion to dismiss the unjust enrichment claim as to the senior debt is denied.

"Unjust enrichment claims are rooted in the equitable principle that a person shall not be allowed to enrich themselves unjustly at the expense of another." *Columbia Mem'l Hosp. v.*

*Hinds*, 192 N.E.3d 1128, 1137 (N.Y. 2022).  A sufficient claim of unjust enrichment must plead

facts showing three elements, that: "(1) the other party was enriched, (2) at that party's expense,

and (3) that it is against equity and good conscience to permit the other party to retain what is

sought to be recovered."  *Id*.  As to the third element,

> to determine if it is against equity to permit a party to retain what is sought to be
> recovered, courts look to see if a benefit has been conferred on the defendant
> under mistake of fact or law, if the benefit still remains with the defendant, if
> there has been otherwise a change of position by the defendant, and whether the
> defendant's conduct was tortious or fraudulent.

*Id*.  "An unjust enrichment claim is not available where it simply duplicates, or replaces, a

conventional contract or tort claim."  *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185

(N.Y. 2012); *accord Haart v. Scaglia*, 219 N.Y.S.3d 293, 297 (1st Dep't 2024).

　　　　Here, all three elements of the claim are satisfied.  First, Case-Mate was enriched by the

benefit of receiving $9.6 million in cash in place of a possibly uncollectable debt obligation from

Vinci.  Unjust enrichment applies not only where the defendant "receives money or property, but

also where she otherwise . . . is saved expense or loss."  *Farina v. Bastianich*, 984 N.Y.S.2d 46,

49 (1st Dep't 2014); *accord Pauwels v. Bank of New York Mellon Corp.*, No. 19 Civ. 2313, 2025

WL 1880742, at *4 (S.D.N.Y. July 8, 2025).  Second, Case-Mate received the benefit at the

expense of ACS, which paid off the loan in exchange for some unspecified arrangement with

Vinci.  Third, it was inequitable for Case-Mate to receive the benefit of being freed of Vinci's

debt obligation while Case-Mate allegedly was seeking to destroy Vinci's business and replace

Vinci as Kate Spade's licensee.  Case-Mate's receipt of the benefit was unjust or inequitable

because the benefit was conferred on Case-Mate under a mistake of fact by ACS about Vinci's

future as Kate Spade's licensee; the benefit of having been paid off still remains with Case-Mate;

there has been a change of position by Case-Mate as it has now replaced Vinci as Kate Spade's

licensee (i.e., Case-Mate was enriched); and Case-Mate's conduct was allegedly tortious or fraudulent, at least toward Vinci, all at the expense of ACS which paid off the loan on behalf of Vinci.

## IV.     CONCLUSION

For the foregoing reasons, the motions to dismiss are **GRANTED in part** and **DENIED in part**.  For clarity, the surviving claims in the ACS Counterclaims are the fraud claim against Kate Spade only on the theory that Kate Spade fraudulently obtained Vinci's inventory list (First Counterclaim), the tortious interference with contract claim against Case-Mate (Seventh Counterclaim) and the unjust enrichment claim against Case-Mate (Eighth Counterclaim).

The Clerk of Court is respectfully directed to close the motions at Dkt. Nos. 673 and 676.

Dated: September 29, 2025
       New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

16